**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DARKPULSE, INC.,

        Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC and ELI FIREMAN

        Defendants.

Index No. 1:21-cv-11222 (ER)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 4

    A.    DPLS Common Shares Are a Heavily Traded Penny Stock .................................. 4

    B.    DPLS Has Extensive Experience With Issuance of Convertible Promissory Notes and Their Conversion To DPLS Common Shares of Stock ......................... 5

    C.    The FirstFire Note ............................................................................................. 6

    D.    The Amendment to the Note ............................................................................... 8

    E.    The Events of Default ......................................................................................... 8

    F.    The Conversion and the Dispute ......................................................................... 9

    G.    FirstFire Sold Half of the DPLS Shares Over The Past Two Months (42 Trading Days) ................................................................................................. 10

ARGUMENT ...................................................................................................... 11

I.    THIS APPLICATION SHOULD BE DENIED, AS DELAWARE IS THE PARTIES' EXCLUSIVE FORUM ..................................................................... 11

    A.    The Amendment to the Exclusive Forum Provision in the Note Is Valid, Was Communicated to Plaintiff, Has Mandatory Force, and Covers the Parties and Claims in this Application ................................................................ 11

    B.    DPLS Fails to Show that Enforcement of the Exclusive Forum Provision Would Be Unreasonable or Unjust ..................................................................... 13

II.    THE REQUEST FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED ....... 14

    A.    DPLS Cannot Show Irreparable Harm ............................................................... 15

    B.    DPLS Is Unlikely to Succeed on the Merits of Counts I and II ........................... 19

    C.    The Balance of Hardships Weighs in FirstFire's Favor ...................................... 24

III.    IF ANY INTERIM RELIEF IS GRANTED, DPLS SHOULD BE REQUIRED TO POST A BOND IN CASH EQUAL TO THE PRESENT TRADING VALUE OF FIRSTFIRE'S SHARES ................................................................................ 25

CONCLUSION .................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*5464 Route 212, LLC v. New York State Dep't of Transportation*,
  2020 WL 1888976 (N.D.N.Y. Apr. 16, 2020) ........................................................24

*Aiena v. Olsen*,
  37 F. Supp. 2d 303 (S.D.N.Y. 1999) .............................................................15, 16

*Alpha Capital Anstalt v. Shiftpixy, Inc.*,
  432 F. Supp. 3d 326 (S.D.N.Y. 2020) ...............................................................15

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*,
  571 U.S. 49 (2013) ...................................................................................11

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998) ........................................................................16

*Borey v. National Union Fire Ins. Co. of Pittsburgh, PA*,
  934 F.2d 30 (2d Cir. 1991) .........................................................................15

*Buffalo Forge Co. v. Ogden Corp.*,
  555 F. Supp. 892 (W.D.N.Y.), *aff'd* 717 F.2d 757 (2d Cir. 1983) ...........................24

*Buffalo Forge Co. v. Ogden Corp.*,
  717 F.2d 757 (2d Cir. 1983), *cert. denied* 464 U.S. 1018 (1983) ...........................23

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*,
  230 F. Supp. 2d 439 (S.D.N.Y. 2002) ...............................................................24

*Cottonwood Holdings, Inc. v. C3, Inc.*,
  1995 WL 276196 (S.D.N.Y. May 11, 1995) ...................................................12, 14

*Dexter 345 Inc. v. Cuomo*,
  663 F.3d 59 (2d Cir. 2011) .........................................................................17

*Elite Parfums Ltd. v. Rivera*,
  872 F. Supp. 1269 (S.D.N.Y. 1995) ................................................................14

*EMA Fin., LLC v. NFusz, Inc.*,
  509 F. Supp. 3d 18 (S.D.N.Y. 2020) ...............................................................20

*EMA Fin., LLC v. Vystar Corp., Inc.*,
  2021 WL 1177801 (Mar. 29, 2021), *reconsideration denied* 2021 WL
  5998411 (S.D.N.Y. Dec. 20, 2021) .........................................................19, 20, 22

*EMA Financial, LLC v. AIM Exploration, Inc.*,
   18-Civ. 145 (ER), 2019 WL 689237 ...............................................................5, 15

*Foulke by Foulke v. Foulke*,
   896 F. Supp. 158 (S.D.N.Y. 1995)......................................................................24

*Foundation Ventures, LLC v. F2G, Ltd.*,
   2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010)......................................................22

*Franklin Fed. Savings Bank v. United States*,
   60 Fed. Cl. 55 (2004) .........................................................................................18

*Frati v. Saltzstein*,
   2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ......................................................20

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005)................................................................................17

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*,
   2021 WL 535485 (S.D.N.Y. Feb. 12, 2021) ........................................................19

*Interlink Int'l Fin. Servs., Inc. v. Block*,
   145 F. Supp. 2d 312 (S.D.N.Y. 2001)..................................................................25

*Jones v. Weibrecht*,
   901 F.2d 17 (2d Cir. 1990)..................................................................................13

*Leasing Serv. Corp. v. Graham*,
   646 F. Supp. 1410 (S.D.N.Y. 1986).....................................................................14

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.*,
   2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018)......................................................20

*Mills v. Electric-Auto-Lite Co.*,
   396 U.S. 375 (1970)............................................................................................16

*Monowise Limited Corp. v. Ozy Media, Inc.*,
   2018 WL 2089342 (S.D.N.Y. May 3, 2018) ...................................................15, 19

*Moody v. Bach & Co.*,
   570 F.2d 523 (5th Cir. 1978) ..............................................................................16

*Nat'l Sch. Reporting Servs., Inc. v. Nat'l Sch. of Cal., Ltd.*,
   924 F. Supp. 21 (S.D.N.Y. 1996)........................................................................13

*NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*,
   2014 WL 2619588 (S.D.N.Y. June 11, 2014) ......................................................18

*Nokia Corp. v. Interdigital, Inc.*,
645 F.3d 553 (2d Cir. 2011)............................................................................25

*Omega Overseas Partners, Ltd. v. Griffith*,
2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014) ...................................................20

*Pompano-Windy City Partners, Ltd. v. Bear Sterns & Co., Inc.*,
794 F. Supp. 1265 (S.D.N.Y. 1992)................................................................23

*Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*,
2021 WL 4463921 (E.D.N.Y. Aug. 17, 2021), *report and recommendation adopted*, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021)..........................12, 13

*S.E.C. v. Big Apple Consulting USA, Inc.*,
783 F.3d 786 (11th Cir. 2015) ........................................................................22

*SEC v. Almagarby*,
479 F. Supp. 3d 1266 (S.D. Fla. 2020) ......................................................22, 23

*SEC v. Fierro*,
2020 WL 7481773 (D.N.J. Dec. 18, 2020).....................................................22

*SEC v. Fife*,
2021 WL 5998525 (N.D. Ill. Dec. 20, 2021)...................................................22

*SEC v. GPL Ventures, LLC*,
Case No. 21-cv-06814 (Jan. 18, 2022) ...........................................................23

*SEC v. Keener*,
2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)..................................................22

*SEC v. River N. Equity LLC*,
415 F. Supp. 3d 853 (N.D. Ill. 2019) .........................................................22, 23

*Strougo v. Scudder, Stevens & Clark, Inc.*,
964 F. Supp. 783 (S.D.N.Y. 1997), *vacated and remanded*, 282 F.3d 162 (2d Cir. 2002) .........................................................................................................18

*Sussman v. Crawford*,
488 F.3d 136 (2d Cir. 2007)............................................................................14

*Transcience Corp. v. Big Time Toys, LLC*,
50 F. Supp. 3d 441 (S.D.N.Y. 2014) (Ramos, J.) ...........................................18

*Union Capital LLC v. Vape Holdings, Inc.*,
2016 WL 8813991 (S.D.N.Y. Mar. 9, 2016) ..................................................16

*Usherson v. Bandshell Artist Management*,
    2020 WL 4228754 (S.D.N.Y. July 22, 2020) ...........................................................................17

*Weaver v. Schiavo*,
    750 Fed. App'x 59 (2d Cir. 2019) .....................................................................................14, 15

*Weiss v. Columbia Pictures Television, Inc.*,
    801 F. Supp. 1276 (S.D.N.Y. 1992) .................................................................................11, 13

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................................................15

*Zerman v. Jacobs*,
    510 F. Supp. 132 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981) ...............................20

**Statutes**

Securities Exchange Act of 1934 § 3, 15 U.S.C. § 78c ...............................................................21

Securities Exchange Act of 1934 § 29, 15 U.S.C. § 78cc.....................................................*passim*

Securities Exchange Act of 1934 § 15,15 U.S.C. § 78o .......................................................*passim*

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................................................................25

Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman respectfully submit this memorandum of law in opposition to Plaintiff DarkPulse, Inc.'s ("DPLS") motion for a preliminary injunction.[1]

## PRELIMINARY STATEMENT

The Court should deny DPLS's motion for a preliminary injunction for several reasons. As a threshold matter, DPLS knowingly has brought this motion (and the related claims in this Action) in violation of the Parties' exclusive forum selection clause.  The parties agreed in an amendment to the convertible promissory note at issue (the "Note") that any action concerning the Note "shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware." (Fireman Decl. ¶ 23.)  There is an action pending in Delaware Chancery Court, filed weeks before this Action, concerning this very same dispute regarding the Note (the "Delaware Action"). On December 13, 2021, weeks after DPLS first demanded that FirstFire return the shares converted pursuant to the Note,[2] FirstFire brought the Delaware Action, seeking a declaration that the conversion was proper and that FirstFire was entitled to the 177,375,000 shares of DPLS common stock it received in connection with the conversion.  In response, DPLS improperly asserts claims in this Action concerning the Note—what should be DPLS's defenses

---

[1] Submitted concurrently herewith are the Declaration of Aaron H. Marks, sworn to on January 19, 2022 ("Marks Decl.") and the Declaration of Eli Fireman, sworn to on January 19, 2022 ("Fireman Decl."). "Mot." refers to Plaintiff DarkPulse, Inc's Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction (ECF 17).  "O'Leary Decl." refers to the Declaration of Dennis O'Leary Pursuant to 28 U.S.C. § 1746 in Support of DarkPulse, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction (ECF 12-2).  Unless otherwise indicated, all emphasis is added and internal citations and quotations are omitted.

[2] Initially, in November, DPLS's CEO Dennis O'Leary requested that FirstFire return to DPLS two-thirds of the DPLS common shares that FirstFire had converted, acknowledging that the Note was valid and the conversion was proper, but claiming that FirstFire had improperly used the default conversion rate under the Note (which provides for a default conversion rate that is one-third of the ordinary conversion rate under the Note).  (Fireman Decl. ¶ 28.)  Only upon filing its Complaint here on December 31, did DPLS first claim that the entire Note should be voided and that FirstFire's conversion of shares should be rescinded in its entirety.

or counterclaims in the Delaware Action—in sharp violation of the Note's exclusive forum provision.[3]

Even if this were the proper forum (which it is not), DPLS cannot meet any of the prerequisites for being granted extraordinary injunctive relief. DPLS cannot show that it would be irreparably harmed in the absence of injunctive relief being granted. FirstFire selling shares of DPLS common stock represents a quintessential reparable harm—if proven, it can be addressed with monetary relief. Nothing precludes DPLS from purchasing 177 million DPLS common shares (it is a penny stock that is heavily traded), thus making interim injunctive relief unnecessary and improper, as there is an adequate remedy of law. There is further no non-speculative concern about dilution from FirstFire selling its DPLS common shares, which make up less than 2% of the DPLS shares in the market. And, the Note and its attendant DPLS common shares, like the previous 19 convertible notes (and their attendant shares) that DPLS entered, are disclosed in DPLS's public filings beginning the date the notes are entered; accordingly, the market already has full knowledge about this purported dilution.

Moreover, DPLS cannot at all demonstrate what it baldly alleges—that FirstFire's sales of DPLS shares will somehow cause the price to fall, and further, that a decline in DPLS's share price somehow harms DPLS. DPLS is remarkably late in bringing this motion; FirstFire converted the Note to 177,375,000 DPLS shares on November 17, 2021—in strict compliance with the Note's terms and with notice in advance to DPLS on November 15, 2021.[4] Over the 42 trading days

---

[3] The Complaint in this Action was deemed served upon the Defendants on January 13, 2022, when Defendants executed a waiver of service. In connection with executing the waiver of service, Defendants' time to respond to the Complaint does not run until March 14, 2022, at which time, Defendants will be filing a motion to dismiss, including a request to dismiss all claims relating to the Note due to this Court being an improper forum.

[4] Section 1.4(a) of the Note provides that "[t]his Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion." As reflected herein, FirstFire provided a Notice of Conversion to Borrower on November 15, 2021 by sending an email to DPLS CEO Dennis O'Leary at his darkpulse.com email address, as provided in Section 4.2 of the Note, and by submitting the Notice of Conversion to Borrower's transfer agent on

between November 18, 2021 (the first trading day after conversion) and January 14, 2022 (the trading day that preceded DPLS filing this application), FirstFire already sold into the market 85,509,808 of the converted DPLS common shares, deliberately selling no more shares than a small percentage of the trading volume on any given day, notwithstanding that well over 1 billion DPLS common shares traded during this period.  (Fireman Decl. ¶ 30.)  As but one example, DPLS wildly and baselessly alleges in its January 17, 2022 filing that on January 14, 2022 FirstFire must have sold at least 56 million shares as the total trading volume for the day was 56 million shares higher than the day before (90 million shares sold in the market versus 34 million the day before). The fact is, however, that on January 14, FirstFire sold 3,134,808 DPLS shares, making up less than five percent of the total trading volume of over 90 million for the day.  At all times over the past two months, FirstFire has sought to receive only the highest price possible for the DPLS common shares it has been selling, and DPLS has of course no evidence that FirstFire's selling has caused any decline in DPLS's share price.[5]

DPLS also cannot come close to demonstrating that it has a likelihood of success on the merits of its claims relating to the Note.  By its complaint in this Action, DPLS seeks rescission with respect to the Note because FirstFire is allegedly an unregistered securities dealer and thus violated the Securities and Exchange Act (Counts I–III).  DPLS does not, however, have a reasonably likelihood of success in establishing any of the several mandatory elements of these claims—that the Note was a prohibited transaction under the Act; that FirstFire should be

---

November 17, 2021.  (Fireman Decl. ¶ 25.)  O'Leary's statement in his submitted affidavit that "FirstFire sent the notice of the conversion to my personal account instead of my DarkPulse account" (O'Leary Decl. ¶ 8) is patently false.

[5] DPLS, in its complaint, disparagingly and baselessly references "FirstFire's well-known practice of dumping issuer stock into the market as soon as possible."  (Compl. ¶ 30.)  Putting aside the insulting and false nature of this "dumping" remark, if DPLS knew FirstFire to be inclined to sell shares quickly after a conversion, why is DPLS only now moving for injunctive relief a full two months after it learned of FirstFire's conversion and receipt of 177 million shares?  Why would DPLS expect FirstFire two months later to still hold any of its common shares, if FirstFire is a "dumper"?

considered an unregistered "dealer" under the Act; or that DPLS here is an "unwilling and innocent" party.  Because, among other things, DPLS has a long history of issuing convertible promissory notes to investment funds that were not registered "dealers," and explicitly covenanted with respect to this Note to never assert that FirstFire is a "dealer" under the Act, it will come as no surprise that DPLS does not have a likelihood of success on the merits of these claims.

Finally, the balance of equities tips decidedly in FirstFire's favor, as preventing FirstFire from selling shares would result in significant financial hardship, especially as the price of DPLS common shares is historically highly volatile.  In contrast, DPLS cannot demonstrate—beyond mere conclusory statements—how a decline in DPLS's current trading price would harm DPLS.

## FACTUAL BACKGROUND

### A.    DPLS Common Shares Are a Heavily Traded Penny Stock

DPLS is a small-cap company and DPLS's stock is a penny stock not listed on a major exchange, but that rather trades through OTC Pink, one of OTC Market Group's platforms.  (Marks Decl. ¶ 2.)  According to DPLS's public filings, as of September 30, 2021, there were nearly five billion (4,922,968,442) shares of DPLS common stock issued and outstanding, and DPLS has authorized a total of twenty billion shares of common stock for issuance.  (*Id.* ¶ 3.) According to Yahoo! Finance and DPLS's own website (https://ir.darkpulse.com/stock/), as of January 14, 2022 (DPLS's application was filed that evening), DPLS common shares closed trading at a price of approximately $0.05 and have a 52-week price range of $0.0014 to $0.202—the high of the range being about 144 times the low.  (*Id.* ¶ 4.)  And DPLS common shares are heavily traded.  According to the figures contained on DPLS's own website, in the 42 trading days between November 18, 2021 and January 14, 2022, the period between FirstFire's conversion and DPLS filing this motion, over 1.178 billion DPLS common shares were traded—for an average daily trading volume of 28.04 million shares per day.  (*Id.* ¶ 5.)  As an aside, over the ten trading days preceding FirstFire's

November 17 conversion, there was an average daily trading volume of 36.08 million DPLS common shares per day.  (*Id.* ¶ 6.)

**B.    DPLS Has Extensive Experience with Issuance of Convertible Promissory Notes and Their Conversion to DPLS Common Shares of Stock**

DPLS has since July 2018 financed its business, in part, through the issuance of convertible promissory notes—notes containing an option for the holder to convert the outstanding balance to shares of DPLS common stock rather than receive repayment in cash.  DPLS's public filings reflect that between July 2018 and July 2021, DPLS entered into 20 different convertible notes with multiple investment funds, including the Note with FirstFire that is the subject of this dispute.  (*Id.* ¶ 8.)  And in 2020 and in 2021, on 36 separate occasions, DPLS issued significant volumes of shares of DPLS common stock upon the conversion or partial conversion of notes by their holders.  (*Id.* ¶ 9.)  In total, in 2020 and 2021, DPLS, through its transfer agent, issued over 3,545,380,000 common shares in connection with these 36 conversions, including the 177,375,000 common shares issued to FirstFire.  (*Id.* ¶ 10.)  Each of the convertible notes entered by DPLS (and their attendant DPLS common shares) are disclosed in DPLS's public filings beginning the date the notes are entered.  (*Id.* ¶ 11.)

DPLS has also been, and is, party to several lawsuits against investment funds with which the company has entered into convertible promissory notes.[6]  For example, according to DPLS's own public filings, on May 13, 2021, two weeks after entering into the Note with FirstFire, DPLS filed a motion in its action against Carebourn Capital, L.P., "arguing that Carebourn is conducting itself as an unregistered dealer, in violation of Section 15(a) of the Securities and Exchange Act of

---

[6] As this Court is well familiar, there have been several lawsuits brought in this Court and in others around the country, involving convertible promissory notes and assertions by issuers of usury and claims based on purported violations of the securities laws.  *See EMA Fin., LLC v. AIM Exploration, Inc.*, 18-Civ. 145 (ER), 2019 WL 689237, at *1, n.1 (S.D.N.Y. Feb. 19, 2019).

1934 (the 'Act'), and, pursuant to Section 29(b) of the Act, the Company is entitled to have all contracts arising under the unlawful securities transaction declared void ab initio and seek rescissionary damages for any unlawful transactions effected by Carebourn"—the same arguments to rescind the Note that DPLS now makes here (with DPLS suggesting that its arguments and knowledge are somehow new).  (*Id.* ¶ 13.)  DPLS is litigating a similar case against More Capital, LLC, and on January 4, 2022, DPLS initiated an action against EMA Financial, LLC and a related entity and an individual that is almost identical to this Action.  (*Id.* ¶ 14.)  It now appears to be DPLS's pattern and practice to enter into convertible notes with investment funds, receive the cash funding thereunder, and then seek to void or rescind the notes in frivolous litigation in which DPLS even suggests that it had no prior knowledge of the allegations of unlawfulness that it is making. (*Id.* ¶ 15.)

### C.     The FirstFire Note

FirstFire is an investment fund focusing on small- to medium-sized public and private companies.  FirstFire's expertise is in distressed, special situations and event-driven investing, both as equity and as a debt participant.  FirstFire's relationships and industry expertise enable it to serve not only as financial investors but also as substantial value-added partners.  In this capacity, FirstFire occasionally takes on a role as an investor providing a lifeline for highly distressed companies. (Fireman Decl. ¶ 2.)

As noted in Complaint, DPLS first issued a convertible note to FirstFire in September 2018 (the "September 2018 Note").  The September 2018 Note was converted by FirstFire to DPLS

common shares (totaling 879,400,000) in multiple partial conversions in 2019, 2020 and 2021. (*Id.* ¶ 4.)  The September 2018 Note is not the subject of this Motion.[7]

On April 26, 2021, DPLS entered into a Securities Purchase Agreement (the "SPA"), a Registration Rights Agreement and the Note with FirstFire.  Under the SPA, FirstFire agreed to provide DPLS with an infusion of $750,000 in cash (provided on April 30) in exchange for the Note.  The Note provides for a principal sum of $825,000 and incorporates an interest rate of 10% per annum.  (*Id.* ¶ 5.)

Alternatively, Section 1.1 of the Note provides for a conversion right, whereby FirstFire could forego repayment of the Note in cash and, instead, have the right to convert outstanding amounts owed under the Note (principal and interest) to shares of DPLS common stock, at a specified Conversion Price.  (*Id.* ¶ 7.)  Section 1.2(a) of the Note provides for a per-share conversion price of $0.015 per share—the Fixed Conversion Price or, alternatively, a Default Fixed Conversion Price of $0.005 per share, applicable if an Event of Default occurs.[8]  (*Id.* ¶ 8.) This fixed-price conversion feature differs from nearly all of the other convertible notes entered by DPLS (including the September 2018 Note with FirstFire), as those notes all provided, rather than a fixed per-share conversion rate, a conversion rate that was variable—providing for a discount (30% or 35%) from the market price at the time of conversion.  (*Id.* ¶¶ 9, 10.)[9]

---

[7] In its Complaint, DPLS also asserts claims relating to the September 2018 Note.  Although the September 2018 Note includes a New York exclusive forum provision (and Nevada choice of law), FirstFire intends to file a dispositive motion in March that will include arguments to dismiss DPLS's claims concerning the September 2018 Note.

[8] If an Event of Default occurs (as has occurred here), Section 3.22 of the Note provides for a Default penalty—that upon the occurrence and during the continuation of an Event of Default, the Note shall be payable in an amount equal to the Principal Amount then outstanding plus accrued interest (including any Default Interest) multiplied by 125%. To date, FirstFire has not converted that part of the Note that includes the Default penalty.  (Fireman Decl. ¶ 29.)

[9] By agreeing to a fixed-price conversion, FirstFire took on significant market risk (particularly given the high volatility in DPLS common stock, the six-month holding and non-conversion period, and that the conversion price in the Note was set near the then-current market price).  A variable rate conversion price, on the other hand, effectively provides for a specified discount to the market price in effect at the time the note is converted into common shares.

In Section 3.e of the SPA, DPLS represents and warrants to FirstFire that "so long as any amount on the Note remains outstanding, the Company shall not to any person, institution, governmental or other entity, state, claim, allege, or in any way assert, that [FirstFire] is currently, or ever has been a broker-dealer under the Securities Exchange Act of 1934."  (*Id.* ¶ 6.)

### D.      The Amendment to the Note

On or about November 4, 2021, FirstFire and DPLS executed "Amendment No. 1 to the Convertible Promissory Note Issued on April 26, 2021" (the "Amendment").  (*Id.* ¶ 22.)  The Amendment is a one-page document, and nearly the entirety of the Amendment concerns the parties' agreement to change the choice of law and exclusive forum provisions from New York to Delaware.  (*Id.* ¶ 23.)  The Amendment was executed by CEO Dennis O'Leary for DPLS while O'Leary and Eli Fireman were together in Arizona (not Nevada, as stated in the Complaint), after DPLS's counsel Brian Higley had reviewed the Amendment with Mr. O'Leary, and Mr. Fireman emailed a countersigned version of the Amendment to Mr. O'Leary thereafter for DPLS's records.  (*Id.* ¶ 22; Compl. ¶ 40.)  Contrary to the allegations in the Complaint (¶¶ 40, 41), at no time did Mr. Fireman seek to conceal from Mr. O'Leary (nor realistically could he) that the Amendment modified the Note's choice of law and exclusive forum provisions.  (Fireman Decl. ¶ 24.)

### E.      The Events of Default

Article III specifies Events of Default under the Note.  Section 3.21 provides that it shall be an Event of Default "[i]f the Borrower fails to meet its obligations under the Registration Rights Agreement entered into by the parties in connection herewith."  (*Id.* ¶ 11.)  Among other things, the Registration Rights Agreement (Section 2(b)) requires DPLS to use commercially reasonable efforts to file a registration statement covering the resale of the shares of DPLS common stock issued or issuable to FirstFire pursuant to the SPA and with respect to the Note and any conversion thereof (the "Registrable Shares"), within ninety (90) days following the funding of the Note.

Section 3.16 of the Note provides that it shall be an Event of Default if DPLS issues common shares pursuant to an equity line of credit or otherwise in connection with a Variable Rate Transaction entered into after the date of the Note.  (*Id.* ¶ 17.)  As reflected in the Fireman Declaration (¶¶ 12–21) and in the Delaware complaint, DPLS has committed Events of Default under both of these provisions.

### F.    The Conversion and the Dispute

On November 15, 2021, in compliance with the procedures specified in the Note,[10] Nick Fireman, an officer of FirstFire, emailed DPLS CEO Dennis O'Leary, at his darkpulse.com email account, a copy of a notice of conversion (the "Notice of Conversion") whereby FirstFire elected to convert the $825,000 principal and $61,875 of interest outstanding on the Note into 177,375,000 shares of DPLS common stock, using the Default Fixed Conversion Price of $0.005 per share, based on the aforementioned Defaults by DPLS.  (*Id.* ¶ 25.)  On November 17, 2021, again in accordance with the Note, FirstFire submitted the same Notice of Conversion, along with a legal opinion and related materials, to the Transfer Agent, and the Transfer Agent confirmed the issuance of the shares of DPLS common stock later the same day.  (*Id.* ¶ 26.)

In any event, by no later than November 23, 2021, DPLS was aware that 177,375,000 DPLS common shares had been issued to FirstFire pursuant to a conversion.  (*Id.* ¶ 27, Ex. E). And on November 29, 2021, FirstFire received an email from Mr. O'Leary requesting that FirstFire return the shares of DPLS common stock it received "over and above the original note amount" and stating that "no additional shares were/are owed per the note agreement."  (*Id.* ¶ 28.)  In other words, DPLS did not contest the validity of the Note or FirstFire's right to convert, but instead

---

[10] Section 1.4(a) of the Note provides that "[t]his Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion."  (Fireman Decl. ¶ 7.)

argued that the conversion should have been effected using the non-default Fixed Conversion Price of $0.015 per share, which would have resulted in the issuance of 59,125,000 shares, and that FirstFire should return to DPLS 118,250,000 shares.  It was not until DPLS initiated this lawsuit that it took the position that the Note should be rescinded.

On December 13, 2021, FirstFire commenced the Delaware Action against DPLS, seeking a declaration that FirstFire is entitled to all 177,375,000 DPLS common shares it converted as well as further shares.[11]  (Marks Decl. ¶ 16.)

### G.     FirstFire Sold Half of the DPLS Shares over the Past Two Months (42 Trading Days)

Over the 42 trading days following the conversion from November 18, 2021 to January 14, 2022, FirstFire sold a total of 85,509,808 DPLS common shares.  (Fireman Decl. ¶ 30.) This represents on average around 6.91% of the trading volume during this period (which, as noted above, was 28.04 million per day).  (Marks Decl. ¶ 5.)  So, for example, on January 14, 2022, the day that DPLS filed this injunction application, there was total trading volume of over 90 million DPLS common shares, and FirstFire accounted for sales of approximately 3,134,808 million DPLS common shares (as opposed to the 56 million alleged by DPLS in its January 17 filing).  (Fireman Decl. ¶ 31.)  All of FirstFire's trading has been in an effort to achieve the highest available price. (*Id.* ¶ 32.)  It is, of course, in FirstFire's best interest that DPLS's share price remain as high as possible while FirstFire sells its shares.  There is no basis to suggest that FirstFire's trading has had any negative impact on DPLS's share price.  (*Id.*)

---

[11] FirstFire is entitled under the Note to more consideration than it originally sought and received in connection with the November 17, 2021 conversion.  Under the Note, because DPLS committed Events of Default, FirstFire is to receive principal and interest at an additional 25% default penalty, which default amount is also subject to conversion to shares of DPLS common stock.  Accordingly, FirstFire is entitled to an additional 44,343,750 DPLS common shares (or a total of 221,718,750 common shares).  (Fireman Decl. ¶ 29.)

## ARGUMENT

Plaintiff's request for a preliminary injunction should be denied.  Plaintiff has brought this motion (and the related claims in the Action) in plain violation of the Note's exclusive forum-selection clause, notwithstanding the preexisting case concerning the same Note already pending in Delaware Chancery Court.  *And*, even if this were the proper venue (which it is not), the injunction should not in any event issue, as Plaintiff has failed to show that it will be irreparably harmed in its absence, that DPLS is likely to succeed on the merits of the Complaint, and that the balance of equities weighs in Plaintiff's favor.

**I.  This Application Should Be Denied, as Delaware is the Parties' Exclusive Forum**

    **A.  The Amendment to the Exclusive Forum Provision in the Note Is Valid, Was Communicated to Plaintiff, Has Mandatory Force, and Covers the Parties and Claims in this Application**

The Second Circuit has a "strong policy of enforcing forum selection agreements." *Weiss v. Columbia Pictures Television, Inc.*, 801 F. Supp. 1276, 1278 (S.D.N.Y. 1992).  A valid forum-selection clause "represents the parties' agreement as to the most proper forum." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013).  Thus, the "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Id.*

By executing the Amendment to the Note, DPLS agreed that "[a]ny action brought by either party against the other concerning the transactions contemplated by this [amendment], the Note, the Warrant, or any other agreement . . . shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware."  (Fireman Decl. Ex. C, Amendment ¶ 2.) Pursuant to the parties' agreed-upon exclusive choice of forum, FirstFire filed the Delaware Action against DPLS, seeking a declaration from the Delaware Chancery Court that the conversion of shares pursuant to the Note was proper and that FirstFire is entitled to the 177,375,000 shares of

DPLS common stock received in connection with the conversion.  (Marks Decl. Ex. I, Del. Compl. ¶ 1.)  In response, DPLS has improperly brought claims in this Action concerning the Note—without regard to and in clear violation of the Note's exclusive forum provision.  (*See* Compl. ¶¶ 9–10.)  Defendants request that the Court enforce the parties' choice of forum and deny this motion.  *See Cottonwood Holdings, Inc. v. C3, Inc.*, 1995 WL 276196, at *4 (S.D.N.Y. May 11, 1995) (holding that the parties' "forum selection clause is found to govern, and all claims against the C3 Defendants are dismissed without prejudice").

"Courts analyzing a contractual forum selection clause must first ask:  (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, *i.e.*, whether the parties are required to bring any dispute to the designated forum or simply permitted to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause."  *Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, 2021 WL 4463921, at *5 (E.D.N.Y. Aug. 17, 2021), *report and recommendation adopted*, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021).  Where the forum-selection clause was communicated to the other party and covers "the claims and parties involved in the dispute," it is presumptively enforceable unless the moving party makes "a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."  *Id.*

First, the existence of the forum-selection clause was communicated to DPLS.  DPLS admits that Mr. "Fireman presented [DPLS CEO Mr.] O'Leary with a one-page amendment to the April 2021 Note."  (Compl. ¶ 40.)  The changes to the forum-selection clause appear plainly on the face of the document, which DPLS acknowledges is just over one page long, and the clause constitutes almost the entirety of the substance of the document.  (Fireman Decl. Ex. C,

Amendment ¶ 2); *see Nat'l Sch. Reporting Servs., Inc. v. Nat'l Sch. of Cal., Ltd.*, 924 F. Supp. 21, 24 (S.D.N.Y. 1996) (finding defendants aware of the exclusive forum clause as "the clause appear[ed] in . . . the Promissory Note, a two-page-long document").  Second, the Amendment has mandatory force as it requires that actions arising under the Note "shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware."  (Fireman Decl. Ex. C, Amendment ¶ 2); *Power Up*, 2021 WL 4463921, at \*6.  Third, the forum-selection clause governs the parties and the claims at issue in this application, which arises out of the Note.  Because the Amendment was communicated to DPLS, has mandatory force, and applies to the parties and the claims at issue in this application, it is presumptively enforceable.  *Power Up*, 2021 WL 4463921, at \*6.

### B.    DPLS Fails to Show that Enforcement of the Exclusive Forum Provision Would Be Unreasonable or Unjust

To avoid enforcement of the Amendment, DPLS bears the burden to make a "sufficiently strong showing that enforcement would be unreasonable or unjust," *id.*, or that the Amendment "was obtained through fraud or overreaching," *Jones v. Weibrecht*, 901 F.2d 17, 18 (2d Cir. 1990). It is not enough to assert "vague and conclusory statements . . . to argue that the clause is unfair." *Nat'l Sch. Reporting Servs., Inc.*, 924 F. Supp. at 24.  Further, "mere absence of negotiation over the terms of a contract does not render a forum selection clause unenforceable."  *Weiss*, 801 F. Supp. at 1279.

Here, DPLS is a sophisticated party, and Mr. O'Leary a sophisticated businessman, with previous experience negotiating contracts containing forum-selection clauses.  (Compl. ¶ 34.) DPLS alleges that Mr. "Fireman failed to mention to [Mr.] O'Leary that the amendment . . . replaced the choice of law provision."  (Compl. ¶ 40.)  Even if true (which it is not), Mr. Fireman was not required to explain in detail the contents of the Amendment to Mr.

O'Leary in order for the Amendment to be enforceable.  *Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986) ("If [a businessman] did not read [a contract's terms] or hire counsel to do so, he is the victim of his own lack of diligence, not [Defendants'] misconduct.").

DPLS does not point to any facts to indicate that Mr. Fireman pressured, coerced or deceived Mr. O'Leary into signing the Amendment.  Mr. O'Leary's purported oversight or lack of diligence does not amount to fraud or overreaching by Defendants.  *See Elite Parfums Ltd. v. Rivera*, 872 F. Supp. 1269, 1273 (S.D.N.Y. 1995).  Because DPLS has not met its burden to show that the Amendment was unfair or obtained fraudulently, the forum-selection clause is valid and enforceable as to all of DPLS's claims relating to the Note.  *See Cottonwood Holdings, Inc.*, 1995 WL 276196, at *3–4 (dismissing securities and state-law fraud claims against defendants who signed forum-selection clause requiring action to be brought in Maryland).

## II.    The Request for a Preliminary Injunction Should Be Denied

Even if DPLS's request for a preliminary injunction was properly before this Court (it is not), it nevertheless fails on the merits.  A district court may only grant a preliminary injunction "when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party."  *Weaver v. Schiavo*, 750 Fed. App'x 59, 60 (2d Cir. 2019).  A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007).  DPLS fails to show that in the absence of an injunction, DPLS would be irreparably harmed, its claims are likely to succeed on the merits, and that the balance of equities weighs in DPLS's favor.

A.      **DPLS Cannot Show Irreparable Harm**

DPLS's failure to show it will be irreparably harmed in the absence of an injunction, on its own, requires denial of its motion.  "Irreparable harm is the single most important prerequisite for relief."  *Weaver*, 750 Fed. App'x at 60.  For this Court to issue an injunction, DPLS must make a "clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  A "mere possibility of irreparable harm is insufficient."  *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.2d 30, 34 (2d Cir. 1991); *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018) ("[I]f a party fails to show irreparable harm, a court need not even address the remaining elements of the test.").

(i)      *There Is an Adequate Remedy at Law*

Where a party is requesting the issuance or return of stock pursuant to a note, "[t]he majority of courts . . . have rejected the notion that monetary damages are not an adequate remedy at law for common stock available on the open market."  *Alpha Capital Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 339 (S.D.N.Y. 2020); *see also EMA Fin., LLC v. AIM Exploration, Inc.*, 2019 WL 689237, at *13 (S.D.N.Y. Feb. 19, 2019) (Ramos, J.).

Plaintiff alleges that FirstFire was "unjustly enriched" by its conversion under the Note and thus "this is a case about money, not the right to possession of specific shares of [DPLS] stock."  *Aiena v. Olsen*, 37 F. Supp. 2d 303, 306 (S.D.N.Y. 1999).  The Complaint concedes this point as it requests primarily "rescissionary damages," "statutory prejudgment interest on any monetary award and on the value of any stock obtained," "compensatory, direct, and consequential damages," "punitive and/or treble damages," and the "return to DarkPulse [of] the *value* of the property they have unjustly retained in the amount of $26,560,750."  (Compl. Prayer for Relief.)  The Complaint rather only states a "conclusory reference to unspecified equitable relief in addition to demanding the payment of damages."  *Aiena*, 37 F. Supp. 2d at 306.  DPLS refers only to

15

financial harm to justify its request for injunctive relief by stating conclusorily that FirstFire's sale would "mak[e] it nearly impossible for the company to find new investors." (O'Leary Decl. ¶ 12.) Any conceivable damage here is ascertainable, and so "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Union Capital LLC v. Vape Holdings, Inc.*, 2016 WL 8813991, at *3 (S.D.N.Y. Mar. 9, 2016) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). As DPLS's stock is fungible and the value of its stock is clearly ascertainable, DPLS can be made whole at a later date should this Action prove meritorious.[12]

DPLS's argument that monetary damages are unavailable under Section 29(b), which thus somehow shows that there exists no adequate remedy at law, is legally unsound. As an initial matter, Plaintiff's cited case law does not support this proposition. *Moody v. Bache & Co.*, 570 F.2d 523, 527 n.6 (5th Cir. 1978) (noting that to allow monetary damages under Section 29(b), plaintiff must show a "causal relationship between the violation and the harm to the complainant"). Despite DPLS's "noted commentator," the Supreme Court specifically stated in *Mills v. Electric-Auto-Lite Co.*, 396 U.S. 375 (1970), that monetary damages are a "possibility" under Section 29(b) "to the extent that they can be shown."[13] *Id.* at 388–89. Finally, DPLS's argument here is surprising given the Complaint explicitly requests monetary damages for Counts I and II brought under Section 29(b), which it now claims are unavailable. (Compl. Prayer for Relief (requesting "rescissionary damages" and "statutory prejudgment interest on any monetary award").)

As there is a clear remedy at law, the Court should decline to issue an injunction.

---

[12] In fact, upon filing this lawsuit, DPLS issued a press release, promising shareholders "[it] is management[']s intention to take an award by the courts and issue a special dividend to all shareholders of record in DPLS *(in the event cash is recovered)*." (Marks Decl. Ex. L.)

[13] The exact remedy under Section 29(b) for Section 15(a) violations specifically is unclear, as the Second Circuit expressly refused to address whether Section 15(a) could form the basis for a Section 29(b) claim. *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 n.6 (2d Cir. 1998).

(ii)     *DPLS Has Not Shown Any Concrete, Actual Harm*

DPLS has failed to allege any actual harm in the absence of an injunction.  To show irreparable harm, Plaintiff must allege "an injury that is neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

DPLS first argues that it will be irreparably harmed by dilution, as the DPLS share price will go down.  (Mot. at 15.)  Yet the 90 million shares that DPLS has not yet sold make up less than 2% of DPLS common shares currently in the market, and their issuance has been publicly disclosed already for a long time.  (Compl. ¶ 43.)  Thus, the dilution harm Plaintiff argues is completely speculative and, at best, constitutes purported harm that has already occurred.  *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (affirming denial of injunction where the harm alleged had already occurred); *see also Usherson v. Bandshell Artist Mgmt.*, 2020 WL 4228754, at *2 (S.D.N.Y. July 22, 2020) ("As the old saying goes, the cat is out of the bag.").

Additionally, as DPLS concedes, DPLS common shares of stock are fungible and there is nothing unique about the shares that FirstFire received upon conversion compared to those on the open market.  (Mot. at 15.)  DPLS states that "[i]f FirstFire is permitted to dump DarkPulse's stock, it would severely injure the company and its shareholders, making it nearly impossible for the company to find new investors and greatly impeding the company's ability to prosecute this lawsuit."  (O'Leary Decl. ¶ 12.)  However, on December 13, 2021, DPLS filed a prospectus registering 300 million shares of its common stock for sale by GHS Investments LLC, noting that common stock outstanding prior to the offering totaled 5,154,044,407.  (Marks Decl. Ex. K, DarkPulse, Inc., Prospectus 4 (Form 424B4) (Dec. 13, 2021).)  DPLS also filed a registration statement on December 8, 2021, noting the issuance of over 3.5 billion shares pursuant to the conversion of a series of convertible notes of which FirstFire's shares constitute only 5%.  (Marks

Decl. Ex. J, DarkPulse, Inc., Registration Statement II-1–II-5 (Form S-1/A) (Dec. 8, 2021).)  Given

the small portion of the market of DPLS shares converted by FirstFire under the Note and the

number of outstanding shares, it is speculative at best what effect FirstFire's sale of its shares

would have on the market.  *NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*, 2014 WL

2619588, at \*7–8 (S.D.N.Y. June 11, 2014) (noting that within six days Plaintiff had nearly

doubled the number of outstanding shares, by issuing shares to other parties, which undermined

any argument of irreparable harm as plaintiff "will continue to hemorrhage common shares and

dilute their value regardless of whether [defendant] is enjoined").[14]

DPLS has failed to show any actual, concrete harm, let alone harm that is irreparable.

(ii)  *DPLS's Delay Militates Against Granting Any Relief*

DPLS's unexplained two-month delay in bringing this request for a preliminary injunction,

and the fact that FirstFire has sold over half of the shares at issue in small volume sales in the

interim, further warrants denial of its request.  Typically, delay in seeking injunctive relief is

"'compelling evidence' that there is no irreparable harm." *Transcience Corp. v. Big Time Toys,*

*LLC*, 50 F. Supp. 3d 441, 457 (S.D.N.Y. 2014) (Ramos, J.).  "Preliminary injunctions are generally

granted under the theory that there is an urgent need for speedy action to protect the plaintiffs'

rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced

need for such drastic, speedy action." *Monowise Ltd. Corp.*, 2018 WL 2089342, at \*2.

While there is no set time after which delay is inexcusable, "courts in this Circuit typically

decline to grant preliminary injunctions in the face of unexplained delays of more than two

---

[14] Plaintiff's cited case law either supports a finding of no irreparable harm or are completely irrelevant.  *Franklin Fed. Savings Bank v. United States,* 60 Fed. Cl. 55, 72 (2004) (rejecting expert's methodology for calculating monetary damages for the dilution of shareholders' interests); *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 802 (S.D.N.Y. 1997) (recognizing monetary damages available to compensate shareholders for dilution in claim for breach of fiduciary duty under Maryland law), *vacated and remanded*, 282 F.3d 162 (2d Cir. 2002).

months." *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021).  Here, DPLS waited two months after FirstFire's notice of conversion before bringing this motion for a preliminary injunction, and the circumstances have changed given that FirstFire has already sold out of more than half of its position.  (Compl. ¶ 42.)  Given Plaintiff was clearly aware of the likelihood of FirstFire selling its DPLS common shares upon conversion (*see* Compl. ¶ 30), which FirstFire was fully within its rights to do, Plaintiff has provided no explanation for its two-month delay in bringing a motion for a preliminary injunction.

### B.    DPLS Is Unlikely to Succeed on the Merits of Counts I and II[15]

DPLS's Section 29(b) claims (Counts I and II) will fail for several reasons.  To establish a violation of Section 29(b), Plaintiff must show that "(1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the Act was designed to protect."  *EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 1177801, at *2 (Mar. 29, 2021), *reconsideration denied* 2021 WL 5998411 (S.D.N.Y. Dec. 20, 2021).  As the Note did not require FirstFire to act as a "dealer," did not involve a "prohibited transaction," and because FirstFire does not meet the requirements of the definition of a dealer and because DPLS is not an unwilling or innocent party, DPLS's 29(b) claims will fail.

### (i)    *The Note Did Not Involve a Prohibited Transaction*

"[O]nly unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts."  *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981).  The *Vystar* case, also involving a convertible note, is instructive.  *Vystar Corp., Inc.*, 2021 1177801, at *1.  EMA Financial sued to recover for breaches of the note and Vystar

---

[15] DPLS does not argue that Counts III–V are likely to succeed on the merits so Defendants have not addressed them here.  Defendants do not believe DPLS is likely to succeed on the merits of these Counts and not addressing them here should not be construed as a waiver of those arguments.

argued in response that EMA acted as an unregistered broker-dealer in violation of Section 15(a)(1) and sought rescission pursuant to Section 29(b). *Id.* The court held that Vystar's argument failed "as a matter of law because the Agreements do not require EMA to act as a broker-dealer and are therefore not voidable under Section 29(b)." *Id.* at *2. Courts in this Circuit have consistently held that absent any provision requiring a party to act as a broker-dealer, contracts are not voidable under Section 29(b). *See LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018) (finding that "even if [plaintiff] should have registered, nothing in the note or the SPA indicates that those contracts 'could not have been legally performed' because [plaintiff] failed to do so"); *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, n.22 (S.D.N.Y. 2020) (noting that for a contract to be void under Section 29(b), a provision requiring the lender "to register as a broker . . . is essential"); *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4–5 (S.D.N.Y. Aug. 7, 2014) (noting that Section 29(b) "voids only contracts that are made illegally or require illegal performance"); *Frati v. Saltzstein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) (holding "[t]here is . . . no reason to believe that the contracts themselves could not be legally performed," which was "fatal to Plaintiffs' claim").[16] Similarly here, the Note and the SPA did not require FirstFire to act as a broker-dealer, as they do not require DPLS to buy or sell securities. Moreover, contrary to DPLS's incorrect statements in its memorandum law (Mot. at 12), the Note does not even involve a variable rate conversion price—the Note's conversion rate is fixed.

---

[16] DPLS attempts to distinguish *Vystar* and *LG Capital*, arguing that "the analysis was based on broker cases" and that the defendants only argued that the contracts were unlawful because they could not be lawfully performed. (Mot. at 13 n.20.) DPLS fails to explain how "broker cases" render these cases "incorrect" and the *Vystar* Court explicitly held that the contracts at issue "were neither *made* nor performed in violation of federal securities laws." *Vystar Corp., Inc.*, 2021 1177801, at *3. As the *LG Capital* Court recognized, the correct inquiry is whether the contracts were illegal *when executed*, not when performed. *LG Capital Funding, LLC*, 2018 WL 6547160, at *5 (holding plaintiff could not "vitiate contracts that were lawful at the time they were executed").

          (ii)    *FirstFire Is Not a "Dealer"*

FirstFire also does not remotely meet the definition of a "dealer" within the Exchange Act. Pursuant to Section 3(a)(5)(A), "[t]he term 'dealer' means any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A).  A "trader" by contrast, for which there is an exception from the definition of dealer, is a party who "buys and sells securities for his or her own account, either individually or in a fiduciary capacity, but not as part of a regular business."  S.E.C., Guide to Broker-Dealer Registration (Apr. 2008).  An entity may meet the definition of a dealer by:

> (1) underwriting; (2) acting as a market maker or specialist on an organized exchange or trading system; (3) acting as a *de facto* market maker whereby market professionals or the public look to the firm for liquidity; or (4) buying and selling directly to securities customers together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in connection with transactions in securities, and carrying a securities account.

*Id.*  FirstFire engages in none of these activities and the Complaint is devoid of any allegations to the contrary.  FirstFire explicitly has only ever sold securities on its own behalf and has never acted as an underwriter for an offering of securities.  (Fireman Decl. ¶ 3.)  While the Complaint claims that Defendants "sold more than 1 billion newly-issued shares of stock obtained from those notes into the public market," the Complaint does not describe even a single stock sale.  (Compl. ¶ 60.)  Rather, the Complaint shows that out of $34 million in principal loaned to various issuers, FirstFire converted only $1.4 million or 4% of the total amount loaned.  (Compl. Ex. 3 at 8.)  This is a far cry from "buying and selling securities" as part of its regular business, but rather clearly shows that FirstFire acts as a trader.  *Foundation Ventures, LLC v. F2G, Ltd.*, 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010) ("[T]he record here does not indicate that [defendant] regularly engages in securities transactions.").

The cases DPLS relies on are distinguishable.  First, all of these cases were brought by the S.E.C. directly under Section 15(a), rather than any involving a private plaintiff bringing a Section 29(b) claim.  *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015); *SEC v. Keener,* 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)*; SEC v. Fierro,* 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife,* 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).  This distinction is important, as these cases do not involve the Court's examination of a single transaction, but rather an entity's entire business, and do not involve consideration of whether the contracts at issue were illegal *when made*.[17]  *Vystar Corp., Inc.*, 2021 1177801, at *3.

These cases additionally all involve very different facts than those at issue here.  For example, in *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015), the Eleventh Circuit interpreted the Securities Act to find that defendants were dealers, where defendants did not contest their "*entire* business model was predicated on the purchase and sale of securities." *Id.* at 809 (emphasis in original).  As explained above, Plaintiff has failed to show that the buying and selling of securities is even a substantial portion of FirstFire's business, let alone its entire business.  The defendants in *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020), and *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019), bought securities from third parties and "immediately" sold them back into the market.  *Almagarby*, 479 F. Supp. 3d at 1272; *River N. Equity LLC*, 415 F. Supp. 3d at 857.  The defendant in *Almagarby* also "went so far as employing and paying 'finders' who were in the business of soliciting referral companies." *Almagarby*, 479 F. Supp. 3d at 127.  Here, by contrast, DPLS hired a registered broker-dealer who found FirstFire

---

[17] DPLS's novel argument that the contracts themselves are securities is unsupported by any case law and would render nearly all of DPLS's financing within the last two years illegal.  (Marks Decl. Ex. J, DarkPulse, Inc., Registration Statement II-1–II-5 (Form S-1/A) (Dec. 8, 2021).)

to enter into the Note (Marks Decl. Ex. H, DarkPulse, Inc., Current Report 2 (Form 8-K) (May 5, 2021)) and FirstFire's conversion was at a fixed price under the Note, rather than at any discount, so FirstFire could only wait for an increase in market price to sell its shares to make a profit (Fireman Decl. Ex. A, Note § 1.2).[18]

While DPLS brings a separate count arguing that the contracts as performed violate federal securities laws, as stated above under Section 29(b), "only unlawful *contracts* may be rescinded, not unlawful transactions made pursuant to *lawful* contracts." *Pompano-Windy City Partners, Ltd. v. Bear Sterns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992). Thus as the contract is not in violation of federal securities law, the transactions as performed are not either.[19]

    (iii)   *DPLS Is Not an Innocent, Unwilling Party*

Finally, DPLS is not an unwilling or innocent party that falls within the class of persons Section 29(b) was designed to protect. To rescind a contract under Section 29(b), Plaintiff must be "an unwilling innocent party to the contract." *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757, 759 (2d Cir. 1983), *cert. denied*, 464 U.S. 1018 (1983). The Note specifically stated that a broker would be used to the extent necessary to effectuate the transfer of the converted shares (Fireman Decl. Ex. A, Note §§ 1.5, 3.19) and the SPA specifically acknowledges that FirstFire is not (nor has ever been) "a broker-dealer under the Securities Exchange Act of 1934" (Fireman Decl. Ex. B, SPA § 3e). DPLS is also a sophisticated entity that has entered into dozens of similar convertible notes over the past few years, including with parties that are not registered as broker-dealers. (Marks Decl. Ex. K, DarkPulse, Inc., Prospectus 39–40 (Form 424B4) (Dec. 13, 2021).)

---

[18] *SEC v. GPL Ventures, LLC*, Case No. 21-cv-06814 (Jan. 18, 2022) (ECF No. 62), involved an unregistered "market maker" for securities, who would convert notes and then have a third-party promotor find investors in the security. *Id.* at 13–14. There is no similar allegation here.

[19] That DPLS affirmatively represented in the SPA that it would not assert that FirstFire is a broker-dealer also speaks volumes to the invalidity of DPLS's claim.

Where, as here, a party "willingly entered into the questioned contract and knew all of the facts which [it] now claims constitute 'manipulation' . . . it may not invoke the provisions of section 29(b) to challenge the contract." *Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 906 (W.D.N.Y.), *aff'd* 717 F.2d 757 (2d Cir. 1983); *see also Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 230 F. Supp. 2d 439, 486 (S.D.N.Y. 2002) ("[T]here is no claim that the contract was entered into because of any misrepresentations. Hence it would be too glib to talk about an 'innocent party,' at whose option the contract is voidable."). DPLS is thus unlikely to succeed on the merits of this and all prongs of its Section 29(b) claims.

### C. The Balance of Hardships Weighs in FirstFire's Favor

"In balancing the equities, the issue is whether plaintiff would suffer decidedly greater harm from an erroneous denial of an injunction than the defendants would suffer from an erroneous grant." *Foulke by Foulke v. Foulke*, 896 F. Supp. 158, 162 (S.D.N.Y. 1995). Even if the Court finds that DPLS is likely to succeed on the merits, it "must consider the balance of hardships between the plaintiff and defendant and issue the injunction *only if* the balance of hardships tips in the plaintiff's favor." *5464 Route 212, LLC v. N.Y. State Dep't of Transp.*, 2020 WL 1888976, at *8 (N.D.N.Y. Apr. 16, 2020).

Here, DPLS seeks to enjoin FirstFire from selling DPLS common shares. The risks to FirstFire are serious—granting DPLS's motion for a preliminary injunction would prevent FirstFire from selling the shares of DPLS stock that FirstFire rightfully converted pursuant to the Note, for any reason, lasting for the entire duration of this Action. The price of DPLS common stock is historically volatile, and enjoining FirstFire from trading its shares for the duration of this Action, without any regard to the movements of the market, would result in undue financial hardships for FirstFire. *See id.* (considering financial hardship in balancing the equities in favor of defendants and denying injunction). In contrast, DPLS has not demonstrated, beyond mere

24

conclusory statements, how a purported drop in the price of its shares (conclusorily stated as caused by FirstFire) would harm DPLS.  Denial of DPLS's motion would merely subject DPLS to the ebbs and flows of the market, as the price of its stock may be affected by any number of factors. Additionally, because FirstFire has already sold out of more than half of its position, the harm DPLS purports to prevent by its motion is already necessarily lessened.

### III.   If Any Interim Relief Is Granted, DPLS Should Be Required to Post a Bond in Cash Equal to the Present Trading Value of FirstFire's Shares

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  *See* Fed. R. Civ. P. 65(c).  This rule serves to "assure[] the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff."  *Nokia Corp. v. Interdigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).

Here, if the Court were inclined to issue an injunction (which it should not do), a bond equal to the present trading value of FirstFire's shares is necessary to protect FirstFire against the volatility of the price of DPLS's shares.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request this Court deny Plaintiff's motion for a preliminary injunction.

Dated:  January 19, 2022                            /s/ Aaron H. Marks

                                                    Aaron H. Marks, P.C.
                                                    Byron Pacheco
                                                    Julia D. Harper
                                                    KIRKLAND & ELLIS LLP
                                                    601 Lexington Avenue
                                                    New York, New York 10022
                                                    (212) 446-4800

                                                    *Attorneys for Defendants*