MIL6DARC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  DARKPULSE, INC.,

4                Plaintiff,

5           v.                          21 CV 11222

6  FIRSTFIRE GLOBAL OPPORTUNITIES        Injunction
   FUND, LLC, et al,
7
                Defendant.
8
   ------------------------------x
9                                      New York, N.Y.
                                       January 21, 2022
10                                     2:00 p.m.

11 Before:

12                    HON. EDGARDO RAMOS,

13                                     District Judge

14                         APPEARANCES

15 THE BASILE LAW FIRM P.C.
        Attorneys for Plaintiff
16 BY:  GUSTAVE P. PASSANANTE
        ERIC BENZENBERG
17
   KIRKLAND & ELLIS LLP
18      Attorneys for Defendants
   BY:  AARON H. MARKS
19      TRACY LIN
        JULIA DEVEREUX HARPER
20

21

22

23

24

25

MIL6DARC

```
 1              (Case called)
 2              DEPUTY CLERK:  Counsel, please state your name for the
 3      record.
 4              MR. PASSANANTE:  Gustave Passanante for the plaintiff.
 5              MR. BENZENBERG:  Eric Benzenberg, your Honor, the
 6      Basile Law Firm.
 7              MR. MARKS:  Good afternoon, your Honor.  Aaron Marks,
 8      Tracy Lin, and Julia Harper from Kirkland Ellis, for the
 9      defendants.
10              THE COURT:  Good afternoon to you all.
11              This matters is on for a preliminary injunction
12      hearing.  I have received the parties' papers, and I'm ready to
13      hear you.  If you speak from the table, you don't have to
14      stand.  If you want to use the podium, if that makes you more
15      comfortable, you can use the podium.  Just please bring the
16      microphone as close to you as possible.
17              And Mr. Passanante or Mr. Benzenberg?
18              MR. PASSANANTE:  It will be Mr. Passanante, your
19      Honor.
20              THE COURT:  Okay.
21              MR. PASSANANTE:  So, your Honor, this case is about an
22      unregistered dealer engaging in the business's security
23      transactions.
24              The first point I want to make is the objections that
25      the defendants made to the amendment of the note and the
```

MIL6DARC

1    venue -- forum selection clause.  The plaintiff's asserting

2    that since the -- on the face of the note, it's criminally

3    usurious based on the stated interest rate, the original issued

4    discount, as well as the commitment shares issue.  It brings in

5    over the usury limitation of 25 percent in the State of

6    New York, deeming the note criminally usurious.

7            THE COURT:  I'm sorry.  Can you slow down, please?

8            MR. PASSANANTE:  Yes.

9            THE COURT:  And I apologize.  We all have to wear

10   masks, but if you speak up a little bit, slow down, speak up a

11   little bit, bring the microphone closer.

12           MR. PASSANANTE:  So because of the stated interest in

13   the note as well as the origination discount and the commitment

14   shares that were issued -- the value of which, by the way, were

15   approximately $1.4 million -- that easily exceeds the

16   25 percent interest cap that the State of New York provides for

17   in the penal law, deemed the note criminally usurious and void

18   *ab initio*.  Since that note is void *ab initio*, that would mean

19   that all ancillary documents, as far as the amendment goes, as

20   well as the forum selection clause, would also be void.

21           THE COURT:  When did you determine that this was

22   usurious?

23           MR. PASSANANTE:  You can tell by the terms of the

24   note, your Honor, because of the stated interest rate and the

25   original issue discount, which is about -- around 10 percent of

MIL6DARC

1    the principal.  However, when you analyze, it actually

2    increases to 15 percent because the nine-month maturity on the

3    note as well as the commitment shares were issued.

4               THE COURT:  So it was usurious at the time it was

5    entered into?

6               MR. PASSANANTE:  Correct, your Honor.

7               THE COURT:  And why didn't your client know that?

8               MR. PASSANANTE:  Well, your Honor, my client is not an

9    attorney, and it's an emerging growth corporation.  They are

10   traded on OTC markets.  They are typically desperate for

11   capital infusions, especially at the stage that they're in.

12              THE COURT:  Did your client have a lawyer?

13              MR. PASSANANTE:  Excuse me?

14              THE COURT:  Did your client have a lawyer?

15              MR. PASSANANTE:  Not sure, your Honor.  I'm only

16   litigation counsel.

17              THE COURT:  What?

18              MR. PASSANANTE:  You're saying at the time they

19   entered the transaction?

20              THE COURT:  Yes.

21              MR. PASSANANTE:  Did they have an attorney?  They had

22   general counsel.  As far as determining the usurious nature,

23   though, I don't think that was a concern -- a concern for them

24   at the time, because they were desperate for capital.  And

25   since they -- since the defendant was willing to provide

MIL6DARC

1    capital, they were more interested in doing that.  And then

2    when the client determined that how --

3              THE COURT:  I'm sorry.  You really have to slow down.

4              MR. PASSANANTE:  I'm sorry.

5              Once my client was able to determine how offensive

6    some of the provisions in the note, were was when they sought

7    counsel to determine the lawfulness of the note, which then

8    when we reviewed it, determined that it was usurious as well as

9    the other potential violations that defendants engaged in.

10             THE COURT:  I'm sorry.  So when, exactly, did your

11   client determine that it was usurious?

12             MR. PASSANANTE:  Your Honor, I don't think my client

13   determined that it was usurious.  I think counsel determined it

14   was usurious, litigation counsel.

15             THE COURT:  When?

16             MR. PASSANANTE:  When?  When we were able to review

17   the note.  The reason it wasn't inserted in our opening brief,

18   your Honor, because -- the point that you posed to me -- is

19   that corporations can't assert usury as an affirmative claim,

20   so we can only raise it as a defense.  The corporation can only

21   raise it as a defense.  So it's really just in response to

22   defendant's argument as to the forum selection clause.

23             THE COURT:  Okay.

24             MR. PASSANANTE:  So that's why it wasn't raised until

25   now, your Honor.

MIL6DARC

| | |
|---|---|
| 1 | THE COURT:  Now, how long has your client been around? |
| 2 | MR. PASSANANTE:  How long have they been around? |
| 3 | THE COURT:  DarkPulse. |
| 4 | MR. PASSANANTE:  As a publicly traded company? |
| 5 | THE COURT:  Yes, sir. |
| 6 | MR. PASSANANTE:  Three years, but there were private |
| 7 | before that for about seven. |
| 8 | THE COURT:  I know they engaged in a similar |
| 9 | transaction with FirstFire in 2018, correct? |
| 10 | MR. PASSANANTE:  Correct. |
| 11 | THE COURT:  Were they desperate for cash then? |
| 12 | MR. PASSANANTE:  Yes, they were, your Honor. |
| 13 | THE COURT:  Have they been desperate for cash since or |
| 14 | throughout? |
| 15 | MR. PASSANANTE:  Yes, your Honor.  So they're a tech |
| 16 | company. |
| 17 | THE COURT:  What do they do? |
| 18 | MR. PASSANANTE:  They -- they create software or |
| 19 | hardware, rather, called BODTA, brillouin optical -- optilian, |
| 20 | something, something, technology.  Essentially, what it does is |
| 21 | it produces a dark pulse sensor, which can be inserted in |
| 22 | mines, and what it will do is it will send out a dark pulse to |
| 23 | read for any weaknesses in structures, any cracks in pipes, or |
| 24 | anything like that.  So they try and sell their software -- or |
| 25 | hardware, rather, to mines, gold mines, oil mines, and things |

MIL6DARC

1    like that.  That's where their technology is used.

2              THE COURT:  And there's at least two with FirstFire,

3    correct?

4              MR. PASSANANTE:  Correct.

5              THE COURT:  And they have engaged in similar

6    transactions with other entities, correct?

7              MR. PASSANANTE:  They have, your Honor.

8              THE COURT:  How many more?

9              MR. PASSANANTE:  I think it's approximately 12.

10             THE COURT:  Approximately 12?

11             MR. PASSANANTE:  Yeah.

12             THE COURT:  And I think you've brought at least one

13   other lawsuit here, correct?

14             MR. PASSANANTE:  We're in litigation -- DarkPulse is

15   in litigation in Southern District.  I think they're a

16   defendant in the Southern District, but they're a plaintiff in

17   the Eastern District.

18             THE COURT:  Don't you have a case before

19   Judge Schofield?

20             MR. PASSANANTE:  Yes, your Honor.  In front of

21   Judge Schofield as well.  You're right.

22             THE COURT:  And then you're engaged in other

23   litigations?

24             MR. PASSANANTE:  Yeah.

25             THE COURT:  When did these litigations begin?

MIL6DARC

1          MR. PASSANANTE:  Roughly around the same time, your

2     Honor, within the last couple of months.

3          MR. BENZENBERG:  The Carebourn litigation, your Honor,

4     is the earliest.  It started approximately one year ago now.

5          THE COURT:  One year ago?

6          MR. BENZENBERG:  Yes.

7          THE COURT:  And did you bring the same causes of

8     action in that litigation as this one?

9          MR. BENZENBERG:  No.  Carebourn brought that action in

10    the State Court of Minnesota, and we've been there since --

11    we've been asserting defenses in that case, and we're currently

12    in discovery as of the moment.

13         THE COURT:  Okay.  So you needed cash, and so you

14    entered into a number of these transactions with entities like

15    FirstFire, et cetera.  Now, these are all multimillion dollar

16    transactions, correct?

17         MR. PASSANANTE:  Not always, your Honor.  For example,

18    I think the first note with FirstFire was roughly $250,000.

19         THE COURT:  With FirstFire?

20         MR. PASSANANTE:  Yes.  The September 2018 note.  It

21    was for roughly around that much.  I am not sure if, actually,

22    any of them are over a million.  I think they're generally a

23    couple hundred thousand dollars in principal.

24         THE COURT:  Okay.  Go ahead.

25         MR. PASSANANTE:  Okay.  And so to move on to the

MIL6DARC

```
1    elements to meet for a preliminary injunction, your Honor, the

2    plaintiff believes that they're likely to succeed on the merits

3    based on only the transactions available on EDGAR, which are

4    public documents -- public record.

5         And I note that plaintiff understands that those are

6    only disclosures regarding the purchase of notes; however,

7    they -- plaintiff did make the allegations as to the selling

8    activity of the defendants, as also evidenced in their

9    affidavits that they provided in support of their opposition,

10   so --

11        THE COURT:  What am I to make of the fact they have

12   been converting your stock?

13        MR. PASSANANTE:  Excuse me?

14        THE COURT:  What am I to make of the pattern, if any,

15   in terms of their conversion of your stock?

16        MR. PASSANANTE:  Well, your Honor, if a person is in

17   the business -- engages in the business of buying and selling

18   securities, they are deemed a dealer under the Exchange Act,

19   under section 3(a)(5).  Generally, when you're in the business

20   of buying and selling securities, it means that you're engaged

21   in more than just a few isolated transactions.

22        What we do know is that the defendants in this action

23   had engaged in dozens and dozens of these transactions, that we

24   can tell, as of disclosures on EDGAR made by other issuers.

25   And just in our cases, we do know that they engaged in the
```

MIL6DARC

```
1    conversion of that debt into stock, and then do sell that

2    common stock into the market.

3              So all of those securities transactions are certainly

4    more than a few isolated transactions, and we believe in

5    discovery, we would be able to obtain the selling records from

6    the brokers of the defendants.

7              THE COURT:  Isn't that published information.

8              MR. PASSANANTE:  No, your Honor.  Not selling records.

9              THE COURT:  Okay.

10             MR. PASSANANTE:  But the disclosures, of course, are

11   public record, which, while it does evidence a lot of

12   transactions, it could also be missing transactions because,

13   remember, those disclosures are on behalf of the issuers, so

14   some issuers don't make proper disclosures.  So in discovery,

15   there's likely to -- we're likely to find even more

16   transactions that are evidenced on EDGAR.

17             THE COURT:  What do you mean some issuers don't make

18   proper disclosures?

19             MR. PASSANANTE:  So some public companies, they might

20   not disclose necessarily the entity name.  They might be not

21   reporting under the Exchange Act, which would -- obviously,

22   they'd suffer consequences from the SEC and from the markets

23   themselves, and could suffer a delisting.  But it's not

24   uncommon for -- especially if a company trades on the OTC

25   markets, to file either incomplete disclosures or just not file
```

MIL6DARC

| | |
|---|---|
| 1 | disclosures at all and not make proper -- not meet the proper |
| 2 | reporting requirements. |
| 3 | THE COURT:  So you're asking me to speculate that |
| 4 | FirstFire may have improperly failed to disclose certain of its |
| 5 | transactions? |
| 6 | MR. PASSANANTE:  Well, no, your Honor.  So FirstFire |
| 7 | wouldn't be the company disclosing it.  It would be the issuer. |
| 8 | So, for example, let's say there's ABC Corp., and FirstFire has |
| 9 | a note with ABC Corp. and ABC Corp. is a publicly traded |
| 10 | company. |
| 11 | THE COURT:  Slow down. |
| 12 | MR. PASSANANTE:  Sorry. |
| 13 | ABC Corp. would then be required to file in the |
| 14 | disclosure -- whether it being 8-K or a 10-Q or a 10-K, stating |
| 15 | the transaction that it entered into was FirstFire.  So we |
| 16 | wouldn't find the disclosures by FirstFire.  We'd -- it would |
| 17 | be evidenced by disclosure of other companies traded on the OTC |
| 18 | markets, which are subject to those reporting requirements by |
| 19 | the SEC.  And so I'm not asking you to speculate, as I think |
| 20 | that there's plenty of evidence on EDGAR as of today.  We |
| 21 | attached the transaction list from all the evidence that we |
| 22 | found regarding transactions with FirstFire as an exhibit to |
| 23 | the complaint. |
| 24 | THE COURT:  Sorry.  Ms. Rivera, can you close the |
| 25 | curtains so we don't blind Mr. Benzenberg, please? |

MIL6DARC

1          MR. BENZENBERG:  Thank you, your Honor.

2          THE COURT:  That's fine.

3          MR. PASSANANTE:  So, your Honor, back to my point.

4     I'm not asking the Court to speculate that FirstFire is engaged

5     in these transactions.

6          THE COURT:  But you're suggesting that there may be

7     some wrongdoing somewhere along the line?

8          MR. PASSANANTE:  Not necessarily wrongdoing.  What I'm

9     trying to purport is that there could potentially be even more

10    transactions out there that are not public record.

11         THE COURT:  Well, what's wrong with the transactions

12    that they've engaged in that we know about?

13         MR. PASSANANTE:  So the transactions that they've

14    engaged in are securities transactions themselves.  So the

15    purchase of the note -- the note's defined as a security under

16    the Exchange Act.  So the securities purchase agreement sets

17    forth the terms for the parties -- for FirstFire in this

18    case -- to purchase the note from DarkPulse.  So that agreement

19    itself is a securities transaction, so that's why the plaintiff

20    takes the position that the agreement itself -- in this case,

21    the note, which is sold through the securities purchase

22    agreement -- is itself, indeed, a securities transaction.

23         THE COURT:  Okay.

24         MR. PASSANANTE:  Right?  On top of that, the --

25    there's significant evidence in our case already that FirstFire

MIL6DARC

1    acts as an underwriter, because they acquire the securities

2    with an intent to redistribute.  They make profits off of the

3    markups because they acquire the securities at a substantial

4    discount to market and then quickly sell after the conversion;

5    that conversion either being a market-adjustable discount to

6    conversion or being a fixed discount, which would still leave

7    them in the money, so to say, similar to an option contract.

8    So they're still acquiring stock at a discount to market, and

9    then they will quickly resell that stock into the market to

10   reap the benefit of the markup.

11        THE COURT:  Can I just ask you a question?  Putting

12   aside whether or not this initial agreement is legal or not, is

13   what you just described allowed for under the agreement?

14        MR. PASSANANTE:  Is it allowed for under the

15   agreement?  Yes, your Honor.

16        THE COURT:  Go ahead.

17        MR. PASSANANTE:  Okay.  And just to bring to the

18   Court's attention there are two cases that were decided in the

19   Southern District that were mentioned in our papers; the *LG* and

20   the *Vystar* cases.

21        THE COURT:  The *LG* and the *Vystar*?

22        MR. PASSANANTE:  *Vystar*, yeah.  Those were two

23   Southern District cases that focused on the performance under

24   the agreements.

25        While sometimes that may be a proper analysis for a

MIL6DARC

1    court to engage in for a section 15(a) violation; in this case,

2    it isn't, only because, as we stated before, the acquisition of

3    the note itself from the defendant is, indeed, a securities

4    transaction, as opposed to, for example, the cases that

5    defendants cite in their brief, the *Frati* and the *Foundation*

6    *Venture* cases.  Those were service agreements that contemplated

7    further securities transactions.

8            THE COURT:  But in the *LG* and *Vystar*, was the same

9    argument made?

10           MR. PASSANANTE:  No, your Honor.  So the argument made

11   in those cases were that the agreements were unlawful because

12   of the performance due under the agreements, which would

13   further -- be further security transactions by an unregistered

14   dealer.  For some reason the court --

15           THE COURT:  Is that what you're saying?

16           MR. PASSANANTE:  No, your Honor.  So under section

17   29(b), it voids all agreements as made in violation under the

18   Exchange Act.  And so like I was saying earlier, these

19   convertible notes are purchased through a securities purchase

20   agreement.  That securities purchase agreement itself is a

21   transaction in securities.  So the position the plaintiff is

22   taking is that the initial transaction -- the acquisition of

23   that note by the defendant -- is in fact, a securities

24   transaction, which is why the entire note would be void.

25           THE COURT:  Okay.

MIL6DARC

1      MR. PASSANANTE:  Okay.  And as a public securities

2   issuer, DarkPulse is within the class of persons that the act

3   was designed to protect.  And to touch on the --

4      THE COURT:  What is the class of persons the act is

5   designed to protect?  How is it defined in that section?

6      MR. PASSANANTE:  Since DarkPulse is an issuer of

7   securities, the act is designed to protect issuers of

8   securities, especially with the dealer registration requirement

9   because of the restrictions and disclosure requirements it

10   imposes on broker dealers.

11      To touch on the unwilling or innocent party argument

12   that defendants brought up in their brief, I just wanted to

13   clarify that that applies only to violaters of the act.  And

14   for a person to be an unwilling or innocent party, they would

15   have to assist in the violation of the act.

16      DarkPulse didn't assist in -- assist in the defendants

17   engaging in securities transactions and buying and selling

18   securities as a part of their business.  So since DarkPulse

19   didn't assist in that violation --

20      THE COURT:  I guess I don't understand that argument.

21   This is a bilateral agreement, and to the extent that DarkPulse

22   was desperate for cash, why can't that be seen as assisting in

23   this transaction?

24      MR. PASSANANTE:  Well, I wouldn't take that position,

25   your Honor.  I wouldn't take that position because they, for

MIL6DARC

1    example, in the *Buffalo Forge* case, there was --

2              THE COURT:  The Buffalo?

3              MR. PASSANANTE:  *Buffalo Forge* case.  That party was

4    essentially on both sides of the transaction, assisting in

5    deals and finding other agreements, which would be -- and then

6    they attempted to terminate the note -- or I'm sorry, void the

7    transaction.  Since they were assisting in it, then they would

8    be considered unwilling or innocent party -- I'm sorry, not

9    considered, because of the activity that they were engaging in,

10   because they were assisting in the violations of the act.

11             Moving on to the irreparable harm argument.  It's been

12   demonstrated that excessive selling activity and the erosion of

13   the stock price is irreparable because it would affect the

14   economic viability of a company.  It's something that's not

15   remedial by money damages.  You can't restore market

16   confidence, you can't restore certain --

17             THE COURT:  Why would market confidence be damaged by

18   FirstFire converting its debt?  As I understand it, from

19   defendant's papers, while their stake in DarkPulse may not be

20   insignificant, it is small.  And as they tell it, even when

21   they're trading on a daily basis, the stock that they traded is

22   a small percentage of the overall stock that's traded on any

23   given day.

24             MR. PASSANANTE:  Well, your Honor, yeah, that was in

25   the affidavit that the defendants brought in support of its

MIL6DARC

1    papers.  However, they do still write currently -- as long as

2    the affidavit was accurate, over 90 million shares of the

3    DarkPulse stock.  So if they were to dump, let's say, all of

4    that stock in one day, that would probably amount to a volume

5    significantly more than their average trading volume.

6            THE COURT:  If they were to do that.

7            MR. PASSANANTE:  If they were to do that.

8            THE COURT:  Why would they do that?

9            MR. PASSANANTE:  Well, your Honor, since they

10   converted at such a substantial discount to market, they would

11   still technically profit from any sales regardless of how much

12   the stock price does decline.

13           THE COURT:  Isn't it in their interest for your stock

14   to be as valuable as possible?

15           MR. PASSANANTE:  It is, your Honor.  But there's no --

16   since they did acquire it at such a steep discount, it's not

17   like they would make no money -- of course, they would make

18   less money, as you're suggesting, but they do have the

19   opportunity to do that, and the opportunity to do that alone

20   would -- if they were to put those many sell orders on a stock

21   trade at this volume, then it would --

22           THE COURT:  Well, let me ask you this, because we're

23   not exactly working on a blank slate here, right?  There's a

24   prior agreement.  And we didn't see FirstFire engage in that

25   type of reckless trading that you're suggesting might happen

MIL6DARC

1  here, right?  They converted that stock over a period of months

2  or maybe even a couple years.  So why are you asking me now to

3  assume that they're going to dump all this stock precipitously,

4  and damages — and even assuming that creates larger than a

5  ripple, given the amount of stock that your company trades on

6  any given day?

7        MR. PASSANANTE:  Well, certainly, your Honor.  The

8  reason why this got brought to our attention is because on

9  January 14th -- I think it was last Friday when plaintiff

10  originally filed its order to show cause for temporary

11  restraining order -- we got notified from our client that there

12  was a massive sell order for DarkPulse stock, and the defendant

13  was one of the only parties that had the ability to put in an

14  order that large, which was why the plaintiff took the position

15  that they might do this again, that the defendants might put in

16  a significant sell order again that could potentially damage

17  the shares.

18        THE COURT:  Was that part of the papers you put in

19  last week?

20        MR. PASSANANTE:  It was part of the first affidavit by

21  Dennis O'Leary.

22        THE COURT:  Did FirstFire put in a massive sell order

23  on that day?

24        MR. PASSANANTE:  Well, FirstFire rebutted that with an

25  affidavit from Eli Firearm, which stated how many shares that

MIL6DARC

1    that they sold.  But the reason that the plaintiff originally

2    believed it was the defendants was because of the sell order

3    that the O'Leary affidavit speaks about.  I believe it was

4    January 14th.

5         THE COURT:  Have you confirmed it was them?

6         MR. PASSANANTE:  Well, your Honor, we were discussing

7    before, we can't see the parties.  It's not public information,

8    who is selling and buying.

9         THE COURT:  Okay.

10        MR. PASSANANTE:  You can just see the volume.

11        THE COURT:  By the way, can I ask another question?

12   Generally speaking, when a party comes to court to request a

13   TRO or preliminary injunction, the party is required to state

14   that no similar application has been made before, and you

15   didn't.  I assume there's not.  But I learned, I guess from the

16   defense, that they had actually started an action in Delaware a

17   couple weeks before you brought your action.  That was not

18   mentioned in your papers.  Should it have been?

19        MR. PASSANANTE:  Well, your Honor, so since the

20   plaintiff takes the position that the agreements are void

21   *ab initio*, the Delaware action, according to the plaintiff's

22   position, was improper.  That's why the plaintiffs didn't feel

23   the need to mention the Delaware action, because it takes the

24   position that it was improper.

25        THE COURT:  So it doesn't exist?

MIL6DARC

1          MR. PASSANANTE:  Well, no, not that it doesn't exist,

2     your Honor.  It was just that we felt -- the plaintiff felt

3     that jurisdiction was improper here because of the usurious

4     nature of the contract, and that amendment would be void.  And

5     the same argument is most likely going to be made in the

6     Delaware action.  And the Delaware action also was only seeking

7     a declaratory judgment; it wasn't to enforce the terms of the

8     note.

9          THE COURT:  No.  Well, I mean, tomayto, tomahto.

10    Again, as I said, it's not that you were required under the

11    rule to tell me about that action.  My only question is should

12    you have.  Would that have then contributed to the quantum of

13    information that would have assisted me in analyzing your

14    papers?  But go ahead.

15         MR. PASSANANTE:  I apologize, your Honor.  Maybe we

16    should have.

17         As to the balance of hardships between the parties,

18    the relief that the defendants could potentially be entitled to

19    is certainly calculable, which, during the pendency of this

20    action, they wouldn't suffer any harm if they were to be

21    prevented from selling any DarkPulse stock on the market

22    because if, let's say, the market conditions increased, that

23    would be calculated into damages and they missed an opportunity

24    to sell that stock at a certain time, then it would be easily

25    quantifiable, and they could obtain a money judgment against

MIL6DARC

1    the plaintiff if they were to be successful on the merits of

2    this action.

3            Lastly, your Honor, of course the plaintiff is willing

4    to post a bond in the amount of whatever the Court would

5    request, pending the disposition of this action.

6            And that's all I have to say, your Honor.

7            THE COURT:  Very well.  Thank you.

8            Mr. Marks, will you be arguing on behalf of FirstFire?

9            MR. MARKS:  I will.  I just want to make sure you can

10   hear me.

11           THE COURT:  I can hear you.

12           MR. MARKS:  Okay.  Thank you.

13           Your Honor, as set out in our papers, we believe there

14   are several reasons why DarkPulse's motion for preliminary

15   injunction should be denied.  As your Honor pointed out in the

16   first instance, we believe that this motion and DarkPulse's

17   claims related to the April 2021 note do not belong before this

18   Court.

19           We agreed in an amendment to the note that the

20   exclusive forum provision would be for the state and federal

21   courts in Delaware.  This dispute first arose in November when

22   FirstFire converted the note to shares, the parties went back

23   and forth after DarkPulse requested two-thirds of the share's

24   back.  And on December 13th, we filed a declaratory action in

25   the chancellery court of Delaware, seeking a judgment that the

MIL6DARC

 1    conversion was proper and that FirstFire is entitled to keep

 2    all of the shares it converted.

 3            DarkPulse, through Delaware counsel, has entered an

 4    appearance there, and we have a scheduling order in place now

 5    for briefing on initial dispositive motions.

 6            THE COURT:  They haven't answered?

 7            MR. MARKS:  What's that?

 8            THE COURT:  They didn't answer?

 9            MR. MARKS:  Not yet.  Their answer is not due yet.

10            THE COURT:  Right.

11            MR. MARKS:  DarkPulse provides no viable reason for

12    nullifying the forum selection clause agreed upon in the

13    amendment and why the claims concerning the April 2021 note

14    should be heard by this Court.

15            First, in their complaint, DarkPulse suggested that

16    the amendment's contents were not explained to their CEO by my

17    client before DarkPulse, the CEO, executed the amendment.

18    That, of course, is not an excuse for a sophisticated party to

19    void a contract or a contractual provision.

20            THE COURT:  But wasn't there some suggestion in I

21    think your paper that, in fact, Mr. O'Leary, if that's his

22    name, did consult with counsel?

23            MR. MARKS:  He did.  He did.  So, yes, it's our

24    contention that the amendment should obviously be enforced;

25    that Mr. O'Leary consulted with counsel; that Mr. O'Leary, as

MIL6DARC

1    the CEO of DarkPulse, was more than capable of understanding

2    the one-page amendment that only really spoke to the governing

3    law provision and the choice of forum provision.  So we

4    think --

5         THE COURT:  So the amendment spoke not only to forum

6    but also to the choice of law?

7         MR. MARKS:  Correct.

8         THE COURT:  Okay.

9         MR. MARKS:  In their papers, for the first time last

10   night, DarkPulse now claims that the note was criminally

11   usurious, and that somehow that is a basis for voiding the

12   forum selection clause.  There are several layers of reasons

13   why this argument is completely unsound.

14        First of all what they don't address, again, is that

15   Delaware law applies here and not New York law, not New York

16   usury statutes.  In fact, Judge Buchwald, in a similar case,

17   *EMA Financial v. NFusz*, 444 F.Supp.3d 530, spoke to whether the

18   parties agreed-upon choice of law -- in that case it was

19   Nevada -- should be ignored because of the New York usury

20   statute, and Judge Buchwald found that the public policy behind

21   the New York usury statute was not fundamental to warrant

22   overriding the parties' choice of law in order to ensure the

23   usury statute's enforcement.  Judge Buchwald could not conclude

24   that enforcing the parties' choice of law provision would be

25   truly obnoxious to New York public policy.

MIL6DARC

```
 1              So they state no reason why we should even look to the
 2      New York's usury statute in assessing the choice of forum
 3      provision.  However, even if they could state a reason from
 4      looking at the New York usury statute, it really does not
 5      matter because, here, it is obvious that even if the New York
 6      statute applied, it is plain that the note at issue here is not
 7      criminally usurious.  On its face, this note has a 10 percent
 8      interest rate, it has a 10 percent OID, original issue
 9      discount, even annualized -- DarkPulse acknowledges in their
10      papers last night that, on its face, the interest rate and the
11      OID adds up to less than 25 percent, which is the limit.
12              THE COURT:  As I understand it, it's a fixed rate in
13      connection with this agreement?
14              MR. MARKS:  Correct, your Honor.  Correct.  So I think
15      what you're referring to is the conversion mechanism, and that
16      is a fixed rate, and there is good reason why one does not then
17      account for the conversion rate in figuring out whether the
18      instrument is usurious or not.
19              And, in fact, DarkPulse did not even suggest that the
20      conversion mechanism here goes into the calculation of usury.
21      What they did suggest, just before when Mr. Passanante was
22      arguing -- what they did suggest was that on top of the
23      interest rate and the original issue discount, that this Court
24      should also add value that of the shares that were reserved for
25      conversion at the time of entering the note to determine usury.
```

MIL6DARC

1    Okay?

2          When the note was entered in April 2021, the company

3    reserved, whatever it was, 177 million or more shares in the

4    event that six months or more later there would be a

5    conversion.  They're suggesting that in determining usury, that

6    these shares, which may never be touched, should be taken into

7    the calculation of whether something is usurious.  That is

8    flatly wrong, and your Honor actually rejected that very same

9    argument in a 2019 decision that your Honor wrote in the case

10   *EMA Financial v. AIM Exploration*.

11          Your Honor cited several Southern District decisions

12   that held, "The reservation of shares is not an independent

13   payment to the lender, but merely a mechanism by which to

14   effectuate the share conversion as envisioned by the note and

15   the SPA.  Since the share conversion feature does not render

16   the agreement usurious, neither does the reservation of shares

17   provision."  And you can conclude in that decision, did hear

18   the note, did not require the share reserve to be paid to the

19   plaintiff.  It was simply security that the defendants were

20   required to set aside so that there would be shares available

21   if the conversion option was exercised.

22          THE COURT:  So is it the case, Mr. Marks, that if the

23   reserve shares are counted, it may be usurious, but if they're

24   not counted, they are not usurious?

25          MR. MARKS:  That's correct.  Meaning that what they

MIL6DARC

1    did in their papers from last night, as you'll see, they value

2    their reserve shares at the time that we contracted, right, you

3    know, however 177 million shares were worth $1.4 million on

4    April 21 -- or April 26 when we entered this contract, and

5    they're saying you add that to your calculation, and that puts

6    you over the usury line.  Okay?  But there's no decision, yours

7    or the several decisions cited in the Southern District, that

8    you cite that would require that.  In fact, they all reject it.

9             So this argument that this note was usurious, and then

10   for that to be a reason to void the forum selection clause is

11   completely speechless.  There's no basis for it whatsoever.

12            So, your Honor, the motion should be denied outright

13   for being brought in the wrong forum.

14            THE COURT:  Can I ask you a question about that note,

15   Mr. Marks?

16            MR. MARKS:  Sure.

17            THE COURT:  My understanding is that there is a

18   New York Court of Appeals decision from last fall.

19            MR. MARKS:  Yes.

20            THE COURT:  Which essentially, I think, tells us that

21   we all, here in the Southern District, got it wrong.

22            MR. MARKS:  Yes.

23            THE COURT:  Was that the reason for the amendment; if

24   you can tell me?

25            MR. MARKS:  Your Honor, the timing -- look, I was not

MIL6DARC

1    involved with the amendment.  Timing would suggest that there's

2    a connection there; however, something that's important to

3    understand is that that decision, the *Ader Bays* decision by the

4    Court of Appeals, really has no application to this note, and

5    that's because of the following:

6          What the *Ader Bays* decision determined was that if a

7    note had a variable or floating conversion rate, meaning that

8    at the time of conversion, six months, eight months after the

9    note is entered, let's say the stock has gone up or the stock

10   has gone down –– the way that a variable or floating rate

11   conversion note works is that, let's say there's $100,000 in

12   outstanding balance, the way the conversion would work under a

13   variable rate note, which is typical, is you'd be able to

14   convert at the then-market rate at the time of conversion,

15   minus like a 30 or 35 percent discount.  That's typical for one

16   of these notes.

17         And what the *Ader Bays* court, what the Court of

18   Appeals said, is that if the noteholder is guaranteed a

19   discount off-of-the-market rate, they are not subject really to

20   market risk of the stock, meaning if the stock goes down here

21   from April to November when we converted, under a variable rate

22   note, our conversion price would drop with the market and go

23   30 percent lower so that it would never be in trouble.  Okay?

24         Our note is different because we don't have a variable

25   rate.  We don't have a variable rate conversion rate.  We have

MIL6DARC

1    a fixed conversion rate here, meaning we agreed that on

2    April 26th, our conversion rate, under normal circumstances,

3    would be 15 cents or .15 cents, whatever it is, per share.  And

4    it was going to stay that regardless.  It was fixed.  So if the

5    stock went down significantly and the company tanked, our

6    conversion rate stayed the same.  We weren't entitled to

7    convert to a lower number with the market and a discount from

8    there.

9         What *Ader Bays* said is this variable rate or floating

10   rate note, notwithstanding the fact it might be tough to

11   calculate what that's worth, but that should be added to a

12   calculation for usury.  They distinguished that from this note,

13   right, which is a fixed rate note.  So the *Ader Bays* decision

14   is really inapplicable to this case.

15        Now, you asked did we get the amendment because of the

16   *Ader Bays* decision.  The timing, I agree, was very close in

17   time, but the *Ader Bays* decision really has nothing to do with

18   this case.  Okay?

19        So for the reasons I just stated, we believe strongly

20   that the motion should be denied because it was brought in the

21   wrong forum.  Delaware is the proper place.

22        As to if your Honor reaches the preliminary injunction

23   motion itself, we think that on the merits of it, it also would

24   have to be denied as it fails every single prong.

25        First, they don't come close to satisfying the

MIL6DARC

1    requirement of irreparable harm here.  DarkPulse asserts that

2    it will be irreparably harmed if we sell into the market.  What

3    was 177 million shares is now half of that.  First of all, you

4    know, obviously, they were late in bringing this motion.

5    Seven weeks and 42 trading days past.  Whatever urgency they

6    had, whatever they saw in the market that they thought we were

7    doing something, we weren't.  And whatever urgency they suggest

8    there was from 177 million shares, obviously, is at least half

9    of that now.

10            First, and obviously, we're talking about shares of

11   stock here.  DarkPulse common shares are heavily traded in the

12   open market.  Monday, Tuesday, Wednesday of this week alone,

13   260 million shares of DarkPulse traded.  85 million shares a

14   day this week.  And my client has little, if any, of that.

15           THE COURT:  But there's something, isn't there,

16   Mr. Marks, to the point that if you were to dump the balance of

17   the DarkPulse shares that you have on Monday, notwithstanding

18   the fact that there are however many billion shares outstanding

19   in circulation, that might have a negative impact on it,

20   wouldn't it?

21           MR. MARKS:  Your Honor, at this point it's less than

22   2 percent of the DarkPulse shares out there.  It's less than

23   what was traded on each of the three days this week.  It's

24   totally speculative as to what impact our selling would have.

25           THE COURT:  I take it that the 85 million shares that

MIL6DARC

| | |
|---|---|
| 1 | were sold on average over the last three days were multiples of |
| 2 | different traders, correct, or different holders? |
| 3 | MR. MARKS:  I mean, that's not public information. |
| 4 | THE COURT:  All right. |
| 5 | MR. MARKS:  And let me add this:  It may or may not be |
| 6 | because last month in December, DarkPulse struck another deal |
| 7 | with a different financing source, right, where they gave -- |
| 8 | this is a firm GHS.  We mentioned this in our papers.  They |
| 9 | offered to GHS 300 million new shares.  Okay?  So GHS is |
| 10 | unlikely holding onto these shares.  GHS is likely a party that |
| 11 | is out there selling their shares.  There are no restrictions |
| 12 | on them whatsoever. |
| 13 | THE COURT:  What are the terms of that agreement; if |
| 14 | you know? |
| 15 | MR. MARKS:  It's a finance agreement.  It's not a |
| 16 | convertible note.  It's a different type of instrument. |
| 17 | THE COURT:  Okay. |
| 18 | MR. MARKS:  But the point is that they're looking to |
| 19 | limit us from selling 85 million shares.  They just gave |
| 20 | another investor completely uninhibited 300 million shares, and |
| 21 | they're not asking that entity to slow down their trade. |
| 22 | Your Honor, again, that where an injunction is sought |
| 23 | regarding common shares of stock, and such shares are available |
| 24 | on the open market, there is no reason why monetary damages |
| 25 | would not adequately compensate the plaintiff if it proved up |

MIL6DARC

1    its case.

2         This notion, as we just talked about, about

3    dilution -- again, I understand it's a hypothetical that if

4    somebody trades a lot of shares in one day, but DarkPulse has

5    done nothing to quantify that, to suggest that a sale of 80 or

6    90 million shares, which my client has not done -- you know, to

7    date, we've only sold in small pieces -- that that would make

8    up less than 2 percent of the market, where this company has

9    issued 300 million to somebody else last month, where they've

10   issued 3.5 billion shares to convertible noteholders over the

11   past three years, 3.5 billion shares -- that this 80 or

12   90 million shares is somehow going to make some sort of

13   difference here.  It just doesn't make sense.

14        THE COURT:  How many different holders did they issue

15   up to?

16        MR. MARKS:  I think it's in our papers that they have

17   done 20 different notes, they've done 36 conversions.  I think

18   it's seven or eight different investment funds that they've

19   converted with.  And it's been massive amounts of shares.

20        THE COURT:  So 3.5 billion over 20 different notes?

21        MR. MARKS:  Yes.

22        THE COURT:  Okay.

23        MR. MARKS:  Right.  So I mean, again, there's now 5, 5

24   and a half billion shares out there.  Three and a half billion

25   of them are issued to the investment funds that they've done

MIL6DARC

1    these deals with.

2           So, your Honor, there's no irreparable harm here.  I

3    can quickly address likelihood of success on merits if you'd

4    like me to.

5           THE COURT:  Is your client an unregistered securities

6    dealer?

7           MR. MARKS:  They are not a dealer, they are not

8    registered, but they are not in the business of buying and

9    selling securities as defined under the Securities and Exchange

10   Act.  You know, first, there are several prongs of 29(b) that

11   are in no way satisfied here.  First, the note issue is not an

12   unlawful transaction under the securities law.

13          THE COURT:  Is it a security?

14          MR. MARKS:  It's not a security at all.  It's funny

15   that when they're claiming that it's usurious, DarkPulse

16   characterizes the note as a loan; when not discussing usury,

17   it's now somehow a security.  It's not a security.

18          And Judge Carter's decision in *Vystar* is really

19   squarely on point.  Judge Carter then granted summary judgment

20   in favor of EMA Financial on plaintiff's 29(b) claims because

21   nothing in the note or the SPA explicitly required

22   EMA Financial, the noteholder, to act as a broker-dealer.  The

23   note was capable of being performed, even if EMA or, here,

24   FirstFire, did not register as a dealer.

25          FirstFire is not required under the note to sell or

MIL6DARC

1    buy securities.  Notes were neither made nor performed in

2    violation of any federal securities laws required for decision

3    under section 29(b).

4            Judge Carter dismissed the Vystar's 29(b) filing on

5    this basis.  He also, by the way, found that rule 15(a)(1)

6    provides no private right of action.  Those are two reasons

7    right there in Judge Carter's opinion why there's no likelihood

8    of success on the merits.

9            But there are more reasons.  Your Honor just asked

10   about the business of buying and selling securities.  DarkPulse

11   would have to prove under 29(b) that FirstFire is irregularly

12   engaged in the business of buying and selling securities as a

13   dealer.  There is no basis for suggesting that the trader

14   exception that is built into this determination of whether an

15   entity would be a dealer, the exception for being a trader

16   trading on its own account; this exemption should apply to

17   FirstFire.

18           As far as whether they're in the regular business of

19   buying and selling securities, one example proving otherwise,

20   comes from DarkPulse's own complaint.  DarkPulse has alleged

21   that out of $34 million in principal, right, loaned by

22   FirstFire for all of its convertible notes that DarkPulse found

23   on EDGAR, FirstFire converted only on $1.4 million of that

24   known amount, or 4 percent of the total amount loaned.

25           So with respect to the other $32.6 million of loans

MIL6DARC

1  made, those were all paid back by the companies they loaned to

2  in cash, right?  They were straight up loan-type transactions.

3  The six months passed or however many months passed.  Rather

4  than converting for shares, the companies paid back, there was

5  $700,000 in cash, plus the interest.  There was no securities

6  involved whatsoever.

7          DarkPulse also said in their papers that FirstFire

8  effectuated no fewer than 203 securities transactions with

9  other small companies like DarkPulse; yet the EDGAR list shows

10 only about 30 conversions and 13 share issuances.

11         DarkPulse does not have a reasonable likelihood based

12 on this data of demonstrating that FirstFire is in the business

13 of buying and selling securities, which is a plain requirement

14 obviously for 29(b).

15         Last element here:  DarkPulse will not be able to show

16 that it is in the class of entities intend to be protected by

17 the Exchange Act.  As set out in our brief, precedent requires

18 a party to be an unwilling and innocent party to a transaction

19 that purportedly violated 29(b).

20         Here, based on DarkPulse's track record of entering

21 dozens of these convertible notes, based on the fact that this

22 note, in particular, acknowledged that FirstFire was not a

23 registered dealer; the fact there's a covenant in the SPA that

24 DarkPulse would never assert before any person or governmental

25 authority that it was entitled to relief based on the fact that

MIL6DARC

1    FirstFire was an unregistered dealer; the fact that DarkPulse

2    is and was plaintiff in lawsuits seeking to void contracts with

3    investment funds like this that were not registered before it

4    entered into this note --

5              THE COURT:  Sorry.  What are the dates of those

6    actions that you're referring to?

7              MR. MARKS:  So Mr. Benzenberg referred to the

8    *Carebourn* action.  For example, that action was brought by

9    Carebourne in advance of -- you know, over a year ago.

10   Carebourne is the plaintiff there pursuing the shares.  It

11   didn't receive the shares.  They didn't convert.  DarkPulse

12   prevented them from converting.  And DarkPulse is defending

13   that action saying that Carebourne was an unregistered dealer,

14   and that predates this note.

15             THE COURT:  Okay.

16             MR. MARKS:  Okay?  All these things point to

17   overwhelmingly that DarkPulse was no babe in the woods when it

18   came to this dealer issue.  They were well aware.

19             THE COURT:  Let me ask you this:  The counsel for

20   DarkPulse says that this was a company that was continually

21   desperate for money, desperate for cash.  Assuming that your

22   client knew that, would that change the analysis as to whether

23   they were, in fact, a willing participant in this transaction?

24             MR. MARKS:  No.  Because, your Honor, there's no

25   question that DarkPulse knew what it was signing up for.  They

MIL6DARC

1   had counsel for each of these notes.  They were aware of this

2   unregistered dealer issue.  There's nothing unlawful about the

3   transaction that's been entered into.  And, again, this is just

4   one of the several prongs of 29(b), the notion that DarkPulse

5   needs to be an unwilling and innocent party.  It would be

6   different if they were coming at this for the first time, but

7   there is nobody more sophisticated than DarkPulse about these

8   convertible notes.  They've done 20 of them.  They've been

9   converted to the tune of 3.5 billion shares.  They've brought

10  all sorts of lawsuits about them.  They've hired here, and

11  they've hired them several times, the law firm that represents

12  all these small-cap companies in these cases.

13          So we believe that that element, that they would not

14  have a reasonable likelihood of success on these several

15  elements under 29(b), including this element.

16          Just to conclude, we don't think your Honor needs to

17  even reach the likelihood of success on the merits of this

18  injunction.  We think, in the first instance, that this belongs

19  in Delaware, where the preexisting case in chancellery court

20  regarding this note is going forward.

21          But if we were to reach the merits, we think that it

22  fails under irreparable harm as well as the likelihood of

23  success on the merits.

24          THE COURT:  Thank you.  Mr. Passanante, I'll give you

25  an opportunity to respond briefly.

MIL6DARC

1          MR. PASSANANTE:  Sure, your Honor.  Thank you.

2          Just one thing I wanted to clarify that Mr. Marks

3   said.  When he was referring to the usurious nature of the

4   contract and arguing that the reserve shares were not included

5   in the calculations, he was absolutely correct.

6          What he's incorrect about were the shares that we're

7   alleging that did count in the calculation, which were the

8   75 million commitment shares that were issued upon execution of

9   the note.  That was what was valued at $1.4 million.  The

10  reserve shares are what the transfer agent holds in reserve.

11  So the commitment shares is what Mr. Marks was supposed to be

12  referring to, because those were issued upon execution of the

13  note.  The reserve shares that he was discussing have to do

14  with an obligation under the notes that require the company to

15  put shares in reserve.  Those shares in reserve are held by the

16  transfer agent, the trust account, which will then be

17  transferred to the lender upon a request for a conversion.

18         Those shares are held in reserve to ensure that the

19  lender can actually obtain shares upon conversion.  So he's

20  correct; they're not conveyed, and they should not be

21  calculated at value; however, the 75 million shares that were

22  conveyed upon execution should be considered value --

23         THE COURT:  So did you include the reserve shares in

24  your calculation in determining the usurious nature of the

25  contract?

MIL6DARC

1          MR. PASSANANTE:  Yes, your Honor.  With the stated

2     interest rate on top of the OID, that amounts to roughly

3     25 percent.  The value of the stock that they acquired upon

4     execution was roughly $1.4 million.

5          THE COURT:  Again, I'm just trying to get this one

6     little point clear in my mind.  Mr. Marks said that you

7     included the reserve shares in your calculation, and my

8     question to you is, did you?

9          MR. PASSANANTE:  No, your Honor.  So what we included

10    was the commitment shares.

11          THE COURT:  Okay.

12          MR. PASSANANTE:  The shares that were actually

13    conveyed upon execution.  Reserve shares were not conveyed upon

14    execution.  They were held, like I said, by the transfer agent.

15          THE COURT:  You didn't include them in your

16    calculation?

17          MR. PASSANANTE:  No, your Honor.  Because they

18    didn't --

19          THE COURT:  Go ahead.

20          MR. PASSANANTE:  And that property under *Sabella*,

21    which was decided in the Southern District, a case we mentioned

22    in our papers, the value of those shares given as consideration

23    are absolutely considered as interest.  And regardless of how

24    those shares are valued, because understandably, they were

25    likely restricted, which would have probably at least a slight

MIL6DARC

1    reduction in value at the time of conveyance as to the market

2    price, regardless even a fraction of a percent would take it

3    under -- over the lawful interest rate, making the entire loan

4    void *ab initio*.

5            THE COURT:  Okay.

6            MR. PASSANANTE:  And with respect to Ader Bays,

7    another clarification, what the Court said was --

8            THE COURT:  With respect to what?

9            MR. PASSANANTE:  Ader Bays, the Court of Appeals

10   decision decided last fall.

11           THE COURT:  Okay.

12           MR. PASSANANTE:  That wasn't mentioned in our papers

13   regarding at least the conversion discount to the applied

14   interest, but if it were, there's certainly a way to value that

15   conversion option.

16           As the Court in that case stated, as the Court of

17   Appeals stated, there is a factually intensive analysis to

18   determine the value of the conversion option at the time of

19   execution.  And it's specifically laid out two methods that it

20   would suggest courts to engage in; either Black-Scholes

21   analysis, the way that options and warrants are valued, or

22   binomial lattice evaluation.

23           THE COURT:  A binomial?

24           MR. PASSANANTE:  Binomial lattice.  Please don't ask

25   me to explain it.

MIL6DARC

1          THE COURT:  All right.

2          MR. PASSANANTE:  But it's a valuation procedure that

3     would occur at the -- by a financial expert that would consider

4     obviously volatility, among other things, to determine how much

5     that conversion option is valued.  But I want to just state

6     that that is not necessary here.  Because of commitment shares,

7     the stated interest and the original issue discount would

8     easily take us past that 25 percent threshold.

9          And, your Honor, as to the note being a security -- a

10    note is defined as a security under the Exchange Act.  So

11    there's really no argument to that effect, saying that it is

12    not a security.  And it is, indeed, also a loan, obviously,

13    because it's money in exchange for a repayment of that debt

14    whether it be by cash or -- sorry.

15         THE COURT:  So if it is a security, is it subject to

16    usury analysis?

17         MR. PASSANANTE:  Well, it's a loan as well, your

18    Honor.  So a loan is subject to a usury analysis, but a note is

19    a security under the Exchange Act.

20         MR. BENZENBERG:  Your Honor, if I may.  The

21    Exchange Act definition section when it defines security, it

22    states stock, note, warrant, option, and lists several other

23    types of financial instruments.  Additionally, New York usury

24    laws applies to any loan or forbearance of money.  The note

25    would constitute a forbearance of money, and in that regard,

MIL6DARC

1    must comply with New York usury laws.

2              MR. PASSANANTE:  And just to speak to the effect of

3    the defendant's reliance on the trader exemption, your Honor.

4    It's important to point out that the defendants do not acquire

5    shares on the open market like a trader would.  They do not

6    make money based on the appreciation of the stock that they

7    acquire, because they make it based off of the markup from the

8    conversions that they -- that they are entitled to under the

9    notes that they enter into.  Traders do not do that.  Traders

10   engage in a few isolated transactions, and aren't acquiring

11   securities with the view towards distributing those same

12   securities.

13             THE COURT:  I'm sorry.  I didn't understand that last

14   part.  Can you go through that again?

15             MR. PASSANANTE:  Yes.  So the defendants argue that

16   they fall into the trader exemption.  The trader exemption is

17   essentially for people like me or you who would engage in

18   purchasing stocks with an e-trade account or some other kind of

19   brokerage account.  If me or you were to acquire those shares,

20   we would acquire them and hope for them to increase in value,

21   and then hope to make money on the gain of that profit.  As

22   opposed to an underwriter or a dealer, who acquires those

23   securities with a view towards distribution.  The reason they

24   can act in that manner is because they acquire them at a

25   discount to the market price.

MIL6DARC

1      THE COURT:  So it's as if they have no interest in the

2  value of the security going up?

3      MR. PASSANANTE:  Well, I wouldn't say that they don't

4  have any interest in the value of securities going up, but I

5  would say that they do not need the value of the securities to

6  go up because they'll always make money because they'll always

7  be in the money based on the conversion discount.  So they'll

8  always acquire under market, whether it be a --

9      THE COURT:  Well, it's under market today, right?

10  Isn't it always going to be to under market?

11      MR. PASSANANTE:  Generally, yeah.  They will draft the

12  agreements to always be under market, whether it be with a

13  fixed discount or with an adjustable discount.  Even though it

14  has a fixed discount, they'll usually have a default provision

15  so they can convert a fraction of the stated fixed interest --

16  fixed conversion rate.

17      THE COURT:  But that doesn't mean that they would

18  never have an interest in having them value the stock over

19  market?

20      MR. PASSANANTE:  Correct, yeah.  And as to the

21  unwilling or innocent party discussion, the fact that DarkPulse

22  was simply a party to these transactions does not mean that

23  they assisted in violations.

24      Like you brought up, they were an emerging growth

25  company, they were desperate for capital, and simply by

MIL6DARC

1    engaging in these tractions does not by any means mean they

2    were assisting in the violations that the unregistered

3    securities dealers were.

4              And that would be all from me, your Honor.

5              THE COURT:  Okay.  Mr. Marks, anything?

6              MR. MARKS:  Just to correct one thing about the trader

7    exception.

8              What Mr. Passanante was referring to when saying that

9    we received these shares at a discount, okay, he's referring to

10   a variable rate note that I described before, where there's a

11   built in 30 percent discount off of the market.  Here, there

12   was a fixed rate at 15 cents, you know, 15 cents or .015 per

13   share.  Okay?  There was market risk.  Okay?  That is not

14   Ader Bays.  That is not a riskless transaction where we're

15   always going to be below the market when we convert.  So that

16   is not the sign of a dealer.  That fits squarely within the

17   trader exception.

18             Otherwise, I rest on my prior arguments and papers.

19             THE COURT:  Very well.  So let's take a 5-, 10-minutes

20   break.  Don't go far.

21        (Recess)

22             THE COURT:  Okay.  The injunction will not issue.

23             First, I find that defendants are correct that the

24   forum selection clause is presumptively enforceable, and thus

25   this action is not properly before this Court.  The forum

MIL6DARC

1    selection clause is presumptively enforceable if:  One, it was

2    reasonably communicated to the party resisting enforcement;

3    two, the clause is mandatory and not merely permissive; and

4    three, covers the claims and parties involved in this suit.

5    Citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2d Cir.

6    2007).  Here, the defendants have put forth evidence that the

7    November 2021 amendment was communicated to DarkPulse's CEO,

8    Mr. O'Leary, who signed it.  DarkPulse cannot reasonably

9    contest that the forum selection clause was communicated to it,

10   because it was contained in the agreement signed by

11   Mr. O'Leary, who, as CEO of the company, was sufficiently

12   sophisticated to understand it.

13           Moreover, there's evidence in the record that he also

14   had the advice of counsel at the time that he signed it.

15           Here, citing *H.A.L. NY Holdings v. Guinan*, reported at

16   2018 WL 5869648, a Southern District case from 2018.  By its

17   terms, the forum selection clause is mandatory and covers this

18   action, and there's no evidence on the record before me that

19   the enforcement would be unreasonable or unjust, nor that the

20   clause is invalid.

21           While that may be sufficient for the denial of the

22   motion, I find that even if the forum selection clause did not

23   apply, I would deny the motion for preliminary injunction.  In

24   deciding whether to enter a preliminary injunction, I must

25   consider four factors:  One, where the plaintiff is likely to

MIL6DARC

succeeds on the merits; two, whether they are likely to suffer

irreparable harm in the absence of preliminary relief; three,

the balance of hardships, or equities; and four, whether an

injunction is in the public interest, citing *Benihana, Inc. v.*

*Benihana of Tokyo*, 784 F.3d 887 of 2015, Second Circuit case.

Plaintiffs has not shown that they are likely to

succeed on the merits of their claims.  In fact, plaintiff's

theory that the April 2021 note is invalid under section 29(b)

of the Securities Exchange Act because FirstFire was acting as

an unregistered broker dealer has already been rejected by two

courts in this district.  See *LG Cap Funding, LLC v. ExeLED*

*Holdings,* reported at 2018 WL 6547160, a Southern District case

from 2018, and *EMA Financial, LLC v. Vystar Corp.,* reported at

2021 WL 1177801, a 2021 Southern District case, reconsideration

denied.  And that was reported at 2021 WL 5998411.  The no

broker-dealer representation clause in the April 2021 agreement

also undercuts plaintiff's claims.

Furthermore, plaintiff has not established that they

will suffer irreparable harm in the absence of an injunction.

All plaintiff argues at section 29(b) must not provide for

damages, the only remedy is recision.  Courts in this district

have found that monetary damages are an adequate remedy for

stock on the market.  See, for example, *Alpha Cap Anstalt v.*

*Shiftpixy*, reported at 432 F.Supp. 326 of 2020, Southern

District case, and *Union Capital, LLC v. Vape Holdings*,

MIL6DARC

1  reported at 2017 WL 1406278 of 2017, Southern District case.

2          I find that the time period between FirstFire's

3  conversion of the note and the initiation of this action

4  further undercuts a finding of irreparable harm.  In addition

5  plaintiff placed a great deal of emphasis on the fact that

6  defendant was apparently reporting to dump, if you will, its

7  remaining stock on the market.  Nothing in the record in the

8  history of the transactions between the relationships between

9  these two parties suggests that will be the case.

10          As to the third and fourth factors, I do not find that

11  plaintiff has demonstrated that the balance of hardship

12  strongly favors it or that the public interest would be

13  disserved by denial of the instant motion.

14          The record shows that FirstFire owns a very small

15  percentage of DarkPulse stock, approximately 5 percent, and so

16  it is unlikely that selling this stock could cause the

17  reputational damage that DarkPulse fears.  In fact, FirstFire

18  has put forth the argument that it could be harmed if I

19  enjoined it from selling the stock it converted pursuant to the

20  note.

21          Finally, while the registration requirement under

22  section 15(a) does serve public interest, I do not find that

23  this necessarily applies to the parties' transactions, given

24  the provisions of their contract, executed between two

25  sophisticated entities who had previously entered into a

MIL6DARC

1    similar contract.

2              That constitutes the opinion of the Court.

3              How do the parties wish to proceed, Mr. Marks?

4              MR. MARKS:  Well, your Honor, we have until

5    March 13th -- I'm sorry, your Honor.

6              THE COURT:  You don't to have to apologize.

7              MR. MARKS:  As far as proceeding goes, our response to

8    the complaint is due, you know, like March 13th.  We were just

9    served January 13th.  I imagine we'll probably be filing a

10   three-page letter before your Honor pursuant to your rules

11   seeking leave to file a dispositive motion.

12             THE COURT:  Very well.  Anything further that I should

13   do today, Mr. Passanante?

14             MR. PASSANANTE:  No, your Honor.

15             THE COURT:  Mr. Marks?

16             MR. MARKS:  No, thank you, your Honor.

17             THE COURT:  Then we're adjourned.  I want to thank the

18   parties for your arguments today.  They were quite helpful.

19             (Adjourned)

20

21

22

23

24

25