## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.,

               Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC

               <u>Serve:</u>
               Eli Fireman
               1040 1st Avenue,
               Suite 190
               New York, NY 10022,

     and

ELI FIREMAN,

               Defendants.

CIVIL ACTION NO. 1:21-cv-11222 (ER)

**PLAINTIFF'S FIRST AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff DarkPulse, Inc. ("DarkPulse"), through counsel, states for its Complaint against

Defendant FirstFire Global Opportunities Fund, LLC ("Defendant", "FirstFire", or "FirstFire

Lending Enterprise") and Eli Fireman ("Fireman") (collectively, "Defendants") as follows:

### I.    <u>NATURE OF THE ACTION</u>

1.     FirstFire is a "death spiral" or "toxic" lender:[1] an unregistered securities dealer that

makes unlawful, predatory loans to small, publicly traded companies.[2] Toxic lenders like FirstFire

---

[1]   *See* SEC discussion (and warnings) about toxic lending and convertible securities, https://www.investor.gov
/introduction-investing/investing-basics/glossary/convertible-securities (last accessed on December 22, 2021.)

[2]   Based on a review of the filings in the EDGAR database from March 17, 2015 to date, FirstFire has engaged in
financing similar to this case on *at least 203* separate occasions with *at least 89* other microcap companies, resulting
in approximately *203 securities transactions* with at least *1,001,396,742* shares being issued, with an estimated open

purport to be investors who 'save' struggling microcap companies, but the reality is very much the opposite:  FirstFire is not an investor, but rather a *creditor* that, in keeping with typical toxic lending arrangements, gives itself the right to take payment of the debt in company stock, but with a substantial discount to the market price.  Unlike a typical private-placement investor, FirstFire can immediately dump the stock into the public market to reap the difference between the discount and the market price.[3]  Moreover, because it can convert the debt in tranches, FirstFire is able to dump large quantities of the newly-issued stock into the market and remain unaffected by the price depression that its selling tends to cause.

2.      The Agreements[4] in this case are a masterful example of toxic lending.  In two separate convertible promissory notes, FirstFire loaned to DarkPulse a combined total of $975,000.  As repayment of those two Notes, FirstFire extracted more than $38 million dollars in company stock from DarkPulse, which it immediately sold into the public market.

3.      According to the Securities and Exchange Commission ("SEC"), FirstFire's business model is not simply predatory, it is patently unlawful.  In several recent civil actions, the

---

market value of tens of millions of dollars.  *See* **Exhibit 3** (EDGAR Spreadsheet, listing securities transactions by FirstFire identified in issuer EDGAR filings).

[3]     Toxic lenders take advantage of the so-called "tacking" provisions currently provided in Rule 144, *see* 17 CFR 230.144(d)(3)(ii).  Recognizing the harms to microcaps and their investors caused by toxic lending, the SEC has proposed rulemaking to revise the holding period for securities acquired upon the conversion or exchange of certain market-adjustable securities like those used by FirstFire:  "Currently, Rule 144 deems securities acquired solely in exchange for other securities of the same issuer to have been acquired at the same time as the securities surrendered for conversion or exchange. Under the amendments, the holding period for the underlying securities acquired upon conversion or exchange of 'market-adjustable securities' would not begin until conversion or exchange, meaning that a purchaser would need to hold the underlying securities for the applicable Rule 144 holding period before reselling them under Rule 144."  *See* Notice of Proposed Rule, https://www.sec. gov/rules/proposed/2020/33-10911.pdf (last accessed on May 4, 2021) ("Prop. Rule").

[4]     The "Agreements" refer to the agreements executed by Plaintiff in favor of FirstFire, *viz.:* (1) a Convertible Promissory Note for $247,500.00 executed on April 20, 2018, (constituted by a "Senior Convertible Promissory Note" and Share Purchase Agreement ("SPA")) ("September 2018 Note"); and (2) a Convertible Promissory Note executed for $825,000.00 executed on April 26, 2021 (also constituted by a "Convertible Promissory Note" and SPA) ("April 2021 Note" and together with the September 2018 Note, the "Notes").  A true and correct copy of each of the Notes and SPAs are attached as follows: (1) September 2018 Note and SPA as **Exhibit 1;** and (2) April 2021 Note and SPA as **Exhibit 2**.  The securities transactions effected by the Agreements are hereinafter referred to as the "DarkPulse Transactions."

SEC has prosecuted toxic lenders for unlawfully operating as unregistered securities dealers, in violation of § 15(a) of the Securities Exchange Act of 1934 ("Act") (15 U.S.C. § 78o).  ***Every court to address the matter has agreed with the SEC***.[5]

4.     The toxic lenders under scrutiny in the SEC cases use FirstFire's *precise* business model (indeed, the contracts seem to have been drafted by the same firm), and—like FirstFire— refrain from registering with the SEC in order to evade regulatory oversight and continue making predatory loans that generate outrageous profits.

5.     The remedy sought by the SEC in those cases (and awarded in cases that have progressed to judgment) is disgorgement of profits and cancellation of any remaining shares.  *See SEC v. Almagarby*, 2021 U.S. Dist. LEXIS 186477 (S.D. Fla. Sep. 29, 2021) (Order).

6.     Similarly, in addition to other remedies, the remedy sought by Plaintiff here is rescission of the DarkPulse Transactions pursuant to § 29(b) of the Act, on the ground that each of the contracts was both *made* and *performed* in violation of § 15(a) of the Act.  *See* 15 U.S.C. § 78o.

7.     Further, the Agreements in this case charge DarkPulse a rate of interest that is criminally usurious under New York law.  As shown in greater detail below, the Agreements charge an annualized interest rate of **more than double** the maximum rate of interest that may be charged by New York which is 25% APR.  *See* N.Y. G.O.L. § 5-501; N.Y. Penal Law § 190.40.[6]

8.     Consistent with FirstFire's established business model, the Agreements provided FirstFire with a conversion option, that is, the right to take repayment by exchanging the accrued

---

[5]    *See, e.g., SEC v. Big Apple Consulting USA, Inc.*,783 F.3d 786 (11th Cir. 2015); *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)*; SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife*, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021). For private civil actions seeking rescission based on failure to register, *see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy*, LLC, 6 F.4th 50 (1st Cir. 2021); *Auctus Fund, LLC, v. Players Network, Inc*., 20-cv-10766 (D. Mass. Dec. 10, 2021).

[6]    *See Adar Bays, LLC v. GeneSYS, ID, Inc*., 37 N.Y.3d 320 (N.Y. 2021).

debt (or any portion thereof) for shares of company stock. Consistent with its general practices, FirstFire does not exchange debt on a dollor-for-dollar basis, but at a significant discount to market at the time of conversion.

9.      FirstFire is an "enterprise" as defined in the Racketeer Influenced and Corrupt Organization Act ("RICO"). *See* U.S.C. 18 § 1961, *et seq.*

10.     FirstFire has engaged in the collection of unlawful debt at the direction and control of Defendant Eli Fireman, culpable "person" as defined in RICO.  *See* 18 U.S.C. § 1961.

11.     FirstFire collected an unlawful debt from DarkPulse when it obtained stock pursuant to the conversion feature of the usurious Agreements.

12.     Accordingly, among other relief, DarkPulse seeks an award of treble damages under RICO, because the amount of interest charged by FirstFire in the Agreements is more than double the maximum enforceable rate of interest allowed by New York law, and FirstFire conducts a business of making usurious loans.

## II.      JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendants' principal place of business is located in this District and because a substantial part of the events giving rise to this action occurred in this District.

16.     Notwithstanding that the DarkPulse Transactions should be voided and rescinded in their entirety by the Court for the reasons stated herein, Defendants should be estopped from

denying that jurisdiction or venue is proper in this Court because the Agreements provide expressly that any action brought by either party concerning the transactions contemplated by the Agreements must be brought in state or federal courts located in the State of New York.[7]

### III.   PARTIES

17.    DarkPulse's principal place of business is located at 1345 Avenue of the Americas, 2nd Floor, New York, New York 10105. DarkPulse is a corporation organized under the laws of the state of Delaware.[8]

18.    DarkPulse's stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major stock exchanges—are traded.

19.    FirstFire's principal place of business is located at 1040 First Avenue, Suite 190, New York, New York 10022. FirstFire is registered as a Delaware limited liability company.

20.    FirstFire's website[9] showed that FirstFire held itself out to the public as a "New York based investment manager" that "will source, structure, and execute direct investments in publicly traded companies with market capitalizations under $750 million."

---

[7]   *See* Notes at § 4.6; SPAs at § 8a.
[8]   In April 2018, DarkPulse was located in Virginia.
[9]   A screenshot of FirstFire's website (http://www.firstfirecap.com/) as it existed on January 26, 2020, was recovered by DarkPulse with the Wayback Machine, a digital archive of the world wide web, *available at:* https://archive.org/web/ (last accessed on December 29, 2021). The website appears to have been deleted from the Internet in 2020.



21.     FirstFire is not now, and has never been, registered as a securities dealer with the SEC.

22.     Upon information and belief, Fireman is a permanent resident in the State of New York.

23.     Upon information and belief, Fireman is the managing member of FirstFire Capital Management, LLC, an entity which is the managing member of FirstFire.

24.     Fireman is not now, and has never been, registered as a securities dealer with the SEC.

25.     FirstFire Capital Management, LLC, is not now, and has never been, registered as a securities dealer with the SEC.

### IV.     FACTUAL ALLEGATIONS

#### A. The September 2018 Note

26.     FirstFire executed the first securities transaction with DarkPulse on September 20, 2018 when it purchased from DarkPulse a convertible promissory note, a type of debt security constituted by a promissory note and a share purchase agreement.

27.     FirstFire paid DarkPulse $225,000 for the September 2018 Note, for which DarkPulse was obligated to repay FirstFire $247,500 plus 8% interest, due in nine months.

28.     The September 2018 Note also gave FirstFire the right, commencing 180 days after purchase, to exchange all or any portion of the debt for company stock, at a 30% discount to the market price.[10]

29.     By exercising the conversion option, Defendants exchanged the debt under the note (securities) for newly-issued company stock (securities).

30.     On June 7, 2019, FirstFire began conversion of the September 2018 Note.  In all, FirstFire effectuated 18 separate conversions under the September 2018 Note.

31.     Each of those 18 conversions, as well as the subsequent sales of the stock obtained thereby, are transactions in securities; with each conversion or sale, FirstFire used the mail and or other means or instrumentalities of interstate commerce to effect a transaction in securities.

32.     FirstFire's conversions of debt into DarkPulse stock under the September 2018 Note are as follows:

     a.    6/7/2019:  converted $5,340.00 of debt for 7,000,000 shares of common stock;

     b.    6/18/2019: converted $3,331.00 of debt for 7,000,000 shares of common stock;

     c.    6/24/2019: converted $2,778.00 of debt for 7,900,000 shares of common stock;

     d.    7/8/2019:  converted $1,560.00 of debt for 6,000,000 shares of common stock;

     e.    7/15/2019: converted $1,560.00 of debt for 6,000,000 shares of common stock;

---

[10]   With the value of the 30% conversion discount added to 10% original issue discount and the stated 8% interest rate, it is clear that the September 2018 Note violates the 25% interest rate cap set forth in New York's criminal usury laws.  *See Adar Bays v. GeneSYS ID, Inc.,* 2021 NY Slip Op. 05616, 2021 WL 4777289 (Oct. 14, 2021).

f.      7/24/2019: converted $2,708.00 of debt for 11,600,000 shares of common stock;

g.      7/30/2019: converted $3,296.00 of debt for 13,700,000 shares of common stock;

h.      8/5/2019:  converted $3,008.00 of debt for 16,100,000 shares of common stock;

i.      8/9/2019:  converted $1,492.00 of debt for 17,800,000 shares of common stock;

j.      8/15/2019: converted $1,426.00 of debt for 20,900,000 shares of common stock;

k.      9/6/2019: converted $4,900.00 of debt for 35,000,000 shares of common stock;

l.      9/10/2019: converted $4,900.00 of debt for 35,000,000 shares of common stock;

m.     9/20/2019: converted $2,765.00 of debt for 35,900,000 shares of common stock;

n.      9/1/2020:   converted $7,000 of debt for 85,000,000 shares of common stock;

o.      1/14/2021: converted $28,000 of debt for 100,000,000 shares of common stock;

p.      1/25/2021:  converted $42,000 of debt for 150,000,000 shares of common stock;

q.      2/5/2021: converted $28,000.00 of debt for 100,000,000 shares of common stock; and

r.      2/18/2021:  converted $103,436 of debt for 220,000,000 shares of common stock.

33.     In all, FirstFire exchanged $247,500 worth of debt for 879,400,000 shares of newly-issued stock.

34.     The estimated open market value of the stock FirstFire acquired from converting the debt under the September 2018 Note totaled ***$10,738,900.00***.

35.     Upon information and belief, as soon as FirstFire received the newly-issued DarkPulse shares, it immediately sold them into the marketplace to reap a substantial profit.

36.     As shown in the following list, the ***average daily trading volume*** in DarkPulse stock increased dramatically in the days following each FirstFire conversion, demonstrating FirstFire's well-known practice of dumping issuer stock into the market as soon as possible.[11]

- 30 days prior to first conversion:                    4,646,131
- 10 days following 06/07/2019 conversion:          8,235,159
- 10 days following 06/24/2019 conversion:        12,059,811
- 10 days following 07/08/2019 conversion:        11,579,818
- 10 days following 07/15/2019 conversion:        13,563,234

### B.  The April 2021 Note

37.     On April 26, 2021, the parties executed a second securities transaction in which FirstFire purchased from DarkPulse a second convertible promissory note.  In that transaction, FirstFire paid DarkPulse $750,000 for the April 2021 Note, which obligated DarkPulse to repay in the amount of $825,000.00, plus 10% APR in interest, with a nine-month maturity date.

38.     The April 2021 Note is a security under the Act, constituted by a promissory note and a share purchase agreement, which gave FirstFire the right to convert the debt into stock.

39.     Unlike the fixed discount under the September 2018 Note the April 2021 Note provided a *fixed* price of $0.015 per share; however, that price would reduce to $0.005 per share upon the occurrence of any incident of default which is, .

40.     The April 2021 Note specified that it was governed by New York law.  *See* EXH.2, Note at 4.6; SPA at ¶ 8.

---

[11]    *See* Prop. Rule, *supra* at note 3 ("If the securities are converted or exchanged after the Rule 144 holding period is satisfied, the underlying securities may be sold quickly into the public market at prices above the price at which they were acquired. Accordingly, initial purchasers or subsequent holders have an incentive to purchase the market-adjustable securities with a view to distribution of the underlying securities following conversion to capture the difference between the built-in discount and the market value of the underlying securities.… [W]hen a holder purchases with a view to distribution, it is acting as an underwriter and is unable to rely on the Section 4(a)(1) exemption from registration.").

41.     Unlike the September 2018 Note, the April 2021 Note contained the extra requirement that DarkPulse pay to FirstFire 60,000,000 "commitment shares" upon execution of the April 2021 Note.  *See* EXH. 2, SPA at 1, section C.

42.     On the date of execution of the April 2021 Note, DarkPulse stock was trading at a price of $0.019 per share, giving the 60,000,000 commitment shares a face value of $1,140,000.[12]

43.     FirstFire's requirement that DarkPulse remit these shares (which, even with a six-month restriction, constitutes property with a fair market value in excess of $1,000,000) as up-front consideration for the $825,000 loan renders the April 2021 Note criminally usurious on its face under New York law.  *See* General Obligations Law Sections 5-501, *et seq.*

44.      On October 14, 2021, the New York Court of Appeals issued its decision in *Adar Bays, Inc., v. GeneSYS ID*, 37 N.Y.3d 320 (2021), wherein that Court was called to answer two certified questions on the correct interpretation of New York criminal usury law.  In a unanimous decision, the Court of Appeals held that under N.Y. G.O.L. § 5-511(1), a criminally usurious loan[13] is *void ab initio*, even where the borrower is a corporation.  *See* Slip Op. at 6-7.

45.     The six-month restriction on the conversion stock (and the commitment shares) expired on October 26, 2021.

46.     On November 4, 2021, DarkPulse CEO Dennis O'Leary met with Fireman while on a business trip in Las Vegas, at Fireman's request.  Fireman presented O'Leary with a one-page amendment to the April 2021 Note, claiming that it would enable DarkPulse to complete future acquisitions without having to notify him.

---

[12]    *See* April 26, 2021 prices at https://seekingalpha.com/symbol/DPLS/chart (last accessed on May 3, 2021).
[13]    Under New York Penal Law § 190.40, any loan charging an interest rate of 25% per annum or greater is criminally usurious.

47.     Fireman failed to mention to O'Leary that the amendment also replaced the choice of law provision, replacing governance by New York law with governance under Delaware law (which has no laws against usury), nor did he explain why the amendment was dated October 14, 2021, the date of the *Adar Bays* decision.  O'Leary signed the amendment.

48.     On November 15, 2021, FirstFire submitted a notice of conversion seeking to convert the full amount of the debt under the April 2021 note (principal + interest = $886,875.00) into DarkPulse common stock.

49.     FirstFire's November 15 notice of conversion (which is submitted to the transfer agent, not DarkPulse) claimed to be due shares using the default price of $.005 per share.[14] Accordingly, on November 17, 2021, with DarkPulse stock trading at $0.1334 per share, the transfer agent delivered to FirstFire 177,375,000 shares of freely-trading stock, with an estimated fair market value of ***$23,661,825.00***.[15][16]

### C.  Defendants' General Business Model:  Violating Federal Securities Laws by Operating as an Unregistered Dealer

50.     Every time FirstFire purchases a convertible note, converts debt into stock, or sells conversion stock, it effects a transaction in securities.

51.     As a part of its regular business, FirstFire acquires large volumes of shares directly from issuers at a substantial discount to market, sells large volumes of shares back into the open market for a substantial profit due to the conversion discount, and does so for its own account and

---

[14]   The April 2021 Note incorporated a registration rights agreement that required DarkPulse to use its "best efforts" to file, within 90 days after execution (July 26, 2021) a registration statement to register the commitment shares and shares issued to FirstFire.  Although the registration statement appears to have been filed, FirstFire maintains that DarkPulse defaulted on this obligation.

[15]   DarkPulse vigorously disputes that it was in default, and alleges that Fireman made repeated assurances to the contrary. Upon learning that the transfer agent had used the default conversion price, DarkPulse contacted FirstFire to raise its objections.  In response, FirstFire filed suit in Delaware Chancery Court seeking a declaratory judgment that not only was the default price correct, but that, under the default provisions of the Note, FirstFire is entitled to even further penalties.  *See* Complaint*, FirstFire Global Opp'ty Fund, LLC v. Darkpulse, Inc*., Case No. 2021-1082.

[16]   The market value of all of the shares obtained by FirstFire, including the "commitment shares" issued pursuant to the April 2021 Note and the shares acquired under the September 2018 Note, equals no less than ***$38,540,725.00***.

absent investment intent.   Accordingly, FirstFire buys securities, converts securities, and sells securities as part of its regular business for its own account.

52.     The SEC's EDGAR database shows that since 2015, FirstFire has purchased similar convertible securities on over 200 occasions, from at least 89 microcap companies in addition to DarkPulse.

53.     Upon information and belief, FirstFire made use of the mails, email, and other instrumentalities of interstate commerce to effect the DarkPulse Transactions and subsequent securities transactions.   For example, FirstFire used its internet website, transferred cash through wire transfers, and used email and telephone communications to negotiate and effect purchases and sales.

54.     Via its website at www.firstfirecap.com, Defendant held itself out to the public as a "New York based investment manager" that "will source, structure, and execute direct investments in publicly traded companies with market capitalizations under $750 million."

55.     FirstFire's business of buying and selling securities is not exclusively intrastate.

56.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC, or, in the case of a natural person, associate with a registered dealer. *See* 15 U.S.C. § 78o(a)(1).

57.     By failing to comply with the dealer registration requirements mandated by federal law, FirstFire purposefully "operated under the radar" to avoid important legal and regulatory oversight by the SEC and the Financial Industry Regulatory Authority ("FINRA").

58.     The dealer registration requirements provide important safeguards for the investing public, shareholders and companies.   The excessive compensation and patently unfair terms used

in the DarkPulse Transactions (and FirstFire's transactions with other issuers) would have violated FINRA Rules 5110 (b)(4)(B) and 5110(c)(2)(A), and hence could not have been effected by a registered securities dealer.

59.     FirstFire's enormous profits from the DarkPulse Transactions resulted from the market prices they received when they sold the stock into the public market, and the deeply discounted price at which it acquired the stock from DarkPulse.  This mechanism, where FirstFire reaps the profits on the spread or markup of the stock they sold, is a common attribute of a securities dealer or underwriter.

60.     Registration as a securities dealer and accompanying SEC oversight would further prevent FirstFire from utilizing the Rule 144 tacking provision (17 C.F.R. 230.144(d)(3)(ii)) because FirstFire's business operations constitute underwriting activity, or sales with a view to distribution.

61.     As shown in EDGAR data, FirstFire had a regular clientele of issuers from which it would purchase securities, convert, and sell newly-issued stock into the market to reap profits on the markup.

62.     Issuers of stock like DarkPulse are clients of underwriters. Operating as an underwriter is not acting as a trader, but as a securities dealer, which requires registration with the SEC.

63.     As a part of its regular business, Defendant obtained newly-issued stock directly from the microcap issuers through note conversions, as opposed to purchases in the open or secondary markets.

64.     The convertible securities that Defendant purchased enabled it to acquire billions of shares of newly-issued stock at a substantial discount—typically between 30 and 50 percent of the trading price.[17]

65.     As a regular part of its business, Defendant sold large blocks of newly-issued shares into the public market, which is a common hallmark of a securities dealer.

66.     Between March 2015 and September 2021, Defendants purchased *more than 107 convertible promissory notes* from approximately *89 different penny stock issuers* and *sold more than 1 billion newly-issued shares of stock* obtained from those notes into the public market for Defendants' own account.

67.     FirstFire has used the same business model– promising easy cash to microcap companies in need of working capital and then fleecing them for millions of shares of stock– since its formation in 2015.  For example:

- DigitalTown, Inc.: FirstFire purchased a convertible security for $183,750.00; upon conversion of that security, FirsfFire acquired *more than 793,406,848* shares of DigitalTown stock (fair market value of $1,384,791.64) which, upon information and belief, were sold into the market shortly thereafter;

- Ionix Technology, Inc.: FirstFire purchased one or more convertible securities for $665,000.00, upon conversion of that security, FirstFire acquired more than 9,467,000 shares of Ionix stock (fair market value $1,041,370.00) which, upon information and belief, it sold into the market shortly thereafter; and

- Visium Technologies, Inc.: FirstFire purchased one or more convertible securities for $150,000.00, upon conversion of that security, FirstFire acquired *more than 49,000,000 shares o*f Visium stock, (fair market value  $196,000.00) which, upon information and belief, it sold into the market shortly thereafter.

---

[17]    Because the Notes required that the discount be applied to a '20-day low' trading price instead of the average price on the date of conversion, the price FirstFire paid at conversion was almost always far lower than a 30% discount.

68.     Defendants continue to purchase new convertible securities, convert the debt into stock and dump the stock into the market to reap profits. In 2021 alone, Defendant has purchased *no less than 23 convertible promissory notes*—from *no less than 14 issuers*.  Upon information and belief, Defendants repeated the same behavior outlined above, utilizing the Rule 144 holding period to sell the conversion shares immediately upon conversion.

69.     The equitable remedy of voiding and rescission provided under § 29(b) of the Act should be effectuated by mandating FirstFire to return to DarkPulse every share of stock it acquired under the Agreements, less the cash value of the net sum provided to the Plaintiff for the purchase of the Notes.

### D.  The FirstFire Lending Enterprise

70.     The FirstFire Lending Enterprise exists to lend money for profit using the business model described herein.

71.     Upon information and belief, the FirstFire Lending Enterprise has made loans to other issuers that also violate New York's usury laws—in the same manner as the Agreements in this case which is by charging and/or collecting more than twice the lawful maximum interest rate.

### E.  The Agreements Evidence the Creation of Unlawful Debt, Subsequently Collected in Violation of RICO, 18 U.S.C. § 1962

72.     The Agreements evidence an unlawful debt under RICO because each one Charges more than twice the enforceable rate under New York law, and FirstFire is in the business of making usurious loans.  *See* 18 U.S.C. § 1961(6); NY Penal Law § 190.40.

73.     The New York criminal usury statute provides:

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

NY Penal Law § 190.40.

74.     The Agreements are loans that must comply with New York usury laws.

75.     Pursuant to the express terms of the Agreements, FirstFire had the right to convert the debt into DarkPulse stock as repayment for the loan, but at a substantial discount of either, 30% to market or at $0. 005 (less than market value), at the time of conversion.

76.     The value of a fixed conversion discount is interest that must be included in the interest calculation for purposes of a usury analysis in New York.  *See Adar Bays*, 37 N.Y.3d at 338.

77.     Both of the Agreements are governed by the laws of the state of New York, irrespective of the choice of law provisions within the Agreements.[18]  Pursuant to New York's usury laws, the maximum enforceable legal rate for a loan to a corporation is 25% A.P.R.[19]  *See* NY Penal Law § 190.40; Gen. Oblig. Law § 5-501, *et. seq.*

78.     In accord with the landmark decision in *Adar Bays, LLC v. GeneSYS, ID, Inc*., 37 N.Y.3d 320 (N.Y. 2021), the Agreements are void *ab initio*, thus, any subsequent amendments that change the controlling law in the Agreements are a nullity.

79.     Although the Agreements impose a stated interest rate of either 8% or 10% per annum, the added value conferred by the commitment shares, conversion discounts, and original issue discounts produces an estimated 291.52%[20] APR for the April 2021 Note and 61%[21] for the

---

[18]     *Power Up Lending Grp., Ltd. v. Cardinal Energy Group, Inc*., No. 2:16-cv-1545 (DRH) (GRB), 2019 BL 118785, at *5 (E.D.N.Y. Apr. 3, 2019).
[19]     In addition to the Agreements, many, if not all, of the other convertible promissory notes entered into by FirstFire with other securities issuers imposed substantially similar terms.
20    The annualized interest is 291.52% A.P.R., which is calculated by adding the 10% stated interest rate on the note, the 10% OID on the note, the 133% conversion discount rate pursuant to the conversion provision on the note, and the 138.18% interest coming from the value received in the commitment shares outlined in the accompanying SPA.
21    The annualized interest is 61% A.P.R., which is calculated by adding the 8% stated interest rate on the note, the 10% OID on the note, and the 43% conversion discount rate pursuant to the conversion provision on the note

September 2018 Note – both of which are more than twice the enforceable rate permitted by New York's criminal usury law (25%).

### F. DarkPulse was Harmed by the Unlawful Debt Collection

80.     As a result of the unlawful debt collection, DarkPulse has been injured in its business and property.

81.     As a result of the unlawful debt collection, FirstFire obtained tens of millions of shares of free-trading DarkPulse common stock to which it was not entitled or capable of lawfully acquiring.

82.     The excessive conversions and resulting issuances forced DarkPulse to increase its outstanding shares, thereby massively diluting DarkPulse's stockholders.

83.     Once FirstFire began converting under the Agreements, its immediate and massive selling of large blocks of newly-issued shares of DarkPulse's common stock into the public market caused enormous depression in DarkPulse's market capitalization and stock price.

84.     As a result of these actions, DarkPulse became unable to privately raise money from other entities, with other toxic lenders becoming the only reasonably available option for short-term financing, leading to more losses.

85.     All of the foregoing harm was foreseeable by FirstFire and was proximately caused by FirstFire's collection of an unlawful debt as alleged herein.

86.     Assessment of the total damage caused by these actions to DarkPulse is difficult to quantify and will be determined at trial.

### G. Fireman Controlled Firstfire in its Convertible Debt Securities Business

87.     At all relevant times, Fireman, due to his position in FirstFire Capital Management LLC, possessed and exercised the ultimate decision-making and control over FirstFire, including the power to decide whether to enter into each of the securities transactions (including the

DarkPulse Transactions), to negotiate and approve the final deal terms, and to direct its sales of stock.

88.     Fireman personally negotiated the terms of the convertible notes that FirstFire purchased from microcap companies (including the DarkPulse Transactions), as well as amendments to the original terms.  Fireman also signed the contracts by which FirstFire acquired the convertible notes, including both Notes with Plaintiff.

89.     Ultimately, Fireman was and remains the sole person with the power to direct, authorize, and compel FirstFire to enter into, convert, and subsequently sell securities through usurious convertible notes with issuers, including the Agreements with DarkPulse.  Fireman is, and was, a "controlling person" within the meaning of Section 20(a) of the Act and had the power to cause FirstFire to engage in the unlawful conduct described herein.

## V.   CAUSES OF ACTION

### A.  COUNT I (Against FirstFire): Rescission Pursuant to § 29(b) of the Act for Violating § 15(a) by Effecting (Making) the DarkPulse Transactions As an Unregistered Dealer

90.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

91.     Section 29(b) of the Act provides in relevant part that: "[e]very contract *made* in violation of any provision of this chapter or of any rule or regulation thereunder … shall be void …."  15 U.S.C. § 78cc(b) (emphasis added).

92.     The DarkPulse Transactions were made in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using the means of interstate commerce to effect any transaction in securities.

93.     FirstFire is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

94.     FirstFire is not registered as a securities dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

95.     FirstFire effected transactions in securities when it executed the DarkPulse Transactions and when it converted and sold or caused to be sold the Darkpulse stock obtained thereby.

96.     FirstFire used the means of interstate commerce to effect the DarkPulse Transactions, such as its use of an internet website, wiring of cash through wire transfers, and use of email and telephone communications to negotiate or effectuate transactions.

97.     As a party to the DarkPulse Transactions, DarkPulse is in contractual privity with FirstFire.

98.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is within the class of persons that the Act was designed to protect.

99.     Because FirstFire, as an unregistered securities dealer, utilized the means and instrumentalities of interstate commerce when it effected the transactions in securities known herein as the DarkPulse Transactions, the DarkPulse Transactions were unlawful when made.

### B.  COUNT II (Against FirstFire): Rescission Pursuant to § 29(b) of the Act for Violating § 15(a) of the Act by Unlawfully Transacting in Securities Via Performance of the Agreements as an Unregistered Dealer

100.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

101.    Section 29(b) of the Act provides in relevant part that: "[e]very contract … **the performance of which** involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void…." (15 U.S.C. § 78cc(b)) (emphasis added).

102.    The DarkPulse Transactions were performed in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using the means of interstate commerce to effect any transaction in securities.

103.    FirstFire is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

104.    FirstFire is not registered as a securities dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

105.    FirstFire effected transactions in securities in performance of the DarkPulse Transactions when it converted debt into stock and sold (or caused to be sold) the DarkPulse stock acquired thereby (hereinafter "Performance Transactions").

106.    FirstFire used the means of interstate commerce to effect the Performance Transactions, such as wiring cash through wire transfer, or using email and telephone communications to negotiate and effectuate sales transactions through their broker.

107.    As a party to the DarkPulse Transactions, Darkpulse is in contractual privity with FirstFire.

108.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is within the class of persons that the Act was designed to protect.

109. Because FirstFire is an unregistered dealer and used the means and instrumentalities of interstate commerce to effect transactions in securities when it performed under the DarkPulse Transactions, the DarkPulse Transactions were **unlawful as performed** (via the conversions and sales of the conversion stock into the public market).

### C. COUNT III (Against Fireman): Violation of § 20(a) of the Act by Fireman as a Control Person Based on FirstFire's Transactions in Securities as an Unregistered Dealer

110. Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

111. Fireman had the power and authority to cause FirstFire to engage in the wrongful conduct described in Counts I and II herein.

112. Fireman did in fact cause FirstFire to engage in the wrongful conduct described in Counts I and II herein.

113. Fireman did not act in good faith.

114. Fireman directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

115. Therefore, Fireman acted as a control person of FirstFire within the meaning of § 20(a) of the Act (15 U.S.C. § 78t).

### D. COUNT IV (Against All Defendants): Conducting the Affairs of the RICO Enterprise (RICO § 1962(c))

116. Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

117. Fireman is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3): an individual or entity capable of holding a legal or beneficial interest in property.

118.    The FirstFire Lending Enterprise is an "enterprise" within the meaning of RICO, 18 U.S.C. §1962(c).

119.    Fireman agreed to, and did, conduct and participate in the conduct of the FirstFire Lending Enterprise's affairs through the collection of unlawful debt from DarkPulse by collecting and attempting to collect debt unenforceable under New York usury laws, having been incurred by a loan by the enterprise that charges, takes or receives, interest at more than double the maximum legal rate.

120.    Upon information and belief, pursuant to and in furtherance of their scheme, the FirstFire Lending Enterprise is in the business of making loans at usurious interest rates, and thereby committed multiple related acts of unlawful debt collection from a plethora of other desperate public companies throughout the country.

121.    Fireman directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the collection of unlawful debt described above, in violation of 18 U.S.C. § 1962(c).

122.    The unlawful conduct violating § 1962(c), including the collection of unlawful debt, was accomplished in this case through the use of the telephone and the internet, and/or other instrumentalities of interstate commerce, as alleged herein.

123.    As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), DarkPulse has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, the value of which is no less than approximately $38 million which shall be trebled to no less than $114 million, and it has suffered further damage and injury to be determined at trial.

### E.  COUNT V (Against All Defendants): Unjust Enrichment

124.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

125.    The Defendants have received valuable benefits from DarkPulse, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of DarkPulse common stock.

126.    These benefits are the result of the wrongful conduct alleged herein in Counts I-III.

127.    The Defendants have unjustly retained these benefits at DarkPulse and its stockholders' expense.

128.    As a result, the Defendants have been unjustly enriched.

### F.  COUNT VI (Against All Defendants): Constructive Trust

129.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

130.    As alleged in Count V, Defendants have been unjustly enriched by DarkPulse.

131.    The circumstances are such that it would be inequitable for Defendants to retain the property conferred on them by DarkPulse.

132.    DarkPulse has a specific, identifiable interest in the property unjustly retained by Defendants as a result of the wrongful conduct alleged in Counts I-IV herein.

133.    Defendants have wrongfully acquired and detained DarkPulse's property obtained via the wrongful conduct alleged in Counts I-IV herein.

134.    Allowing Defendants to retain the property conferred on them by DarkPulse would inequitably allow Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes, including, without limitation, paying their attorney's fees and costs in

connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

135.     As a result, a constructive trust should be imposed on DarkPulse's property retained by Defendants.

## VI.     **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff DarkPulse seeks a Verdict and Judgment against the Defendants herein as follows:

### A.     **On Count I (Against FirstFire):**

1.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

    a.     The DarkPulse Transactions and the Performance Transactions are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

    b.     FirstFire is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

    c.     The DarkPulse Transactions are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

    d.     FirstFire is entitled to retain only the principal amount of the loans made pursuant to DarkPulse Transactions.

2.     DarkPulase  requests that the Court enter an Order:

    a.     Rescinding the DarkPulse Transactions pursuant to the Act (15 U.S.C. § 78cc);

    b.     Awarding rescissionary damages and such other relief as the Court

deems just and equitable to effectuate the voiding and rescission of the DarkPulse Transactions;

c.    Requiring FirstFire to return to DarkPulse all DarkPulse stock obtained via the DarkPulse Transactions, less the number of shares constituting the principal amount originally loaned to DarkPulse under the DarkPulse Transactions; and

d.    Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the DarkPulse Transactions.

**B.    On Count II (Against FirstFire):**

1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

a.    The DarkPulse Transactions and Performance Transactions are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

b.    FirstFire is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

c.    The Darkpulse Transactions are void and subject to rescission under the Act (15 U.S.C. § 78o); and

d.    FirstFire is entitled to retain the principal amount of the loans made pursuant to the DarkPulse Transactions, already repaid by DarkPulse.

2.    DarkPulse requests that the Court enter an Order:

a.     Rescinding the DarkPulse Transactions pursuant to the Act (15 U.S.C. § 78o);

b.     Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the DarkPulse Transactions;

c.     Requiring FirstFire to return to DarkPulse all DarkPulse stock obtained via the DarkPulse Transactions; and

d.     Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the DarkPulse Transactions.

**C.**     **On Count III (Against Fireman):**

1.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

a.     Fireman had the power and authority to cause FirstFire to engage in the wrongful conduct described in Counts I and II herein;

b.     Fireman did in fact cause FirstFire to engage in the wrongful conduct described in Counts I and II herein; and

c.     Fireman acted as a control person of FirstFire within the meaning of § 20(a) of the Act (15 U.S.C. § 78t(a)).

2.     DarkPulse requests that the court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Fireman jointly and severally liable with and to the same extent as FirstFire is liable to DarkPulse under Counts I, II,

IV, and V herein.

**D.     On Count IV (Against All Defendants):**

    1.    DarkPulse requests that this Court enter a Judgment against all the Defendants as follows:

    a.    awarding DarkPulse compensatory, direct, and consequential damages;

    b.    awarding DarkPulse treble damages as a remedy for the economic injury sustained by Defendants' collection of unlawful debt pursuant to 18 U.S.C. § 1964 (c);

    c.    awarding DarkPulse its attorneys' fees and costs associated with this litigation pursuant to 18 U.S.C. § 1964 (c);

    d.    entering an award of monetary damages jointly and severally against the Defendants; and

    e.    awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

**E.     On Count V (Against All Defendants):**

    1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

    a.    Defendants have voluntarily accepted and retained the property conferred by FirstFire on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

    b.    The circumstances are such that it would be inequitable for

the Defendants to retain the property conferred on them by DarkPulse without first paying the value thereof to DarkPulse, to prevent the Defendants from being unjustly enriched.

c.    DarkPulse requests that the Court enter an Order requiring the Defendants to return to DarkPulse the value of the property they have unjustly retained in the amount of $26,560,750 less the value conferred upon the Plaintiff.

**F.    On Count VI (Against All Defendants):**

1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that the Defendants have been unjustly enriched as alleged in Count VI; and

2.    DarkPulse requests that the Court enter an Order imposing a constructive trust on DarkPulse's property in the possession of the Defendants as a result of the benefits conferred on them by Darkpulse.

**F.    As to each of Counts I-VI,** to the extent permitted by applicable law, and not otherwise requested, DarkPulse requests that the Court enter an Order:

1.    Awarding DarkPulse compensatory, direct, and consequential damages;

2.    Awarding DarkPulse punitive and/or treble damages, to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

3.    Awarding DarkPulse its attorneys' fees and costs associated with

this litigation;

4.     Entering an award of monetary damages jointly and severally against the Defendants; and

5.     Awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## VII.     JURY DEMAND

Plaintiff demands a trial by jury on all issues properly so tried.


DATED: May 5, 2022                                      Respectfully submitted,

*/s/ Gustave Passanante*
Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
**THE BASILE LAW FIRM, P.C.**
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:    (631) 498-0748
Email: gus@thebasilelawfirm.com
           eric@thebasilelawfirm.com

*Attorneys for Plaintiff Darkpulse, Inc.*