# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.,

*Plaintiff,*

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC, and ELI FIREMAN,

*Defendants.*

Civil Action No. 1:21-cv-11222-ER

## DARKPULSE, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**THE BASILE LAW FIRM P.C.**

Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:   (516) 455-1500
Fax:    (631) 498-0748
Email:  gus@thebasilelawfirm.com
        eric@thebasilelawfirm.com

*Attorneys for Plaintiff DarkPulse, Inc.*

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 1

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT .................................................................................................................... 6

I.   BECAUSE THE APRIL 2021 TRANSACTION WAS EXPRESSLY GOVERNED
     BY NEW YORK LAW, AND WAS USURIOUS ON ITS FACE, IT WAS VOID *AB
     INITIO*, AND DEFENDANTS' ATTEMPT TO AMEND THE APRIL 2021 NOTE
     WITH DELAWARE LAW AND A DELAWARE FORUM HAD <u>NO</u> <u>EFFECT</u> ....... 6

     A.   THE NOTE IMPOSES A CRIMINALLY USURIOUS RATE OF INTEREST ... 6

          1.   *Usurious Intent* is Implied Where a Usurious Rate Is Evident From the Face of
               the Loan. .................................................................................................... 6

          2. "Interest" is Broadly Defined in the Usury Statute. ........................................... 7

               a.   Interest Includes the Value of Securities Given as Consideration for a Loan.
                    .................................................................................................................. 8

               b.   *Beaufort* and *Union Capital* are Abrogated by *Adar Bays*. ......................... 8

     B.   THE APRIL 2021 NOTE EVIDENCES A LOAN CHARGING IN EXCESS OF
          THE LEGAL RATE, PROPERLY INCLUDING THE VALUE OF THE
          "COMMITMENT SHARES" AS INTEREST ...................................................... 8

          Criminally Usurious Loans are Void in New York Under *Adar Bays* ............ 10

     C.   THE CHOICE OF LAW CLAUSE IN THE SEPTEMBER 2018 NOTE IS
          UNENFORCEABLE ............................................................................................. 10

          The September 2018 Note is Void *Ab Initio* Under New York Law. ............. 13

II.  THE AGREEMENTS INVOLVE A PROHIBITED TRANSACTION BECAUSE
     THEY REQUIRE AN UNREGISTERED SECURITIES DEALER TO PURCHASE
     A CONVERTIBLE SECURITY, IN VIOLATION OF § 15(a) ................................. 14

     A.   THE PLAIN LANGUAGE OF § 29(b) STATES THAT CONTRACTS ARE
          VOIDABLE IF EITHER "MADE IN VIOLATION" OF THE EXCHANGE ACT
          OR IF "PERFORMANCE … INVOLVES A VIOLATION" OF THE
          EXCHANGE ACT ............................................................................................... 14

i

1.  Unlike *Vystar*, the Agreements Here Involve Performance that Violates § 15(a) of the Exchange Act, Because the SPAs Obligates FirstFire—an Unlicensed Securities Dealer—to Purchase a Convertible Security ................................... 15

2.  Supreme Court Precedent Affirms Section 29(b) Rescission of Contracts "Made in Violation" of the Exchange Act .................................................................. 17

3.  The Second Circuit Court of Appeals Affirms Section 29(b) Rescission of a Contract "Made in Violation" of the Exchange Act ........................................ 17

4.  The Formation of the Agreements Violated the Exchange Act Because—Under § 15(a)(1)—FirstFire Was Prohibited From Effecting the September 2018 and April 2021 Transactions ................................................................................. 17

III. PLAINTIFF'S § 29(b) CLAIMS ARE NOT TIME-BARRED .................................. 18

FirstFire's Registration Status Would Not Have Alerted DarkPulse to the Violation ...................................................................................................... 20

The Rescission Claim is Timely As to the 2018 Agreement Under the Continuing Violation Doctrine ...................................................................... 20

*Kahn v. Kohlberg*'s Continuing Violation Analysis is Not Applicable to this Case ............................................................................................................. 20

IV. DARKPULSE HAS PLED A PLAUSIBLE RICO CLAIM (COUNT IV) ............... 21

A. DarkPulse Has Alleged A RICO "Person" Distinct From the Enterprise ......... 21

B. DarkPulse Has Alleged that FirstFire Collected Upon an Unlawful Debt and is Engaged in the Business of Collecting Unlawful Debts ................................... 22

V. PLAINTIFF'S STATE LAW CLAIMS (COUNTS V-VI) ARE PROPERLY PLED. 24

CONCLUSION ........................................................................................................ 25

**T**ABLE OF **A**UTHORITIES

## Cases

*Adar Bays, LLC v. Genesys ID, Inc.*,
 37 N.Y.3d 320 (N.Y. 2021) .....................................................2, 3, 4, 6, 7, 8, 10, 13, 14

*Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*,
 2004 U.S. Dist. LEXIS 6970 (S.D.N.Y. Apr. 23, 2004) .............................................11

*Am. E. Grp., LLC v. Livewire Ergogenics, Inc.*,
 2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020) .......................................................8, 10

*Am. Express Travel Related Servs. Co. v. Assih*,
 893 N.Y.S.2d 438 (Richmond Cnty. 2009) ..............................................................11

*Angelo v. Brenner*,
 90 A.D.2d 131 (3d Dept. 1982) ...............................................................................6

*Arista Records, LLC v. Doe 3*,
 604 F3d 110 (2d Cir. 2010) ...................................................................................23

*Auctus Fund, LLC, v. Players Network, Inc.*,
 Case No. 20-cv-10766, ECF No. 84 (Order) (D. Mass. Dec.10, 2021) .....................20

*Bakhash v. Winston*,
 19 N.Y.S.3d 887 (1st Dept. 2015) ...........................................................................10

*Band Realty Co. v. N. Brewster, Inc.*,
 335 N.E.2d 316 (N.Y. 1975) ...................................................................................8

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
 692 F.3d 42 (2d Cir. 2012) ....................................................................................5

*Beatie and Osborn LLP v. Patriot Scientific Corp.*,
 431 F. Supp. 2d 367 (S.D.N.Y. 2006) .......................................................................11

*Beaufort Cap.Partners LLC v. Oxysure Sys., Inc.*,
 2017 WL 913791 (S.D.N.Y. Mar. 7, 2017)..................................................................8

*Blue Wolf Capital Fund II, LP v. Am. Stevedoring Inc.*,
 105 A.D.3d 178 (1st Dept. 2013) ..........................................................................4, 7

*Busher v. Barry*,
 2019 U.S. Dist. LEXIS 172754 (S.D.N.Y. 2019)........................................................20

*Cargill, Inc. v. Charles Kowsky Resources, Inc.*,
  949 F.2d 51 (2d Cir. 1991) ..................................................................................11

*Case Cash Funding, LLC v. Gilberg*,
  57 N.Y.S.3d 674 (2d Dept. 2017) ........................................................................10

*Cent. Sch. Dist. No. 3 of Cortlandt v. Town of Cortlandt*,
  49 A.D.2d 899 (2d Dept. 1975) ...........................................................................25

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ..................................................................................5

*Chassman v. Shipley*,
  695 F. App'x 630 (2d Cir. 2017) ...........................................................................7

*Chechele v. Dundon*,
   850 Fed. Appx. 75 (2d Cir. 2021) .......................................................................23

*Clever Ideas, Inc. v. 999 Rest. Corp.*,
  2007 N.Y. Misc. LEXIS 9248 (N.Y. Cnty. Oct. 12, 2007) ................................23

*DeStaso v. Bottiglieri*,
  901 N.Y.S.2d 905 (N.Y. 2009) ............................................................................10

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
  755 F.2d 239 (2d Cir. 1985) ................................................................................24

*Eastside Church of Christ v. National Plan, Inc.*,
  391 F.3d 357 (5th Cir. 1968) ...............................................................................18

*EMA Fin., LLC v. Vystar Corp.*,
  336 F.R.D. 75 (S.D.N.Y. 2020) .....................................................................15, 16

*Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*,
  9 N.Y.S.3d 682 (2d Dept. 2015) ..........................................................................10

*Freitas v. Geddes Sav. & Loan Ass'n*,
  471 N.E.2d 437 (N.Y. 1984) ..................................................................................7

*Funding Group, Inc. v. Water Chef Inc.*,
  852 N.Y.S.2d 736 (N.Y. 2008) ..........................................................................6, 8

*Hammelburger v. Foursome Inn Corp.*,
  76 A.D.2d 646 (2d Dept. 1980) ...........................................................................10

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
230 F.3d 549 (2d Cir. 2000) ...................................................................... 11

*Hartley v. Eagle Ins. Co.*,
118 N.E. 622 (N.Y. 1918) ........................................................................... 7

*Hillair Capital Invs., L.P. v. Integrated Freight Corp.*,
963 F. Supp. 2d 336 (S.D.N.Y. 2013) ................................................ 8, 10

*Hufnagel v. George*,
135 F. Supp. 2d 406 (S.D.N.Y. 2001) ...................................................... 6

*Hogg v. Walker*,
622 A.2d 648 (Del. 1993) ........................................................................ 25

*Hoover v. Ronwin*,
466 U.S. 558, 587 (1984) .......................................................................... 5

*Ingenito v. Bermec Corporation*,
376 F. Supp. 1154 (S.D.N.Y. 1974) ....................................................... 21

*Int'l Adiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995) ......................................................................... 5

*In re Grand Union Co.*,
219 F. 353 (2d Cir. 1914) ......................................................................... 7

*In re McCorhill Publ'g, Inc.*,
86 B.R. 783 (Bankr. S.D.N.Y. 1988) ...................................................... 11

*In re: Venture Mortgage Fund LP*,
282 F. 3d 185 (2d Cir. 2002) ................................................................... 10

*Jaghory v. N.Y. State Dep't of Educ.*,
131 F.3d 326 (2d Cir. 1997) ...................................................................... 5

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
970 F.2d 1030 (2d Cir. 1992) ........................................................... 19, 20

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991) .................................................................... 12

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
498 U.S. 894 (1990) ................................................................................ 19

v

*Lawrence v. Richman Grp. of Conn., LLC*,
    407 F. Supp. 2d 385 (D. Conn. 2005)........................................................................19

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
    108 F.3d 1531 (2d Cir. 1997) ..................................................................................11

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.*,
    2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018) ..........................................................16

*Madden v. Midland Funding, LLC*,
    237 F. Supp. 3d 130 (S.D.N.Y. 2017) ......................................................................11

*Marcus v. AT & T Corp.*,
    938 F. Supp. 1158 (S.D.N.Y. 1996) ........................................................................12

*McCall v. Frampton*,
    81 A.D.2d 607, (2d Dept. 1981) ..............................................................................24

*McPhee v. Gen. Elec. Int'l, Inc.*,
    736 F. Supp. 2d 676 (S.D.N.Y. 2010) ......................................................................11

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ................................................................................................17

*N. Am. Bank, Ltd. v. Schulman*,
    123 Misc. 2d 516 (Westchester Cnty. 1984) ............................................................13

*Omega Overseas, Ltd. v. Griffith*,
    2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014)..........................................15

*Pearlstein v. Scudder & German*,
    429 F.2d 1136 (2d Cir. 1970) ..................................................................................17

*Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*,
    2022 U.S. Dist. LEXIS 25145 (E.D.N.Y. Feb. 11, 2022) ..........................................12

*Roswell Capital Partners LLC v. Alt. Const. Techs.*,
    2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ............................................................10

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ......................................................................................23

*Schermerhorn v. Talman*,
    14 N.Y. 93 (N.Y. 1856)..............................................................................................7

*SEC v. Almagarby*,
   479 F. Supp. 3d 1266 (S.D. Fla. 2020) .................................................................20

*Seidel v. 18 East 17th Street Owners, Inc.*,
   79 N.Y.2d 735 (N.Y. 1992) ...............................................................................7, 8

*Simon v. Electrospace Corp.*,
   269 N.E.2d 21 (N.Y. 1971) ...................................................................................8

*Simsbury Fund, Inc. v. New St. Louis Associates*,
   611 N.Y.S.2d 557 (1st Dept. 1994) ......................................................................10

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*,
   263 F.3d 26 (2d Cir. 2001) ..................................................................................10

*Sweet Baby Lightning Enter., LLC v. Keystone Cap. Corp. et al.*,
   Case No. 21-cv-06528-RA, ECF 31 (Order) (S.D.N.Y. June 15, 2022) ......................7

*UFCW Local 1500 Pension Fund v. Mayer*,
   2016 U.S. Dist. LEXIS 145091 (N.D. Cal. 2016) ...................................................21

*Union Cap. LLC v. Vape Holdings Inc.*,
   2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017) ...........................................................8

*United States v. Biasucci*,
   786 F.2d 504 (2d Cir. 1986), *cert. denied*, 479 U.S. 827 (1986) ................................7

*United States v. Moseley*,
   980 F.3d 9 (2d Cir. 2020) ....................................................................................13

*Uni-World Capital, L.P. v. PreferredFragrance, Inc.*,
   2014 U.S. Dist. LEXIS 109919 (S.D.N.Y. 2014) ....................................................14

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ..................................................................................21

*Waxman v. Envipco Pickup & Processing Servs.*,
   2006 U.S. Dist. LEXIS 44006 (S.D.N.Y. June 28, 2006) ...........................................8

**Statutes and Regulations**

15 U.S.C. § 77a ...............................................................................................................1

15 U.S.C. § 78a ...............................................................................................................1

15 U.S.C. § 78cc ................................................................................................................ 14

15 U.S.C. § 78cc(b) ..................................................................................................... 14, 18

15 U.S.C. § 78o(a)(1) ........................................................................................................ 15

15 U.S.C. § 80b-1 ................................................................................................................. 1

18 U.S.C. § 1961 ............................................................................................................ 1, 22

28 U.S.C. 1658(b) ............................................................................................................. 19

17 C.F.R. § 230.144 ............................................................................................................. 3

NY Gen. Oblig. § 5-501(2) .................................................................................................. 7

N.Y. Gen. Oblig. Law § 5-511 ................................................................................... 4, 6, 10

N.Y. Penal Law § 190.40 ........................................................................................... 4, 6, 10

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 1

Fed. R. Evid. 201 .............................................................................................................. 12

**Secondary Sources**

Samuel Williston & Richard A. Lord,
   *A Treatise on the Law of Contracts* § 1:20 (4th ed. 1990) ......................................... 10

## INTRODUCTION[1]

The arguments that Defendants advance in support of their Motion do not approach the high bar for dismissal under Fed. R. Civ. P. 12(b)(6).  They fail to show that DarkPulse should be denied the opportunity to prove its claims that the Defendants violated the Exchange Act and RICO, by engaging in the business of buying and selling securities without being registered as a securities dealer, and by collecting an unlawful debt, respectively.  The Motion should be denied.

## STATEMENT OF FACTS

FirstFire is a self-proclaimed "New York based" lender, registered as a Delaware LLC, that loans money to small publicly-traded companies in need of cash.   DarkPulse is a New York based microcap company registered in Delaware.  DarkPulse stock trades on the "over the counter" market.

In September 2018, FirstFire loaned DarkPulse $225,000.00 via the purchase of a convertible promissory note[2] with a principal amount of $247,500.00.  FAC, Ex. 1 (ECF 29-1).  The September 2018 Note charges interest at 8% APR, a 10% original issue discount, and uses a nine-month maturity date.  *Id.* at 1.  The documents making up the September 2018 Transaction

---

[1] The following terms are used herein:  Plaintiff DarkPulse, Inc. ("Plaintiff" or "DarkPulse"); Defendant FirstFire Global opportunities Fund, LLC ("Defendant" or "FirstFire"); Defendant Eli Fireman ("Defendant Fireman" or "Fireman" and together with FirstFire, the "Defendants"); Convertible Promissory Note executed April 26, 2021 ("April 2021 Note"); Securities Purchase Agreement executed April 26, 2021 ("April 2021 SPA"); Registration Rights Agreement executed April 26, 2021 ("RRA") (the RRA, together with the April 2021 Note and April 2021 SPA, the "April 2021 Transaction"); Amendment No. 1 to the Convertible Promissory Note executed April 26, 2021 ("*Adar Bays* Amendment"); Senior Convertible Promissory Note executed September 20, 2018 ("September 2018 Note" amd together with the April 2021 Note, the "Notes"); Securities Purchase Agreement executed September 20, 2018 ("September 2018 SPA" and together with the September 2018 Note, the "September 2018 Transaction") (the September 2018 SPA and April 2021 SPA together, the "SPAs"); Plaintiff's First Amended Complaint (ECF 29) ("Complaint" or "FAC"); FAC Exhibit 3 (ECF 29-3) ("FirstFire Transaction List"); Defendants' Memorandum of Law in Support of their Motion to Dismiss the First Amended Complaint ("Motion" or "MTD"); Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act"); Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act"); Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); Investment Advisors Act, 15 U.S.C. § 80b-1, *et seq.* ("IAA").

[2] A convertible promissory note is a type of debt security that gives the lender (FirstFire) the right to take repayment of the loan either in cash or in newly-issued company stock.  Like an option or warrant, the lender is given the right to purchase company stock at a particular strike price; at conversion, the lender 'converts' the note, *i.e.*, it uses the accrued debt to 'purchase' the stock instead of cash.  *See* September 2018 Note at § 1.1.

consist of the convertible promissory note and a securities purchase agreement, which sets forth the terms for the purchase of the September 2018 Note.

Unlike a typical *fixed-price* option, the conversion option in the September 2018 Note carried no fixed strike price; instead, conversion carried a substantial, 30% *fixed discount*, often referred to as a "floating price" discount.  This type of conversion option guaranteed FirstFire a strike price pegged at 30% below the market price at the time of exercise.  In practical terms, this guaranteed that for every $100 of debt converted, FirstFire would "purchase" a minimum of $142 worth of DarkPulse stock.  The value of floating price conversion options is substantial and must be included in the interest calculation for the loan.  *See Adar Bays, LLC v. Genesys ID, Inc*., 37 N.Y.3d 320, 334 (2021).

On April 26, 2021, FirstFire loaned DarkPulse $750,000.00 via the purchase of a convertible promissory note in the principal amount of $825,000.00.  FAC, Ex. 2 (ECF 29-2).  The April 2021 Note charges interest at 10% APR ($61,875) and a nine-month maturity date.  *Id.* at 1. In addition to the April 2021 Note and SPA, the April 2021 Transaction incorporated the RRA, which obligated DarkPulse to register the shares.

The April 2021 Note provided a "Fixed Conversion Price" of $0.015 per share.  *See* April 2021 Note at § 1.2(a).  Hence, commencing 180 days after purchase of the April 2021 Note, FirstFire could exercise the option to use the debt (at that point, $825,000 + $61,875) to exercise its right to convert the debt into DarkPulse stock at $0.015 per share.  *Id*. at § 1.1.

The April 2021 Note also provided that if the borrower defaulted on any provision under the April 2021 Transaction, much lower "Default Fixed Conversion Price" of $0.005 per share would become operative.  *See* April 2021 Note at § 1.2(a) and Art.III (naming 21 separate events of default under the Note).

As a condition for FirstFire's purchase of the April 2021 Note, DarkPulse was required to pay FirstFire 60,000,000 "commitment shares" as up-front consideration.  *See* April 2021 SPA at § C, 1(a), Ex. 2.  Since the average trading price of Darkpulse stock on April 26, 2021, was $.019/per share, the 60 million commitment shares had an estimated fair market value of $1,140,000.  Although the shares were not registered under the Securities Act and were hence restricted from sale for six months from the date of purchase, 17 C.F.R. § 230.144, DarkPulse was also obligated to register[3] the shares pursuant to the RRA.

Additionally, the April 2021 SPA charged an original issue discount of $75,000 which reduced the net amount of the loan to $750,000.00.  DarkPulse was also obligated to pay all other expenses incurred by FirstFire in executing the April 2021 Transaction, *see* April 2021 SPA at § 8(k), as well as any conversion processing fees, *see* April 2021 Note at 1, and for the costs of legal opinion letters, *see* April 2021 SPA at § 4(k).

Importantly, § 4.6 of the April 2021 Note and § 8(a) of the April 2021 SPA provided that ***New York law governs the April 2021 Note and SPA.***

Between July 2019 and February 2021, FirstFire effected 18 separate conversions of debt under the September 2018 Note.  By the time the September 2021 Note was fully converted, FirstFire had acquired no less than 879,400,000 shares of DarkPulse common stock—with an estimated open market value in excess of $10 million—in exchange for $247,500 worth of debt under the September 2018 debt.

On October 14, 2021, the New York Court of Appeals issued its opinion in *Adar Bays*, resolving two certified questions concerning the interpretation of New York's usury statutes.  *Adar*

---

[3] Registration refers to registration of the stock pursuant to the Securities Act.  Registered stock is freely-trading and not subject to the six-month restriction period under Rule 144; however, registration is a costly and time-consuming process.

*Bays, LLC v. GeneSYS ID, Inc.* The second question in *Adar Bays* is relevant to the April 2021 Transaction, *viz.*: "[i]f the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is void *ab initio* pursuant to N.Y. Gen. Oblig. Law § 5-511." *Adar Bays,* 37 N.Y.3d 320, at 323-24. The Court of Appeals answered this question in the affirmative, holding that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: *complete invalidity of the loan instrument*."[4] *Id.* at 333 (emphasis added).

On October 26, 2021, FirstFire had DarkPulse sign an Amendment to the September 2021 Note, which, *inter alia*, purported to change the governing law from New York to Delaware, and required suit in a Delaware forum. FAC, Ex. 2. Though the signatures are dated October 26, 2021, the Amendment states that it was "entered into on October 14, 2021," *i.e., the date of the Adar Bays decision. Id.* at 1. Delaware has no laws against usury.

October 26, 2021 also marked the end of the six-month restriction period under Rule 144, and commenced FirstFire's right of conversion under the Note. *See* April 2021 Note at § 1.1 (specifying conversion right commences 180 days after issuance). Accordingly, the 60,000,000 commitment shares, as well as any shares obtained via conversion, would be deemed freely trading on that date (regardless of registration status). On October 27, 2021, DarkPulse stock traded for an average price of $0.08 per share, which would give the freely-trading commitment shares an estimated fair market value of ***$4,800,000*** (60,000,000 x $.08 = $4,800,000).

On November 17, 2021 FirstFire effected a conversion for $886,875 (the entire debt (principal plus stated interest) under the April 2021 Note). At conversion, FirstFire represented that DarkPulse was in default under the April 2021 Note and claimed entitlement to the Default

---

[4] Under New York law, when a transaction is void *ab initio* for usury, there are no equitable remedies available to the lender. *See Blue Wolf Capital Fund II, LP v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 185 (1st Dept. 2013).

4

Fixed Conversion Price of $0.005 per share.  The transfer agent honored FirstFire's notice of conversion and delivered to FirstFire (using the default price) 177,375,000 shares of freely trading DarkPulse stock. (886,875/$.005 = 177,375,000).  On November 17, 2021, DarkPulse's average trading price was $0.12465 per share, giving the conversion shares an estimated fair market value of ***$22,109,793.75***.

FirstFire claimed to be owed even more shares due to various alleged defaults, and filed suit in Delaware to obtain a declaratory judgment on its rights under the September 2021 Transaction.  FirstFire withdrew its lawsuit in response to DarkPulse's Motion to Dismiss.

## LEGAL STANDARD

In deciding a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 51-52 (2d Cir. 2012).  The Court may not grant a motion to dismiss unless "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997) (quoting *Hoover v. Ronwin*, 466 U.S. 558, 587 (1984)).  "For purposes of this general rule, 'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Adiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam*)).

## ARGUMENT

I. **BECAUSE THE APRIL 2021 TRANSACTION WAS EXPRESSLY GOVERNED BY NEW YORK LAW, AND WAS USURIOUS ON ITS FACE, IT WAS VOID *AB INITIO,* AND DEFENDANTS' ATTEMPT TO AMEND THE APRIL 2021 NOTE WITH DELAWARE LAW AND A DELAWARE FORUM HAD <u>NO</u> <u>EFFECT</u>**

It is evident from the face of the April 2021 Transaction that the agreement between the parties was a loan to DarkPulse, and that the April 2021 Note contemplates charging DarkPulse far in excess of the legal interest rate set forth in N.Y. Penal Law § 190.40. Pursuant to New York G.O.L. § 5-511 and *Adar Bays*, *a criminally usurious loan is void ab initio, and—by definition—it cannot be later amended, nor can it ever be enforced.* Defendants' attempt to backdate the Amendment to October 14 to avoid the original choice of law provision (which stated governance by New York law) was without effect because under New York law, the contract was deemed void at its inception. *See* Complaint *passim.*

### A.   THE NOTES IMPOSE CRIMINALLY USURIOUS RATES OF INTEREST

New York's criminal usury statute prohibits a person from knowingly charging interest on a loan at a rate exceeding 25% per annum. N.Y. Penal Law § 190.40. Criminal usury requires proof that the lender (1) knowingly charged, took or received (2) annual interest exceeding 25% (3) on a loan or forbearance. *Hufnagel v. George*, 135 F. Supp. 2d 406, 407 (S.D.N.Y. 2001); *Funding Group, Inc. v. Water Chef Inc*., 852 N.Y.S.2d 736, 740 (N.Y. 2008).

### 1.   *Usurious Intent* is Implied Where A Usurious Rate Is Evident From the Face

**of the Loan.** Criminal usury is a crime of general, not specific intent. Accordingly, this element requires proof only of the general intent to charge a rate in excess of the legal rate[5] rather than the specific intent to violate the usury statute. *See Angelo v. Brenner*, 90 A.D.2d 131 (3d Dept. 1982);

---

[5] FirstFire's attempt to amend the April 2021 Note to change the governing law from New York to Delaware, dated October 14, 2021—the date that *Adar Bays* was issued—strongly indicates that FirstFire was fully aware that the April 2021 Transaction charged a usurious rate.

6

*U.S. v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986), *cert. denied,* 479 U.S. 827 (1986).  If a usurious interest rate "can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law."  *Blue Wolf*, 105 A.D.3d at 183.  Hence, the borrower satisfies his *prima facie* burden of proving usury by showing that the note purchased by the lender evidences a loan and charges an illegal rate of interest.  *See Freitas v. Geddes Sav. & Loan Ass'n*, 471 N.E.2d 437, 443 (N.Y. 1984).  *Cf. Hartley v. Eagle Ins. Co*., 118 N.E. 622, 625 (N.Y. 1918) (where interest payable is "so large," intent may be imputed even if not clear from the face of the loan).  *See also Sweet Baby Lightning Enter., LLC v. Keystone Cap. Corp. et al*., Case 1:21-cv-06528-RA, ECF 31 (Order) (S.D.N.Y. June 15, 2022) (filed herewith as **Exhibit 1**).

> **2.**      **"Interest" is Broadly Defined in the Usury Statute.**  Under NY Gen. Oblig. § 5-501(2), "interest" is construed broadly, and includes "money, goods or things in action" and "shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance."  *Id*.  *See also Adar Bays*, 37 N.Y.3d at 336 ("our cases involving criminal usury show strict attention to additional fees exacted sometimes creatively through loan instruments.  Exchanges of other forms of property, substituted for money, are equally germane to the calculation.").[6]

---

[6] FirstFire cites to *Chassman v. Shipley*, 695 F. App'x 630 (2d Cir. 2017) as support for its contention "the commitment shares were not interest on the loan but rather an added inducement to convince FirstFire" to make the loan.  *See* MOL at 22.  *Shipley* is an unpublished opinion without precedential value–but more importantly, the holding in *Shipley* is contrary to *Adar Bays*, and contrary to well-established New York usury law.  Under the *Shipley* analysis, a lender could charge usurious interest at will, so long as it labeled the offending charges as something other than interest.  This position fails the fundamental duty imposed on courts to look beyond the form of the document and take into account "all other property exchanged in consideration for the loan," which must be "included in determining the loan's interest rate for purposes of [New York's] usury statutes," *Adar Bays*, 37 N.Y.3d at 334.  *See also Adar Bays*, 37 N.Y.3d at 336 (noting that since New York's founding, the legislature construed 'interest' broadly and included "the value of all goods and promises exchanged in consideration for a loan in the usury analysis"); *In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914); *Seidel v. 18 East 17th Street Owners, Inc.*, 79 N.Y.2d 735 (N.Y. 1992); *Schermerhorn v. Talman,* 14 N.Y. 93 (N.Y. 1856).

a.    **Interest Includes the Value of Securities Given as Consideration for a**

**Loan.**  It is settled law in New York that the value of securities given as consideration for a loan must be included in the interest calculation.  *Adar Bays*, 37 N.Y.3d at 334.  *See also Funding Group,* 852 N.Y.S.2d at 488 (finding usury based upon payment in stock at 120%); *Am. E. Grp., LLC v. Livewire Ergogenics, Inc*., 2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020) (finding usury based on added value of up-front stock payment).  Restricted stock is also included in the interest calculation, *see Hillair Capital Invs., L.P. v. Integrated Freight Corp*., 963 F. Supp. 2d 336 (S.D.N.Y. 2013), although the face value of restricted stock is typically discounted in some way. *Simon v. Electrospace Corp*., 269 N.E.2d 21, 27 (N.Y. 1971).[7]

b.    ***Beaufort* and *Union Capital* are Abrogated by *Adar Bays*.**  FirstFire next contends that because "both Notes have already been converted," the usury defense no longer applies."  MOL at 22 (citing *Union Cap. LLC v. Vape Holdings Inc.*, 2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017) and *Beaufort Cap. Partners LLC v. Oxysure Sys., Inc.*, 2017 WL 913791 (S.D.N.Y. Mar. 7, 2017).  This argument was rejected in *Adar Bays*: "loans with the option of repayment in property (including stock) rather than cash remain loans—not equity investments."  179 N.E.3d at 622; *see also Seidel* (holding that the "mere presence of a unilateral option in favor [the lender] … did not transform the lender into a joint venturer."  *Id.* at 744.

---

[7] The vast majority of judicial restricted-stock valuations are done in the context of a damages calculation.  *See, e.g., Waxman v. Envipco Pickup & Processing Servs*., 2006 U.S. Dist. LEXIS 44006, at \*12-14 (S.D.N.Y. June 28, 2006) (concluding that the average discount for a two-year restriction on stock (which was the length of the restriction in that case) was 30-35%).  Unlike a damages calculation, the only question in a usury valuation is whether the added stock value causes the interest rate to exceed the legal maximum.   As observed by the New York Court of Appeals, the "issue is not a question of determining most precisely the rate of return realized by a lender as an abstract matter … [r]ather the issue is *whether a lender has received a return proscribed as usurious* by the Legislature."  *Band Realty Co. v. N. Brewster, Inc*., 335 N.E.2d 316, 319 (N.Y. 1975) (emphasis added).

**B.      THE APRIL 2021 NOTE EVIDENCES A LOAN CHARGING IN EXCESS OF THE LEGAL RATE, PROPERLY INCLUDING THE VALUE OF THE "COMMITMENT SHARES" AS INTEREST**

Despite the stated 10% interest rate, the April 2021 Note is patently usurious when the value of the commitment shares is included as interest.  While the precise valuation of the (restricted) commitment shares is a finding of fact, no reasonable estimate of the share value would be low enough to put the April 2021 Note into non-usurious (*or non-RICO*) territory.  Given that DarkPulse was obligated to register the commitment shares, it is debatable whether they should be discounted at all for the six-month restriction.  In fact, the value of these shares is so substantial that the loan is usurious *even when the shares are discounted by 80%.*

Importantly, FirstFire does not challenge the value of the commitment shares.  However, it is worth noting that (1) DarkPulse was obligated to register the commitment shares; (2) the value of the shares quadrupled by the time the six-month restriction was removed (leaving the 60,000,000 commitment shares with an estimated fair market value of ***$4,800,000***);[8] and (3) the parties themselves designated the discounted share price of $0.0138 per share.

Under New York law, up-front payments to the lender are *retained interest*; the value of up-front payments are subtracted from the amount the borrower received from the lender at closing.  *See Band Realty*, 335 N.E.2d at 318.  Here, the April 2021 Note reflects DarkPulse receiving a principal amount of $825,000 at closing.  Using the lowest valuation for the 60,000,000 commitment shares on the date of transfer ($741,500.00) the net loan to DarkPulse is calculated as $84,000.00.  Hence, *at the time it was executed*, the April 2021 Note was governed by New

---

[8] And the prices continued upward until the end of November 2021.  Accordingly, the "leak out" provision in the April 2021 SPA, which prevented FirstFire from dumping all the stock in 1-2 would (if followed) increased profits.

York law, and obligated DarkPulse to repay FirstFire $886,875 (defined interest + principal) on a nine-month loan of $84,000.00, evidencing an interest rate of **1,242% APR.**[9]

Criminally Usurious Loans are Void in New York Under *Adar Bays*.[10]  Prior to *Adar Bays*, certain federal courts interpreting New York usury law found that the voiding mechanism in N.Y. G.O.L. § 5-511 did not authorize the voiding of criminally usurious loans to corporations.  Those rulings were directly attributed to *dicta* in *In re: Venture Mortgage Fund LP*, 282 F. 3d 185 (2d Cir. 2002).  Accordingly, when the U.S. Court of Appeals for the Second Circuit certified the usury voiding question to the New York Court of Appeals, it was to resolve this confusion.  As explained, the unanimous decision of the New York Court of Appeals on this question was that "[a] loan determined to be criminally usurious under NY Penal Law § 190.40 is void *ab initio*[11] pursuant to N.Y. Gen. Oblig. Law § 5-511." *Adar Bays*, 37 N.Y.3d at 333 (emphasis added).

### C.  THE CHOICE OF LAW CLAUSE IN THE SEPTEMBER 2018 NOTE IS UNENFORCEABLE

The September 2018 Note contains a choice-of-law provision declaring it be interpreted

---

[9] 886,875-84,000)/84,000 x 100 = 956%  x  12/9 = 1,242.8%.

[10] New York caselaw makes clear that criminal usury cannot be waived in a contractual provision such as those found in the April 2021 Note.  *See Hammelburger v. Foursome Inn Corp.*, 76 A.D.2d 646, 649-50 (2d Dept. 1980).  Moreover, it is also well-established that usury-savings clauses like the ones set forth in § 4.12 of the Note and § 4(c) of the April 2021 SPA do not save an otherwise usurious note.  *See Bakhash v. Winston*, 19 N.Y.S.3d 887, 887 (1st Dep't 2015); *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*, 9 N.Y.S.3d 682, 682 (2d Dept. 2015) ("[A] clause in the subject promissory note purporting to reduce the rate of interest to a non-usurious rate if the rate originally imposed was found to be usurious could not save the note from being usurious."); *Hillair Capital*, 963 F. Supp. 2d at 338 n.1; *Simsbury Fund, Inc. v. New St. Louis Assoc.*, 611 N.Y.S.2d 557, 557 (1st Dept. 1994); *DeStaso v. Bottiglieri*, 901 N.Y.S.2d 905 (N.Y. 2009); *Roswell Capital Partners LLC v. Alt. Const. Techs.*, 2009 WL 222348, at *15 n.13 (S.D.N.Y. Jan. 30, 2009).  The same logic compels the conclusion that the severability clauses found in § 4.13 of the April 2021 Note and § 8(d) of the April 2021 SPA, do not render the April 2021 Note non-usurious.  *See Case Cash Funding, LLC v. Gilberg*, 57 N.Y.S.3d 674, 674 (2d Dept. 2017) ("The severability clause of the Agreement is likewise ineffective to save the Agreement).  *See Am. E. Grp., LLC v. Livewire Ergogenics, Inc*., 2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020).  The September 2018 Transaction contains similar provisions.

[11] "**Void *ab initio***" means a bargain is null from the beginning, as from the first moment when the purported contract was entered into.  A bargain that is void *ab initio* is a nullity because it is based on a promise for breach of which law neither gives a remedy nor otherwise recognizes any duty of performance by the promisor.  *See* Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 1:20, at 49 (4th ed. 1990).  Indeed, the appellation "void contract" is, as noted by Williston, a misnomer, for "if an agreement is void, it cannot be a contract." *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co*., 263 F.3d 26, 31 (2d Cir. 2001).  ***And if the April 2021 Note was never a contract, it was—and remains—incapable of being amended.***

under the laws of Nevada.  *See* September 2018 Note at § 4.6, September 2018 SPA at § 8.a. However, since the Court sits in New York, it must apply New York's choice of law approach to determine the governing law.  *McPhee v. Gen. Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 679 (S.D.N.Y. 2010).  *See also Beatie and Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 378 (S.D.N.Y. 2006) ("New York courts may refuse to enforce a choice-of-law clause only where (1) the parties' choice has no reasonable basis or (2) application of the chosen law would violate fundamental public policy of another jurisdiction with materially greater interests in the dispute."). In cases involving a contract with an express choice-of-law provision, New York law holds that "absent fraud or violation of public policy, a court is to apply the law selected in the contract [as long as the state selected has sufficient contacts with the transaction]."  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).  *See also Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("New York law allows a court to disregard the parties' choice [to designate the laws of another state] when the 'most significant contracts' are in another state.").

Overwhelming authority[12] demonstrates that the Court should disregard the September 2018 Note's choice-of-law provision and apply the laws of the state with the most significant relationship:  New York.[13]  For example, in *Madden v. Midland Funding, LLC*, this Court declined

---

[12] *See, e.g., Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*, 2004 U.S. Dist. LEXIS 6970, at *8 (S.D.N.Y. Apr. 23, 2004) (disregarding the choice-of-law provision designating New Jersey law after noting New York's strong public policy, which the court found "must be enforced," and that New York had the most substantial relationship, as demonstrated by the parties negotiating and performing the agreement in New York, and despite the borrower's headquarters being located in New Jersey); *In re McCorhill Publ'g, Inc.*, 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988) (holding that enforcing New Jersey law would violate New York's "strong public policy against interest rates which exceed 25%, which policy must be enforced"); *Am. Express Travel Related Servs. Co. v. Assih*, 893 N.Y.S.2d 438, 446 (Richmond Cnty. 2009) ("New York has a strong public policy against interest rates which are excessive and this is a policy the courts must enforce."); *Clever Ideas, Inc. v. 999 Rest. Corp.*, 2007 N.Y. Misc. LEXIS 9248, at *2-4 (N.Y. Cnty. Oct. 12, 2007) (choice of Illinois law not given effect in part because New York's usury prohibition is a fundamental public policy).
[13] *See McPhee*, 736 F. Supp. 2d at 680 (applying the following factors to assist with identifying the state with the most significant contacts:  "(1) the place of contracting; (2) the place of contract negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile of the contracting parties").  *See also Lazard*

to apply a Delaware choice-of-law provision because applying Delaware usury law would violate New York's fundamental public policy against usury. *See* 237 F. Supp. 3d 130, 150-51 (S.D.N.Y. 2017). The Eastern District reached this conclusion in *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, disregarding a Virginia choice-of-law clause when Virginia had no connection with the parties. 2022 U.S. Dist. LEXIS 25145, *8-9 (E.D.N.Y. Feb. 11, 2022). The court applied New York's law after finding New York had the greatest interest, when the harmed party was headquartered in the state and, thus, suffered loss in the same. *Id.*

Here, FirstFire's principal place of business was, at all times relevant hereto, located in New York, and, thus, FirstFire also negotiated, entered into, and performed the September 2018 Note from New York. *See* FAC ¶¶ 19-20. DPLS also suffered all harm under the September 2018 Note while its principal place of business was located in New York. *See* DarkPulse, Inc., Form 8-K (filed January 3, 2019) (showing that as of January 3, 2019—months before the first conversion under the September 2018 Note (*see* FAC ¶ at 32)—DarkPulse's headquarters was located in New York, New York);[14] DarkPulse, Inc., Form 8-K (filed Apr. 1, 2021) (showing that as of April 1, 2021—months after the last conversion under the September 2018 Note (*see* FAC at ¶ 32)—DarkPulse's headquarters was located in New York, New York, and, thus, suffered all harm from FirstFire's collections under the September 2018 Note while located in New York); *McPhee*, 736 F. Supp. 2d at 680; *Am. Equities*, 2004 U.S. Dist. LEXIS 6970, at *8 (finding New York's fundamental public policy requires it be applied and that New York had a substantial connection— *vis-à-vis* the *situs* of negotiation, performance, and principal place of business and at the time of

---

*Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 n.5 (2d Cir. 1997) ("In New York, 'the relevant analytical approach to choice of law in tort actions' is the 'interest analysis.' That is, 'the law of the jurisdiction having the greatest interest in the litigation will be applied.'").

[14] *See* Fed. R. Evid. 201; *Kramer v. Time Warner, Inc.*, 937 F.2d 767 , 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public documents required to be filed with the SEC"); *Marcus v. AT & T Corp.*, 938 F. Supp. 1158, 1164-65 (S.D.N.Y. 1996) (noting that on a motion to dismiss, the court may take judicial notice of public documents even if not included in or attached to complaint).

the alleged harm—requiring application of its laws despite, like here, the other party entering the disputed contract from its headquarters in New Jersey).

Nevada—the choice-of-law designated in the September 2018 Note—has *no connection whatsoever* to the parties or to the September 2018 Note.  None of the parties were formed under the laws of Nevada, nor did they maintain their respective places of business in Nevada.  And they did not negotiate or perform the September 2018 in Nevada.  Consequently, the enforcement of Nevada law would require this Court to enforce a choice-of-law provision that has no basis—let alone a reasonable one—and would violate a fundamental public policy of New York, a state with significantly greater interests.  *See, e.g., United States v. Moseley*, 980 F.3d 9, 21 (2d Cir. 2020) ("New York judicial opinions have consistently recognized the state's prohibition of excessive interest rates as embodying a *fundamental public policy*.") (emphasis added).  Accordingly, this Court should disregard the Nevada choice-of-law provision and, instead, apply New York law to the September 2018 Note.  *Accord N. Am. Bank, Ltd. v. Schulman*, 123 Misc. 2d 516, 520-21 (Westchester Cnty. 1984) (finding that, when usury is at issue, allowing a contract to be "governed by the laws of a jurisdiction which has apparently chosen not to outlaw usury at all … would, in this court's view, fly in the face of time-honored public policy").

**DarkPulse has pled facts sufficient to support its claim that the September 2018 Note is void *ab initio* under New York law.**  *First*, DarkPulse pled that the Defendants intended or knowingly charged a usurious rate of interest.  *See* FAC ¶¶ 30-36, 51, 119-120.  Here, the September 2018 Note contained a conversion discount, *id.* ¶¶ 51, 59, 64, 75-79, which is construed as interest, *see Adar Bays*, 37 N.Y.3d at 338.  Usurious intent is a question of fact where usury is not evident from the face of the loan.  *Id.* at 336.  Accordingly, DarkPulse has alleged the Defendants had usurious intent since it is a question of fact for the September 2018 Note.  *See Uni-*

*World Capital, L.P. v. PreferredFragrance, Inc.,* 2014 U.S. Dist. LEXIS 109919 (S.D.N.Y. 2014). *Second*, DarkPulse alleged that Defendants charged interest in excess of 25% a.p.r. because the value of the conversion discount—like the value of the commitment shares—caused the September 2018 Note to be usurious. *See* FAC ¶¶ 77-79. As *Adar Bays* noted: "our cases involving criminal usury show strict attention to additional fees exacted sometimes creatively through loan instruments . . . other forms of property, substituted for money, are equally germane to the calculation." 37 N.Y.3d at 336. Here, DarkPulse pled that the value of the conversion discount caused the interest rate charged under the September 2018 Note to be approximately 61%. *See* FAC ¶ 79.[15] *Third*, DarkPulse pled that the September 2018 Transaction was a loan. FAC ¶¶ 2, 7, 26-28, 70-79. DarkPulse thus properly alleged all three elements of usury that would, if true, render the September 2018 Transaction void *ab initio.*

## II.    THE AGREEMENTS INVOLVE A PROHIBITED TRANSACTION BECAUSE THEY REQUIRE AN UNREGISTERED SECURITIES DEALER TO PURCHASE A CONVERTIBLE SECURITY, IN VIOLATION OF § 15(A)

Section 29(b) of the Exchange Act (15 U.S.C. § 78cc) provides aggrieved parties the right to rescind contracts where the formation *or* performance violates the act or any rule or regulation thereunder, stating:

> **Every contract made in violation of any provision** of this chapter or of any rule or regulation thereunder, and **every contract … the performance of which involves the violation** of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract…

Exchange Act at § 29(b) (codified as 15 U.S.C. § 78cc(b)) (emphasis added).

### A.    THE PLAIN LANGUAGE OF § 29(b) STATES THAT CONTRACTS ARE VOIDABLE IF EITHER "MADE IN VIOLATION" OF THE EXCHANGE

---

[15] The value of the conversion discount is a question of fact requiring expert testimony. *See Adar Bays*, 37 N.Y.3d at 340. The interest calculation here includes the original issue discount, the stated 8% APR, and the value of the conversion discount.

### ACT OR IF "PERFORMANCE … INVOLVES A VIOLATION" OF THE EXCHANGE ACT

Congress could not have been clearer in drafting § 29(b), which requires the court to scrutinize *both* whether the "making" of the contract was unlawful, or whether the "performance" of the contract "involved a violation" of the Exchange Act.  "Thus, the express terms of a contract could be perfectly lawful, yet the 'making' of the contract might involve a violation of the Exchange Act or its rules or regulations."[16]  As noted by this District, a contract is void under § 29(b) "where the contract was made illegally or required illegal performance."  *Omega Overseas, Ltd. v. Griffith*, 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014).

The violations at issue can be characterized in either sense:  the Agreements were "made in violation" of Section 15(a) of the Exchange Act *and* require "performance" that would violate Section 15(a) of the Exchange Act.  Under Section 15(a):

> It shall be unlawful for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce **to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security** (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

Exchange Act at § 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)) (emphasis added).  Because the Notes at issue here are *themselves securities,* an unregistered securities dealer violates § 15(a) of the Exchange Act merely by entering into a contract to purchase the Notes (violation in formation), or where the contract requires the unregistered dealer to purchase a security.

1. **Unlike *Vystar*[17], the Agreements Here Involve Performance that Violates § 15(a) of the Exchange Act, Because the SPA Obligates FirstFire—an Unlicensed Securities Dealer— to Purchase a Convertible Security**

---

[16] Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened*, 48 Geo.Wash.L.Rev. 1, 21 (1979).
[17] *EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020)

Page one of the SPA (under both Agreements) unequivocally demonstrates that, for both the 2018 and 2021 Agreements, FirstFire's only real obligation was to *purchase a security*:

1. Purchase and Sale of Note.

   a. Purchase of Note. On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto.

SPAs at § 1.a., Ex. 1, 2.  Unlike the defendant in *Vystar* who was unable to "identify a provision in the contracts that obligates [plaintiff] to act as a broker dealer"[18] the contracts in this case clearly show that FirstFire's primary obligation under the SPAs is to purchase the Notes.  Because section 15(a) prohibits an unregistered securities dealer from "effecting a transaction in securities," Firstfire (an unregistered securities dealer) cannot perform the obligation in the SPAs without violating the Exchange Act.

Contrary to the apparent holdings of *Vystar* and *ExeLED*, a contract may be voided not just for requiring *performance* in violation of the Exchange Act, but also where the Exchange Act was violated *in the formation* of the contract.  FirstFire contends that "a Section 29(b) claim cannot lie where the contract is not illegal on its face," and that DarkPulse "fails to provide any compelling reason to deviate from the overwhelming case law consistently holding the same thing."  MOL at n.7.  FirstFire is wrong on both counts.  First, the "overwhelming case law" largely stems from two cases (*Vystar* and *ExeLED*[19]) where the court analyzed the contracts as if they were brokerage services contracts instead of *securities contracts*.  Next, rescission of contracts that are not "illegal on their face"—but violated the Exchange Act during their formation—is mandated not only by

---

[18] *Vystar* characterizes a 15(a) violation as "acting as a broker dealer," but the statute provides that it is unlawful for an unregistered dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security."
[19] *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018).

the plain language of section 29(b), but also by precedent of the U.S. Supreme Court, and the U.S. Court of Appeals for the Second Circuit.

### 2. Supreme Court Precedent Affirms Section 29(b) Rescission of Contracts "Made in Violation" of the Exchange Act

A best-known example of a contract rescinded under § 29(b) of the Exchange Act was based on violations occurring during *the formation* of the contract.  In *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970), a group of shareholders used § 29(b) to rescind a merger contract with another corporation.  The shareholders showed that the proxy-soliciting materials used to gain shareholder approval of the merger contained material misstatements, in violation of section 14(a) of the Exchange Act.  The Court affirmed rescission of the merger contract, holding that because the violating proxy solicitation was an "essential link in the accomplishment of the transaction," the linkage was sufficient to invoke the voidability provision of section 29(b).  *Mills*, 396 U.S. at 385.  The contract at issue in *Mills* was not illegal on its face and did not require performance that would violate the Exchange Act.

### 3. The Second Circuit Court of Appeals Affirms Section 29(b) Rescission of a Contract "Made in Violation" of the Exchange Act

In *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970) the court upheld a § 29(b) rescission of a bond purchase.  The bond contract was not illegal on its face, and required no performance that would violate the Exchange Act.  However, the broker violated Regulation T of the Exchange Act during the formation of the contract because the broker had permitted the customer to take out a bank loan to finance the purchase, which is prohibited under the Exchange Act.  *Pearlstein*, 429 F. 2d at 1140-41.  The court considered the violation to be "essential link" in the formation of the contract, and deemed it void.

### 4. The Formation of the Agreements Violated the Exchange Act Because—Under § 15(a)(1)—FirstFire Was Prohibited From Effecting the September 2018 and April 2021 Transactions

A securities purchase agreement executed by an unregistered securities dealer would be unlawful as made, because an unregistered securities dealer cannot lawfully purchase a security. The primary example of this scenario is found in *Eastside Church of Christ v. National Plan, Inc.*, 391 F.3d 357 (5th Cir. 1968).  *Eastside Church* is relevant to this case because, just as in this case, the contract was a securities contract.

In *Eastside Church*, Fifth Circuit granted rescission under § 29(b), where the plaintiff sought to rescind certain bonds (securities) that it had issued to defendant National Plan.  The church alleged that because National Plan was an unregistered broker dealer, National's purchase of the bond was unlawful under § 15(a)(1).  Upon review, the Fifth Circuit agreed that National was indeed "a broker and a dealer within the meaning of the Act," and hence, because it was not registered, it could not lawfully effect the bond transactions in that case.  The court held:

> Under § 15(a)(1), National was prohibited from effecting the transactions here involved and thus violated the Act by entering into those transactions.  Under the voiding provision of § 29(b), it is sufficient to show merely that the prohibited transactions occurred and that appellants were in the protected class.

*Eastside Church*, 391 F.3d at 362 (citations omitted).  Nothing on the face of the bond compelled the unregistered dealer to further transact in securities, or was otherwise illegal.  The bond was unlawful as made, because "National … violated the Act by entering into those transactions."  *Id.*

## III.   PLAINTIFF'S § 29(b) CLAIMS ARE NOT TIME-BARRED[20]

FirstFire begins its statute of limitations argument by intentionally misquoting section 29(b).  FirstFire argues that:  "Section 29(b) action must be brought within 'one year after the discovery that [a] sale or purchase involves [a violation of Section 15(a)] and within three years after such violation.' 15 U.S.C. § 78cc(b)."  MOL at 11.  In fact, § 29(b) unambiguously provides that the limitations period *only* applies "to paragraph (1) or (2) of subsection (c) of section 15 of

---

[20] FirstFire does not challenge the timeliness of claims against the April 2021 Note.

this title" (*i.e.,* § 15(c)), which pertains to broker-dealer fraud.  Nothing in section 29(b) indicates

a statute of limitations for § 15(a).  *See Lawrence v. Richman Grp. of Conn*., LLC, 407 F. Supp.

2d 385, 389 n.7 (D. Conn. 2005).

Defendants' untimeliness claim is based on *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970

F.2d 1030 (2d Cir. 1992), where the Second Circuit considered the limitations period for rescission

claims under § 215 of the IAA, a section widely recognized as very similar to § 29(b).  As with

§ 29(b), § 215 contains no limitations period; hence, the court looked to the analysis in *Lampf,*

*Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 498 U.S. 894 (1990), to determine whether the

one/three year limitations period should apply to § 215 rescission (based on, *inter alia,* the

defendant's failure to register as an investment advisor).  The *Kahn* plaintiffs argued that the

one/three-year limitations period only applied to claims involving fraud, making it inappropriate

for application to a non-fraud case such as failure to register as an investment advisor.  As support

for this argument, the *Kahn* plaintiffs noted that section 29(b) of the Exchange Act only applied

the one/three-year limitations period to claims under section 15(c), which pertains to broker fraud.

*Kahn* rejected this argument and applied the one/three-year limitations period, observing that both

the IAA and the Exchange Act were "enacted for the purpose of avoiding frauds," and noted

specifically that section 15 of the Exchange Act "is an antifraud provision."  *Khan,* 970 F.2d at

1038-39.

Further, the Sarbanes Oxley Act of 2002 changed the statute of limitation period for any

private right of action that "involves a claim of fraud, deceit, manipulation, or contrivance in

contravention of a regulatory requirement concerning the securities law…"  28 U.S.C. § 1658(b).

Given the Second Circuit's present designation of § 15 as "an antifraud provision," it stands to

reason that a claim under § 15(a) would be governed by the two-year/five year limitations period.

**FirstFire's Registration Status Would Not Have Alerted DarkPulse to the Violation.**
Defendants aver that the one-year clock started to run on the date the September 2018 Note was executed, because "through the exercise of reasonable diligence," DarkPulse "could have discovered the alleged violation in September 2018." MOL at 12. That makes no sense because *Defendants have consistently maintained—as they do even now—that they are not dealers and therefore are not required to register. See Auctus Fund, LLC, v. Players Network, Inc.*, 20-cv-10766, ECF No. 84 (Order) at \*18 (D. Mass. Dec. 10, 2021) (stating that the results of a BrokerCheck search "would not have put the [issuer] on notice of any violation because the [noteholder's] misrepresentations made the [issuer] believe that [the noteholder] was *not* a dealer and thus not required to register as such.") (filed herewith as **Exhibit 2**). *See also Busher v. Barry*, 2019 U.S. Dist. LEXIS 172754, at \*18-19 (S.D.N.Y. 2019).

**The Rescission Claim is Timely As to the 2018 Agreement Under the Continuing Violation Doctrine.** Even if the Court were to apply the 1-year/3-year rule here, DarkPulse's claims would be timely under the continuing violation doctrine, which is "aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time." *SEC v. Almagarby,* 479 F. Supp. 3d 1266, 1271 (S.D. Fla. 2020).

***Kahn v. Kohlberg*'s Continuing Violation Analysis is Not Applicable to this Case.**
Although *Kahn* declined to apply the continuing violation doctrine, the contract at issue in *Kahn* (investment advisor services) is substantially different from the Agreements in this case. As an unregistered dealer, Defendants first violated § 15(a) in September 2018, when it used the channels of interstate commerce to effect securities transactions beginning with the September 2018 Transaction. Unlike the contract in *Kahn*, Firstfire committed a fresh, independent violation of

§ 15(a) each time it *effected a transaction in DarkPulse securities, or induced or attempted to induce the purchase or sale of a DarkPulse security*. *See UFCW Local 1500 Pension Fund v. Mayer*, 2016 U.S. Dist. LEXIS 145091, at *36 (N.D. Cal. 2016).  Although Firstfire could have refrained from further violations of the Exchange Act and simply taken cash as repayment of the Note, they did not do so. *See Ingenito v. Bermec Corporation,* 376 F. Supp. 1154, 1184 (S.D.N.Y. 1974).  Each conversion and sale constituted an independent act and inflicted a new and accumulating injury to DarkPulse and its shareholders. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019).

On February 18, 2021, Defendants acquired 220,000,000 shares of DarkPulse stock via a Notice of Conversion under the September 2018 Note.  Thus, the operative date is February 18, 2021, the last violation in a chain of unlawful acts that reaches back to, and was enabled by, the 2018 Agreements.  This action was commenced on December 31, 2021 and it is therefore timely.

Firstfire's claim that it does not qualify as a dealer because Darkpulse has not yet offered adequate proof of stock sales is meritless. FirstFire: is not registered as a dealer with the SEC, FAC ¶ 21; engages in a large number of transactions, FAC ¶¶ 51,52; purchases directly from issuers like a dealer, not a trader, *id.*; profits *primarily* by reaping the difference between the low price it pays for the stock and the market price, *id.*; engages in underwriting activity, *id.*, ¶ 62; has a regular clientele of issuers from which it would purchase securities, *id.*, and never holds the stock but quickly resells the stock to obtain the underwriting spread, *id.* ¶¶ 35, 36.  Accordingly, DarkPulse's claim that FirstFire is an unregistered securities dealer is plausible.

## IV.    DARKPULSE HAS PLED A PLAUSIBLE RICO CLAIM (COUNT IV)

### A.    DarkPulse Has Alleged A RICO "Person" Distinct From the Enterprise

Defendants inexplicably argue that DarkPulse has failed to allege a RICO "person" distinct from the enterprise, when that most basic requirement has clearly been met.  *See* MOL at 17-18.

In paragraph 117 of the Complaint, DarkPulse alleges: "Fireman is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):  an individual or entity capable of holding a legal or beneficial interest in property."  *See also* allegations incorporated in Count IV, including ¶ 23, Section IV.G. "*Fireman Controlled FirstFire in its Convertible Debt Securities Business*" (¶¶ 87-89), and ¶ 111.  Further, there is no conflation of the Defendants, as FirstFire is separately alleged to be the RICO "enterprise" (which Defendants acknowledge, *see* MOL at 17).  FAC ¶¶ 9-10, 70-71, 87-89, 119-121.  Accordingly, Defendants' 'distinctiveness' argument lacks merit.

### B.    DarkPulse Has Alleged that FirstFire Collected Upon an Unlawful Debt and is Engaged in the Business of Collecting Unlawful Debts [21]

Defendants have selectively read the Complaint.  They ignore that DarkPulse did, in fact, allege that Defendants:  (1) collected the unlawful debt imposed by the Notes (*see* FAC ¶¶ 32 (alleging that between June 2019 and February 2021, Defendants collected the unlawful debt imposed by the September 2018 Note through 18 separate conversions), 48-49 (alleging FirstFire collected the unlawful debt imposed by the April 2021 via a conversion), and (2) are engaged in the business of making usurious loans.  *See* FAC ¶¶ 1, 12, 52, 54, 66-68 (alleging Defendants more than 200 substantially similar loans transactions with at least 89 different microcap companies).  *See also* MOL at 23 (conceding that "[DarkPulse] appears aware of the publicly available information regarding other transactions [in which FirstFire has engaged]").  Indeed, DarkPulse has made *specific non-conclusory* allegations that FirstFire has made loans to other issuers that violate New York's usury laws based on publicly available factual information regarding other transactions FirstFire has entered into (*see* FirstFire Transaction List) that makes the inference of culpability plausible.  *See* FAC ¶ 71.  The Complaint also alleges that "FirstFire has used the same

---

[21] As discussed above, DarkPulse has properly alleged that New York law applies to both Notes, and, under such law, both Notes are void *ab initio.*

business model—promising easy cash to microcap companies in need of working capital and then fleecing them for millions of shares of stock—since its formation in 2015." *Id.* ¶ 67 (citing examples of loans each imposing interest in excess of 69% (DigitalTown, Inc., Ionix Technology, Inc., and Visium Technologies, Inc.)).  Finally, the Complaint alleges that "FirstFire is in the business of making usurious loans," *id.* ¶ 72, and that it has "committed multiple related acts of unlawful debt collection from a plethora of other desperate public companies throughout the country[,]" *id.* ¶ 120.

The allegations meet the "facial plausibility" standard, as sufficient facts have been pled to allow the Court to draw a reasonable inference that Defendants are liable for the misconduct alleged.  *See Arista Records, LLC v. Doe 3*, 604 F3d 110, 120 (2d Cir. 2010) (citing *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009)); *Chechele v. Dundon*, 850 Fed. Appx. 75, 76 (2d Cir. 2021) ("For purposes of a motion to dismiss, the complaint includes 'any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'") (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).[22]   Thus, DarkPulse has pled that Defendants are

---

[22] Indeed, the FirstFire Transaction list contains factual material demonstrating that ***Defendants have engaged in unlawful debt collection no fewer than 204 times.*** *See Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity].").  The FirstFire Transaction List, which makes reference to information published on the SEC's publicly-accessible EDGAR database, shows Defendants have entered into numerous convertible note transactions that are governed by New York law (and, thus, subject to New York's usury laws) that contain substantial fixed conversion discounts that render the loan transaction criminally usurious, for example: (1) Accelerated Pharma, Inc., Form S-1/A EX-10.28 (filed June 20, 2017), *available at* https://bit.ly/3xuZeRr (convertible promissory note with 2% stated interest rate, a 50% fixed conversion discount, and a three-month repayment period, resulting in an estimated true interest rate greater than 69.97% APR); (2) Petrone Worldwide, Inc., Form 10-K EX-10 (filed Sept. 9, 2016), *available at* https://bit.ly/3xBBURQ (convertible promissory note for 7% stated interest rate, a 50% fixed conversion discount, and an eight-month  repayment period, resulting in an estimated true interest rate greater than 77.66% APR); (3) Indoor Harvest Corp., Form 8-K EX-10.2 (filed Dec. 16, 2016) and Form 8-K EX 10.2 (filed Oct. 21, 2016), *available at* https://bit.ly/3HsRRP7 and https://bit.ly/3MZYnht (two separate convertible promissory notes, each with a 8% stated interest rate, 45% fixed conversion discount, and six-month repayment period, resulting in an estimated true interest rate *for each loan* in excess of 75.24% APR); (4) Ubiquity, Inc., Form 8-K EX-4.1 (filed March 27, 2015), *available at* https://bit.ly/3b6uX3D (convertible promissory note for 1% stated interest rate, a 45% fixed conversion discount, and a six-month repayment period, resulting in an estimated true interest rate greater than 64.48% APR); (5) NuLife Sciences, Inc., Form 8-K EX-4.3 (filed Sept. 28, 2017), *available at* https://bit.ly/3zPS2BY (convertible promissory note for 5% stated interest rate, a 35% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater

engaged "in the business" of making usurious loans, and of collecting unlawful debts. *See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).

## V.    PLAINTIFF'S STATE LAW CLAIMS (COUNTS V-VI) ARE PROPERLY PLED

Defendants' arguments concerning Plaintiff's state claims are flawed.  As to Plaintiff's unjust enrichment claim, the Complaint contains ample allegations—which must be accepted as true—that Defendants are unregistered dealers who acted (and continue to act) in violation of Section 15(a) of the Exchange Act.  Although Plaintiff cannot seek relief from a Section 15(a) violation, equity heavily supports the proposition that Defendants should be barred from benefiting from their unlawful acts (*i.e.*, unlawful securities transactions and debt collection) at Plaintiff's expense.  *See, e.g., McCall v. Frampton*, 81 A.D.2d 607, 608-09 (2d Dept. 1981) ("[W]here the agreement consists in part of an unlawful objective and in part of lawful objectives, under certain circumstances the illegality may be severed and the legal components enforced," with the final resolution look towards "prevents of unjust enrichment").  Indeed, the authorities relied on by Defendants, *see* MOL at 24-25, and the legal theories supporting their conclusion, are entirely based on the existence of *a valid and enforceable* contract—*which does not exist in this case.*

Likewise, Defendants cite authority that actually supports Plaintiff's constructive trust claim.  Defendants cannot overcome Plaintiff's allegations—which must be accepted as true—that

---

than 70.63% APR); (6) Touchpoint Group Holdings, Inc., Form 10-Q EX-10.2 (filed June 30, 2020), *available at* https://bit.ly/3O1fwsk (convertible promissory note for 10% stated interest rate, a 35% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater than 61.54% APR); (7) Bioxytran, Inc., Form 8-K EX-10.40 (filed Nov. 25, 2019), *available at* https://bit.ly/3MVm5v3 (convertible promissory note for 4% stated interest rate, a 30% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater than 60% APR); (8) Major League Football, Inc., Form 8-K EX-10.4 (filed Aug. 9, 2021), *available at* https://bit.ly/3tFgjqJ (convertible promissory note for 12% stated interest rate, a 30% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater than 70% APR); (9) Clean Energy Technologies, Inc., Form 8-K EX-10.120  (filed Oct. 19, 2020), *available at* https://bit.ly/3OkRXdH (convertible promissory note for 8% stated interest rate, a 30% fixed conversion discount, and a ten-month repayment period, resulting in an estimated true interest rate greater than 70.92% APR); (10) Global Wholehealth Partners Corp., Form 10-K EX-4 (filed Sept. 27, 2021), *available at* https://bit.ly/3xVwYsG (convertible promissory note for 12% stated interest rate, a 30% fixed conversion discount, and a ten-month repayment period, resulting in an estimated true interest rate greater than 81.40% APR).

support that FirstFirst is an unregistered dealer, engaged in the collection of unlawful debts.  Thus, Defendants have engaged in unconscionable conduct—acting in violation of federal law—and Plaintiff is entitled to an equitable remedy that puts in escrow all wrongfully, and unlawfully obtained monies to which Defendants are not entitled.  *See Cent. Sch. Dist. No. 3 of Cortlandt v. Town of Cortlandt*, 49 A.D.2d 899, 901 (2d Dept. 1975) (finding "equity *requires* us to declare a constructive trust" over *unlawfully obtained monies*, even when certain claimants could not recover the illegally levied taxes); *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("When one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.").

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss the First Amended Complaint should be denied in its entirety.

DATED: June 16, 2022

Respectfully submitted,

**THE BASILE LAW FIRM, P.C.**

By: _/s / Gustave P. Passanante_
Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:    (631) 498-0748
Email: gus@thebasilelawfirm.com
            eric@thebasilelawfirm.com

*Attorneys for Plaintiff DarkPulse, Inc.*