UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AUCTUS FUND, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 20-10766-LTS |
| | ) |
| PLAYERS NETWORK, INC. | ) |
| MARK BRADLEY | ) |
| | ) |
| Defendants. | ) |
| | ) |

ORDER ON MOTIONS TO DISMISS (DOC. NOS. 35, 67)

December 10, 2021

SOROKIN, J.

Plaintiff Auctus Fund, LLC ("Auctus")[1] brought this case alleging various causes of

action arising from a contractual agreement it entered into with Defendants Player Network, Inc.[2]

("Players Network") and Players Network's CEO, Mark Bradley.[3]  The Defendants[4] have since

moved  for Judgment on the Pleadings (Doc. No. 35)[5], asserting that the contract upon which

Count I is based is void under the Securities Exchange Act of 1934 ("the Act") and Counts II–

VII fail to plausibly state claims upon which relief can be granted.  Defendants have also brought

---

[1] Auctus is a Delaware LLC with a primary place of business in Boston, Massachusetts.  Doc. No. 1 ¶ 4.

[2] Players Network is a Nevada corporation with a primary place of business in Nevada.  Doc. No. 1 ¶ 5.

[3] Mark Bradley is the Chairman of the Board of Directors, CEO, and CFO of Players Network and a resident of Nevada.  Doc. No. 1 ¶ 6.

[4] For the sake of consistency, the Court refers to Players Network and Mark Bradley as "the Defendants" and Auctus as "the Plaintiff" throughout this Order including when it addresses the counterclaims.

[5] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

several Counterclaims, which the Plaintiff has moved to dismiss.  Doc. No. 67.  The Court addresses both Motions to Dismiss here.

For the reasons explained below, the Defendants' Motion (Doc. No. 35) is DENIED as to Counts I and III and ALLOWED as to Counts II, IV, V, VI, and VII WITHOUT PREJUDICE.  The Plaintiff's Motion to Dismiss is DENIED as to Counterclaims I, II, and IV, and ALLOWED as to Counterclaims III and V.

I.     LEGAL STANDARD

A motion for judgment on the pleadings is "treated much like a 12(b)(6) motion to dismiss."  Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  "There is, of course," a "modest difference between Rule 12(c) and Rule 12(b)(6) motions," in that the former "implicates the pleadings as a whole."  Aponte-Torres v. Univ. Of Puerto Rico, 445 F.3d 50, 54-55 (1st Cir. 2006).

To survive a motion to dismiss under Rule 12(b)(6) and, by extension a 12(c) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The complaint must also "set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"  Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  Courts must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff."  Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007).

II.     DEFENDANTS MOTION TO DISMISS (DOC. NO. 35)

   A.    Facts

   The events giving rise to the Plaintiff's complaint are as follows.  Auctus entered into two

transactions with Players Network whereby Auctus loaned Players Network a total of $630,000[6]

in return for promissory notes that could, upon Auctus's request, be converted into discounted

Players Network stock.  See Doc. Nos. 1-3, 1-5.  The documents underlying each of these

transactions include a Securities Purchase Agreement ("SPA") and a corresponding Convertible

Promissory Note ("note").[7]  See Doc. Nos. 1-2, 1-3, 1-4, 1-5.  The parties effectuated the first set

of transaction documents with a principal amount of $250,000 on November 6, 2018 (Doc. No. 1

¶ 10), and the second set of transaction documents with a principal amount of $380,000 on

March 22, 2019 (Doc. No. 1 ¶ 11).  Mark Bradley signed and executed two Confessions of

Judgement simultaneous with these transactions stating the amounts owed and interest rates

applicable to both transactions.  Doc. Nos. 1-6, 1-7.

   The SPAs govern Auctus's purchase of the notes from Players Network.  See Doc. Nos.

1-2, 1-4.  According to their terms, the notes are "convertible into shares of common stock of

[Players Network]."  Doc. Nos. 1-2 at 2, 1-4 at 2.  The notes, inter alia, set forth "events of

default" (Doc. Nos. 1-3 at 14, 1-5 at 14) and detail the process by which Auctus can exercise its

conversion right (Doc. Nos. 1-3 at 3-13, 1-5 at 3-12).  Under the terms of the notes, Auctus has

the right to convert all or part of the unpaid loan principal into Players Network common stock.

Doc. Nos. 1-3 at 3, 1-5 at 3.  The total number of shares of common stock that Auctus is entitled

to receive is calculated by dividing the total amount of principal (plus interest) that Auctus elects

---

[6] The $630,000 total is divided between two separate notes: the first for $250,000 and the second
for $380,000.  See Doc. Nos. 1-3, 1-5.

[7] Together, the note and SPA are referred to by the Court as the "transaction documents."

to convert by the "conversion price."  Doc. Nos. 1-3 at 3-4, 1-5 at 3-4.  The conversion price is 70% (under the first note) and 65% (under the second note) of the average of the three lowest trading prices of the common stock during the ten-day (under the first note) or fifteen-day period (under the second note) prior to the conversion date.  Doc. Nos. 1-3 at 4, 1-5 at 4.  Put simply, the notes grant Auctus an "unconditional" right to receive discounted Players Network common stock in lieu of cash repayment.  Doc. Nos. 1-3 at 7, 1-5 at 7.  Auctus exercised its conversion rights under the notes by converting and liquidating Players Network common stock.  See Doc. No. 1-9 at 2 ("[Auctus] is converting and liquidating pursuant to the terms of the Documents and will continue to do so until the balances due to it under the Notes are paid in full.").

On October 14, 2019, Auctus's lawyer sent Players Network's Directors a letter informing them that Players Network had defaulted on the first note and outlining several breaches of its terms.  Doc. No. 1-8 at 2-3.  The Defendants subsequently defaulted on the second note as well.  Doc. No. 1 ¶¶ 14-19.  Players Network defaulted on the notes by, inter alia, failing to: (1) file required periodic filing with the SEC, (2) reserve common stock for Auctus upon its exercise of the conversion right, and (3) pay the principal and interest under the notes when due.  Doc. No. 1 ¶¶ 18-19.  Auctus alleges that, pursuant to the terms of the Confession of Judgment, its damages under both notes include the principal due, plus the interest on the principal calculated at a default interest rate of twenty-four percent per year, plus penalties applicable under the notes, plus costs and attorney's fees.  Doc. No. 1 ¶¶ 21-27.  Auctus also points out that Players Network's defaults triggered a 50% increase in the amount owed under the first note and 35% increase under the second note.  Doc. No. 1 ¶¶ 28-30.  In all, Auctus alleges damages in the amount of $415,352.14 under the first note and $590,815.29 under the second note for a total of $1,006,167.43.  Doc. No. 1 ¶¶ 29-32; Doc. No. 1-1.

B. <u>Count I: Breach of Contract</u>

    1.    *Governing Law*

The parties agree the Nevada law governs the breach of contract claim pursuant to the choice of law clause contained in the transaction documents.[8]  Generally, federal courts apply the choice of law rules of the forum state when "confronting a choice of law question in a diversity case."  Trent Partners & Assocs., Inc. v. Digital Equip. Corp., 120 F. Supp. 2d 84, 94-95 (D. Mass. 1999).  Therefore, Massachusetts choice of law rules apply here.  Massachusetts courts typically enforce contractual choice-of-law provisions unless unreasonable.  Mowbray v. Waste Mgmt. Holdings, Inc., 189 F.R.D. 194, 199 n.3 (D. Mass. 1999), aff'd, 208 F.3d 288 (1st Cir. 2000).  Because neither party claims that the choice-of-law provision is unreasonable, the Court applies Nevada law to Count I.

    2.    *The Breach of Contract Claim*

Nevada courts employ the familiar elements of breach of contract claims.  Branch Banking & Tr. Co. v. Westar Properties, No. 215CV00574MMDPAL, 2017 WL 1179942, at *3 (D. Nev. Mar. 29, 2017).  The Defendants, however, do not materially dispute that they defaulted on Auctus's loan thereby breaching the terms of the transaction documents.  Doc. No. 36 at 11-12.  Rather, they argue that their contract with Auctus is void pursuant to Section 29(b) of the Securities Exchange Act.  Id.  Section 29(b) voids "every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the

---

[8] See First Note, Doc. No. 1-3 at 20 ("This Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws."); Second Note, Doc. No. 1-5 at 20 (same); First SPA. Doc. No. 1-2 at 21 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada without regard to the principles of conflicts of laws."); Second SPA, Doc. No. 1-4 at 22 (same).

performance of which involves the violation of . . . any provision of this chapter or any rule or regulation thereunder."  15 U.S.C.A. § 78cc(b) (West).  "Section 29(b) does not immediately void the contract at issue; instead the contract is 'voidable at the option of the innocent party.'" EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC, 6 F.4th 50, 59 (1st Cir. 2021) (quoting Mills v. Electric Auto-Lite Co., 396 U.S. 375, 387-88, (1970)).  A party seeking to void a contract under 29(b) must establish "(1) that it is in contractual privity with the opposing party, (2) that it is within the class of people that the securities acts were designed to protect, and (3) that the contract involved a prohibited Act."  Id.  The parties agree that they are in contractual privity, but dispute whether prongs two and three are satisfied.

The prohibited conduct underlying the Defendants' 29(b) defense is the Plaintiff's alleged violation of Section 15(a) of the Act, which prohibits brokers and dealers who are unregistered in accordance with the Act from "mak[ing] use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security."[9]  15 U.S.C.A. § 78o(a)(1) (West).  The Defendants

---

[9] The Act defines a security as:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C.A. § 78c(a)(10) (West).

contend that "the Notes are prohibited securities transactions because they call for [Auctus,] an unregistered dealer[,] to engage in multiple securities transactions."  Doc. No. 36 at 16. Specifically, the Notes give Auctus an absolute right to obtain payment by converting and liquidating Players Network common stock.  Id. at 18.

The broker-dealer registration requirement is the "keystone of the entire system of broker-dealer regulation."  Roth v. SEC, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (citation omitted). By triggering "standards of professional conduct, financial responsibility requirements, recordkeeping requirements, and supervisory obligations," broker-dealer registration protects prospective purchasers of securities.  Id.

Of course, Auctus is only subject to the registration requirement if it is in fact a "dealer" under the terms of the Act.  The Act defines a dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C.A. § 78c(a)(5)(A) (West).  The definition carves out an exception, often referred to as the "trader exception," for those "that buy[] or sell[] securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.  15 U.S.C.A. § 78c(a)(5)(B) (West).

As another district court recently noted, the dealer "definition has not been subject to extensive judicial interpretation."  SEC v. River N. Equity LLC, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019).  The courts that have expounded on the parameters of the term have interpreted it to "connote s certain regularity of participation in securities transactions at key points in the chain of distribution."  Massachusetts Fin. Servs., Inc. v. Sec. Inv. Prot. Corp., 411 F. Supp. 411, 415 (D. Mass.), aff'd, 545 F.2d 754 (1st Cir. 1976).  In SEC v. Big Apple Consulting USA Inc., the

7

11th Circuit assessed whether the defendant was a dealer. 783 F.3d 786 (11th Cir. 2015).[10] The court reasoned that the "centerpiece" of the definition is its reference to underlined engaging in the business of buying and selling securities underlined for profit. Id. at 809. "While evidence of merely some profits from buying and selling securities may alone be inconclusive proof," a "business model predicated on the purchase and sale of securities" is indicative of dealer status. Id. The court went on to find that the defendant was a dealer in light of its business model, which was based entirely on securities transactions and the profits earned therefrom. Id. Courts also consider the "sheer volume" of securities transactions as being indicative of dealer status. SEC v. Almagarby, No. 17-62255-CIV, 2020 WL 4783405, at *1273 (S.D. Fla. Aug. 17, 2020).

In support of their assertion that the Plaintiff qualifies as a dealer under the Act, the Defendants rely on a "transactions list" allegedly indicating that Auctus engaged in the purchase and sale of securities from "at least 160 microcap issuers." Doc. No. 36 at 19; Doc. No. 25-1. Assuming without deciding that the Court can rely on the transaction list,[11] this evidence does

---

[10] Though the 11th Circuit interpreted the definition of "dealer" under the Securities Act of 1933, it noted that the definitions of dealer in the 1933 Act and the Exchange Act are "very similar." 783 F.3d at 809 n.11. Other courts have relied on Big Apple's analysis when interpreting the dealer definition under the Exchange Act. See SEC v. Almagarby, No. 17-62255-CIV, 2020 WL 4783405, at *1272 (S.D. Fla. Aug. 17, 2020).

[11] The "transactions list" (Doc. No. 25-1) was compiled by the Defendants based on data from the SEC's EDGAR database. Doc. No. 50 at 9. The Defendants request that the Court take judicial notice of this document pursuant to Federal Rule of Evidence 201, which allows courts to take notice of records "not subject to reasonable dispute." Fed. R. Evid. 201(b). The Court's review of the present 12(c) motion is limited to "documents the authenticity of which are not disputed by the parties; [] official public records; [] documents central to plaintiffs' claim; or [] documents sufficiently referred to in the complaint. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The Plaintiff objects to the Defendants' reliance on the transaction list, describing it as "self-made exhibit" and disputing its authenticity. Doc. No. 41 at 10-11. The Defendants characterize the data underlying the transaction list as a public record derived from the SEC EDGAR disclosures and appropriately presented as a summary of a voluminous writing pursuant to Federal Rule of Evidence 1006. Doc. No. 50 at 9-10. Nowhere do the Defendants state that they have complied with Rule 1006's requirement that the proponent "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time

not warrant dismissing the Plaintiff's breach of contract claim.  Determining whether an entity is sufficiently engaged in the business of buying and selling securities to render it a dealer is "a necessarily [] fact-based inquiry best reserved for summary judgment or trial." River N. Equity LLC, 415 F. Supp. 3d at 858; see also SEC v. Keener, No. 1:20-CV-21254, 2020 WL 4736205, at *4 (S.D. Fla. Aug. 14, 2020) ("[T]he Court need not ultimately resolve at this stage whether Defendant is a dealer or a trader—a legal determination better suited for a complete factual record."); SEC v. Fierro, No. CV202104MASDEA, 2020 WL 7481773, at *3 (D.N.J. Dec. 18, 2020) (same).  As explained by the court in Big Apple, 783 F.3d at 809, the dealer analysis necessitates an examination of the entity's business model and profit sources.  Even assuming the transaction list could be fairly considered by the Court, it is not sufficient, without more evidence pertaining to Auctus's business model and the relative frequency of its participation in securities transactions, to establish, as a matter of law at this stage of the proceedings, the Plaintiff's dealer status.  Because the Defendants have not proven "prohibited conduct" under 29(b), their motion to dismiss Plaintiff's breach of contract claim is DENIED.  The Court need not address the other prongs of the 29(b) analysis here because the Defendant's motion to dismiss Count I necessarily fails absent sufficient evidence of prohibited conduct.[12]

---

and place." Fed. R. Evid. 1006.  In light of the dispute regarding the transaction list's authenticity as well as the Defendants' failure comply with the Rule 1006 disclosure requirements, it is questionable whether the Defendants can properly rely on the transaction list in the face of the Plaintiff's objections.  As discussed below, even assuming the Court can fairly consider transaction list it is insufficient to establish Plaintiff's dealer status.

[12] The Plaintiff's Opposition includes as an exhibit the report of James R. Burns, who opines on the dealer definition.  Doc. No. 41-1.  This expert report is better considered by the Court at the summary judgment phase and not in its evaluation of the present Motions to Dismiss.  Watterson, 987 F.2d at 3.

C.  Count III: Unjust Enrichment[13]

Count III is a claim for unjust enrichment, which includes the following elements: "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) an acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." Takiguchi v. MRI Int'l, Inc., 47 F. Supp. 3d 1100, 1119 (D. Nev. 2014). Plaintiff has adequately alleged that the Defendants were unjustly enriched upon defaulting on Auctus's loans.  Though the Defendants correctly point out that Nevada law does not recognize claims for unjust enrichment when there is an express written agreement, one of the Defendants' affirmative defenses is that the transaction documents are void pursuant to Section 29(b).  Doc. No. 62 at 45.  Thus, Count III can proceed in the event that the Court finds the underlying transaction documents void.  See Magma Holding, Inc. v. Au-Yeung, No. 220CV00406RFBBNW, 2020 WL 2025365, at *6 (D. Nev. Apr. 26, 2020), appeal dismissed sub nom. by Meta Lab, Inc. v. Au-Yeung, No. 20-15938, 2021 WL 1984871 (9th Cir. Jan. 7, 2021) (allowing an unjust enrichment claim to proceed despite the existence of an express written agreement when the complaint claimed that the underlying contract was void and unenforceable).  The Motion to Dismiss is DENIED as to Count III.

D.  Counts II-VII: Plaintiff's Other Claims

In Counts II through VII, the Plaintiff brings claims for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II), Breach of Fiduciary Duty (Count IV), Fraud and

---

[13] With respect to the Plaintiff's remaining claims, neither party has engaged in a choice of law analysis.  Both parties cite Nevada law, and this Court follows suit.  As for Count VII, which is brought under a Massachusetts statute, the Court's dismissal is based on the pleading requirements of the Federal Rules of Civil Procedure, which are independent of state law.

Deceit (Count V), Negligent Misrepresentation (Count VI), and violations of Massachusetts General Law 93(A) (Count VII). As discussed in detail below, these claims are based on conclusory allegations, none of which are sufficient to state a plausible basis for relief. Therefore, the Defendant's Motion to Dismiss Counts II, IV, V, VI, and VII is ALLOWED.

Under Federal Rule of Civil Procedure 9(b), fraud claims must state with particularity "the circumstances constituting fraud." "Rule 9(b)'s heightened pleading standard applies to state law fraud claims asserted in federal court." N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009). To satisfy the heightened pleading standard, Plaintiff must "specify the who, what, where, and when of the allegedly false or fraudulent representation." Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

The parties agree that the Rule 9(b) standard applies to Plaintiff's claims for fraud (Count V) and negligent misrepresentation (Count VI). Doc. No. 36 at 25; Doc. No. 41 at 37. The Court also finds that Rule 9(b)'s heightened pleading requirements govern Plaintiff's 93A claim (Count VII) because its "core allegations effectively charge fraud." Cardinale, 567 F.3d at 15; see Martin v. Mead Johnson Nutrition Co., No. 09-cv-11609-NMG, 2010 WL 3928707, at *3 (D. Mass. Sept. 30, 2010) ("A claim under Chapter 93A that involves fraud is subject to the heightened pleading requirement."). In support of its 93A claim, the Plaintiff alleges that the Defendants "fraudulently" induced their investment in Players Network by, inter alia, "conceal[ing]" relevant "financial and operational details." Doc. No. 1 ¶ 67. Because the

Plaintiff's 93A claim is "directly linked to the fraud allegations," Rule 9(b) applies.[14]  Hayduk v.

Lanna, 775 F.2d 441, 443 (1st Cir. 1985).

In support of its fraud-based claims, the Plaintiff contends that "the Defendants made

false representations of material facts, and/or omitted material facts with a duty of disclosure,

knowing or having reason to know of their falsity" and "negligently provided the Plaintiff with

erroneous and misleading information, and negligently omitted material information with a duty

to disclose, to the Plaintiff's detriment."  Doc. No. 1 ¶¶ 60, 63.  Yet, the complaint is devoid of

any factual bases for these claims.  See Newton v. Uniwest Fin. Corp., 802 F. Supp. 361, 368 (D.

Nev. 1990), aff'd, 967 F.2d 340 (9th Cir. 1992) (setting forth the elements of a fraud claim,

which include, inter alia, "(1) a false representation made by defendant, (2) knowledge or belief

on the part of the defendant that the representation is false—or, that he has not a sufficient basis

of information to make it; and (3) an intention to induce plaintiff to act or to refrain from acting

in reliance on the misrepresentation"); Hall CA-NV, LLC v. Ladera Dev. LLC, No.

318CV00124RCJVPC, 2018 WL 4094858, at *3 (D. Nev. Aug. 27, 2018) (reciting the elements

of negligent misrepresentation under Nevada law, which include, inter alia, "(1) a false

representation by the defendant; (2) made in the course of the defendant's business or in any

---

[14] Defendants contend that the Court should assess its fraud-based claims using the relaxed Rule
9(b) standard applicable when "the particular facts are primarily within the defendant's
knowledge, and [] the plaintiff cannot be expected to have ready access to them."  Doc. No. 41 at
37 (citing Rocker v. KPMG LLP, 148 P.3d 703, 709 (Nev. 2006), abrogated on other grounds by
Buzz Stew, LLC v. City of N. Las Vegas, 181 P.3d 670 (Nev. 2008)).  Yet, the Plaintiff has not
stated why the facts underlying this claim are "are peculiarly within the defendant[s'] knowledge
or are readily obtainable by [them]." Id. at 709 (quoting Neubronner v. Milken, 6 F.3d 666, 672
(9th Cir. 1993)).  In addition, the Plaintiff's allegations do not even satisfy the relaxed standard,
which allows plaintiffs to make allegations based on information and belief, but still requires that
they put forth "a factual basis for the belief." Id.

action in which he has a pecuniary interest, (3) for the guidance of others in their business transactions").

These claims fail because they do not specify why the Defendants knew or should have known that their representations were false, and in what way they were false. For the same reasons, the 93A claim, which requires evidence of an unfair or deceptive act, cannot survive. See Framingham Auto Sales, Inc. v. Workers' Credit Union, 671 N.E.2d 963, 965 (Mass. App. Ct. 1996) ("[M]ere breach of a legal obligation under commercial law, without more, does not amount to an unfair or deceptive act under [M.]G.L. c. 93A."). The Plaintiff's "threadbare recitals of the elements of" its fraud, negligent misrepresentation, and 93A claims cannot satisfy its burden at the motion to dismiss phase, let alone the heightened Rule 9(b) standard. Iqbal, 556 U.S. at 678. At base, the Plaintiff's complaint suggests nothing more than "that Auctus lent money to a high-risk business, that then failed." See Auctus Fund, LLC v. First Columbia Gold Corp., No. 17-cv-10543-ADB, 2019 WL 1316736, at *2 (D. Mass. Mar. 21, 2019).

The Plaintiff's remaining claims (Counts II and IV) fail for reasons similar to those discussed above, namely that the conclusory allegations contained therein do not satisfy the elements of breach of the covenant of good faith and fair dealing or fiduciary duty. First, the Plaintiff has not specified what particular actions by Defendants constitute a breach of the covenant of good faith and fair dealing. See Eagle SPE NV 1, Inc. v. S. Highlands Dev. Corp., 36 F. Supp. 3d 981, 990 (D. Nev. 2014) (citation omitted) (dismissing a breach of the covenant of good faith and fair dealing claim when the "Plaintiff has not alleged that the Borrowers and Guarantors performed, let alone performed in a manner unfaithful to the contract's purpose. In fact, Plaintiff alleges just the opposite—that the Borrowers and the Guarantors acted unfaithful to the contract's purpose 'by failing to comply with the terms and obligations of the Note and the

13

Guarantee'"). As for the breach of fiduciary duty claim, the Plaintiff broadly alleges that "Mark Bradley . . . acted in the interest of the corporation only," "repeatedly entered into debt obligations that [PNTV] did not intend to satisfy," and "made baseless threats [to Auctus] concerning usury." Doc. No. 41 at 36. Once again, the Plaintiff does not elaborate on why Mark Bradley's actions satisfy the element of breach, nor on what basis they infer that Bradley intentionally entered into agreements knowing that he would violate them. See Klein v. Freedom Strategic Partners, LLC, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009) ("In Nevada, a claim for breach of fiduciary duty has three elements: (1) existence of a fiduciary duty; (2) breach of the duty; and (3) the breach proximately caused the damages."). Accordingly, the Motion to Dismiss is ALLOWED as to Counts II, IV, V, VI, and VII.

### III.  PLAINTIFF'S MOTION TO DISMISS (DOC. NO. 67)

#### A.  Facts

The Defendants bring several counterclaims arising from the following alleged facts.

Players Network is a diversified holding company engaged in the recreational and medical marijuana business. Doc. No. 62 at 20 ¶ 8. In the wake of the "tremendous growth" in the marijuana business sector during 2017, Auctus approached the Defendants about providing financing for Players Network through convertible securities. Id. at 20 ¶ 8. The parties thereafter entered into the transaction documents described above on November 6, 2018, and March 22, 2019. Id. at 21-22 ¶¶ 16-19.

Auctus exercised its rights under the Notes on four occasions, converting Players Network's debt into stock. Id. at 23 ¶¶ 26-28. Upon conversion, Auctus sold the Players Network shares into the public market. Id. at 24 ¶ 35. Defendants allege that these conversions "provided [Auctus] with 26,000,000 newly issued Player's Network securities, with a

corresponding estimated total open market value of $238,400.00." <u>Id.</u> at 23 ¶ 27. Due to the discounted nature of the conversions, however, only $57,320 of Defendants' debt was satisfied. <u>Id.</u> at 23-24 ¶ 29.

The Defendants allege that Auctus's transaction with Players Network was typical of its larger business model, which is premised on "loan[ing] public companies' money using convertible promissory notes . . . and convert[ing] the debt obligated under the notes, at a discount, into newly issued shares of stock and then sell[ing] those shares into the public market for a profit." <u>Id.</u> at 20 ¶ 12, 26 ¶ 50. According to the Defendants, Auctus entered into agreements similar to its transactions with Players Network with 160 other public companies. <u>Id.</u> at 24-25 ¶ 37-38. Defendants also allege that Auctus engaged in the process of converting and selling securities without registering as a dealer with the SEC or the Commonwealth of Massachusetts in violation of state and federal securities laws. <u>Id.</u> at 19 ¶ 4-5, 25 ¶ 39.

The Defendants contend that Auctus was aware of its obligation to register as a dealer. <u>See id.</u> at 28-29 ¶ 67. Nevertheless, Auctus "intentionally misrepresented though documentation that it lawfully entered into the Transaction Documents and, therefore, misrepresented its obligation to register pursuant to federal and state registration requirements." <u>Id.</u> Specifically, Defendants point to a language in the SPAs, which, they argue, implies that Auctus was in compliance with registration requirements:

> The Buyer [Auctus] understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company [Players Network] is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgements and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire securities.

15

Doc. Nos. 1-2 at 3, 1-4 at 3.  In reliance on the SPAs, Defendants "believe[d] that Auctus was not a dealer because it wasn't required to register as such."  Doc. No. 62 at 30 ¶ 80.

According to the Defendants, Auctus also misrepresented its intention to sell Players Network stock upon conversion by stating in the SPAs that "as of the date hereof, the Buyer is purchasing the Note and the shares of Common Stock issuable upon conversion of or otherwise pursuant to the Note . . . for its own account and not with a present view towards the public sale or distribution thereof[.]"[15]  Doc. Nos. 1-2 at 3, 1-4 at 3.  Auctus's misrepresentation in this regard harmed the Defendants because Players Network "needed financing from lenders who did not have the intention of selling or distributing shares it would acquire through other securities," activity that would "negatively affect Players Network's share price."  Doc. No. 62 at 30-31 ¶¶ 82-86.

Finally, Defendants contend that Auctus manipulated Players Network's stock price by taking short positions against the stock shortly before exercising its conversion right under the notes.  Id. at 34 ¶ 110.  Auctus's short position would have the effect of "depressing" Players Network's stock price at which point Auctus would exercise its conversion right and "acquire more stock due to the conversion feature in the Notes being based on current market prices."  Id. 34 ¶ 111.

B.  Counterclaim I: Declaratory Judgment to Void and Rescind the Transaction Documents under Section 29(b) of the Exchange Act and for Violation of Section 15(a)(1)

It the first counterclaim, the Defendants seek to void and rescind the transactions pursuant to Section 29(b) because they violate Section 15(a) of the Act, which requires dealers to

---

[15] The Plaintiff points out that the SPAs make no representation regarding the length of time that Auctus will hold the securities and clearly state that "by making the representations herein, the Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time[.]"  Doc. Nos. 1-2 at 3, 1-4 at 3.

register with the SEC.  Id. at 36-38.  For the reasons discussed below, the Court DENIES the Plaintiff's Motion to Dismiss Counterclaim I.

1. *Applicability of the heightened pleading requirements*

As an initial matter, the Court addresses the applicability of heightened pleading requirements to Defendants' first counterclaim.  The Plaintiff contends that the pleading requirements imposed by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") apply to Counterclaim I because it is based "on the same fraudulent narrative" that undergirds its Section 10(b) claim.  Doc. No. 68 at 22; see Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 265 (D. Mass. 2013) ("Securities fraud cases charging violations of Section 10(b) of the Securities Exchange Act are [] subject to the heightened pleading standards of Fed.R.Civ.P. 9(b) and the PSLRA.").  In addition to the Rule 9(b) requirements explained previously, the PSLRA states that the complaint must "specify each statement alleged to have been misleading," "the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 30 (1st Cir. 2012) (quoting 15 U.S.C.A. § 78u-4(b)(1)-(b)(2) (West)).  Though the First Circuit has not addressed the applicability of Rule 9(b) or the PLSRA to Section 29(b) claims based on violations of Section 15(a)(1), the Court assumes without deciding that the heightened pleading requirement applies.  For the reasons set forth below, the Defendants have sufficiently plead Counterclaim I under both standards of review.

2. *The Statute of Limitations*

Next, The Plaintiff contends that Counterclaim I should be dismissed because it is barred by the applicable statute of limitations.  Doc. No. 68 at 24.  Though there is no express statute of limitations contained in Section 29(b), other courts have applied the statute of limitations

contained in other provisions of the Act, which require lawsuits to be brought one year after

discovery and three years after the violation.  See, e.g., Weiss v. Altholtz, No. 10 C 02609, 2011

WL 4538459, at *2 (N.D. Ill. Sept. 29, 2011) ("Courts in this district have held that the 1–and–

3–year statutory periods apply to Section 29(b) claims arising from violations of Section

15(a).").  Even if the Plaintiff is correct in its contention that a one-year statute of limitations

applies to the counterclaim, an issue that this Circuit has not yet addressed, it has not established

when the Defendants should have discovered the violation.  The Plaintiff argues that "the

Defendants easily could have discovered that the Plaintiff was not registered as a broker-dealer

by consulting the BrokerCheck® service . . . at the time they entered into the transactions in

November 2018 and March 2019."  Doc. No. 68 at 25.  Such a search would not have put the

Defendants on notice of any violation because the Plaintiff's alleged misrepresentations made the

Defendants believe that Auctus was not a dealer and thus not required to register as such.  Doc.

No. 62 at 30 ¶ 80.  The Plaintiff has therefore not met their burden of establishing that the statute

of limitations has run.  See Young v. Lepone, 305 F.3d 1, 9 (1st Cir. 2002) ("If . . . a defendant

seeks to truncate the limitations period by claiming that the plaintiff had advance notice of the

fraud through the incidence of storm warnings, then the defendant bears the initial burden of

establishing the existence of such warnings.").

3.  *Prohibited Conduct*

As discussed previously, to survive the Plaintiff's motion to dismiss their Section 29(b)

claim, the Defendants must sufficiently allege the following three elements: (1) that it is in

contractual privity with the opposing party, (2) that it is within the class of people that the

securities acts were designed to protect, and (3) that the contract involved a prohibited Act.  See

supra at 6.

18

In support of the third prong of the analysis, the Defendants argue that the Plaintiff
engaged in prohibited conduct by "purchasing and selling securities as a regular part of its
business without being registered as a dealer." Doc. No. 62 at 36 ¶ 129. More specifically, the
Defendants contend that Auctus was aware, through its Managing Director Lou Posner, of its
obligation to register as a dealer, but failed to do so. Id. at 27-28 ¶¶ 58-62. Turning first to the
question of dealer status, the Defendants have adequately alleged that the Plaintiff is a dealer.
The Defendants allege that Auctus entered into "nearly identical" transactions with 160 other
companies (id at 24-25 ¶ 37, these transactions were demonstrative of Auctus's business model
(id. at 20 ¶ 12), and these transactions generated substantial profits for Auctus (id. at 24 ¶ 36).
See Big Apple Consulting USA, Inc., 783 F.3d at 809 (explaining that the hallmark of dealer
status is engaging in the business of buying and selling securities for profit).

The Plaintiff asserts that the prohibited conduct prong is not satisfied because the
transaction documents do not, by their terms, compel Auctus to act like a dealer by converting
and liquidating Players Network stock. Doc. No. 68 at 26. The Plaintiff points to several cases
from outside this district holding that similar transactions were not voidable under Section 29(b)
because "nothing in the Note or the SPA 'explicitly require[s the lender] to act as a broker.'" LG
Cap. Funding, LLC v. ExeLED Holdings, Inc., No. 17 CIV. 4006 (RJS), 2018 WL 6547160, at
*5 (S.D.N.Y. Sept. 28, 2018) (quoting Found. Ventures, LLC v. F2G, LTD., No. 08-cv-10066
(PKL), 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010)); see also Ema Fin., LLC v. Vystar
Corp., 336 F.R.D. 75 (S.D.N.Y. 2020) (reaching the same conclusion). In other words, Auctus
was able to perform under the transaction documents without acting like a dealer simply by
refraining to exercise its conversion right.

19

The Plaintiff's argument fails for two reasons. First, while it is true that some circuits require that the violation be "inseparable from the performance of the contract" to justify recission under Section 29(b), see Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 204 (3d Cir. 2006) (citation omitted), the First Circuit does not appear to take this requirement so literally.  In its recent Edgepoint decision, the First Circuit noted that "the mere fact that it is possible to legally perform a contract does not mean the contract was not made in violation of securities law." 6 F.4th 50 at 61.  Moreover, "a contract may be voidable under Section 29(b) if its performance in fact involved a violation of the Exchange Act." Id. at 59.  The Defendants have clearly alleged that Auctus acted as a dealer by converting and liquidating Players Network stock to obtain payment.  Doc. No. 62 at 39 ¶¶ 39-41.  Thus, the Defendants have satisfied their burden at this phase of the proceedings with respect to the prohibited conduct prong.

4. *Protected Class*

Finally, the Plaintiff argues that the Defendants have not satisfied the third prong of the analysis, which requires them to prove that they were "unwilling innocent part[ies] to the contract." Buffalo Forge Co. v. Ogden Corp., 555 F. Supp. 892, 906 (W.D.N.Y. 1983) (citation omitted), aff'd, 717 F.2d 757 (2d Cir. 1983).  Though the First Circuit has not clearly defined the contours of the "unwilling and innocent" standard, the Plaintiff points to non-binding case law in which the party seeking recission was deemed complicit in the contract it later sought to void because, at the time of contracting, it was aware of all of the relevant facts underlying the claim. Id.  The Plaintiff contends that the Defendants were similarly aware of the relevant facts because Players Network "willingly issued PNTV shares to the Plaintiff via conversions pursuant to the Agreements." Doc. No. 68 at 29.  Though the Defendants may have willingly issued shares to Auctus, they were unaware of a critical fact that the Plaintiff does not address, namely that

20

Auctus entered into the transaction as an unregistered dealer. Thus, the Plaintiff's argument fails, and the Defendants have plausibly alleged that they were unwilling and innocent parties to the agreement.[16] Accordingly, the Motion to Dismiss Counterclaim I is DENIED.

C. Counterclaim II: Declaratory Judgment to Void and Rescind the Transaction Documents for Violation of the Massachusetts Uniform Securities Act

Both parties agree that Massachusetts courts look to analogous federal law when interpreting its Uniform Securities Act. Mass. Gen. Laws Ann. ch. 110A, § 415 (West) ("This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation."). Therefore, the Plaintiff's Motion to Dismiss the Counterclaim II is DENIED for the same reasons discussed with respect to Counterclaim II.

D. Counterclaim III: Declaratory Judgment to Void the Transaction Documents for Violation of Massachusetts Criminal Usury Law

In their third counterclaim, the Defendants allege that the Plaintiff violated the Massachusetts Criminal Usury law, which prohibits loans that charge a rate of interest greater than 20% per year. Mass. Gen. Laws Ann. ch. 271, § 49(a) (West). For the reasons discussed below, the Plaintiff's Motion to Dismiss Counterclaim III is ALLOWED.

---

[16] The Plaintiff also argues that the Defendants have failed to establish that they were harmed by the transaction because they have not repaid their full debt. Doc. Nos. 41 at 24-25, 68 at 29. First, it is doubtful that "harm" is an essential element of the "unwilling and innocent" standard. The Plaintiffs point to a Southern District of New York case denying a party's motion to amend its counterclaims in order to state a recission claim because, inter alia, "[counterclaim plaintiff] is not remotely prejudiced from its inability to amend, particularly where [it] has not pointed to any harm it suffered because [counterclaim defendant] is not a registered dealer." EMA Fin., LLC v. NFusz, Inc., 509 F. Supp. 3d 18, 36 (S.D.N.Y. 2020). This language does not imply that "harm" is an essential element of the unwilling and innocent standard. Moreover, the Defendants do make specific allegations about how they were harmed by the contract. See Doc. No. 62 at 30-31 ¶ 82-87.

Though both parties agree that Nevada law applies to some of the claims at issue here due to the choice of law provision contained in the contract, see supra at 5, and that Nevada has no usury law, see Doc. No. 70 at 16, the Defendants argue that Massachusetts law applies to this claim because the state has a strong public policy against usury.  Id. at 14-16; see Auctus Fund, LLC v. Sunstock, Inc., 405 F. Supp. 3d 218, 227 (D. Mass. 2019) (quoting Oxford Glob. Res., LLC v. Hernandez, 106 N.E. 556, 564 (Mass. 2018)) ("Where contracting parties 'have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy.'").

The Defendants have failed to establish a basis to apply Massachusetts law to this claim. In support of their argument that usury is contrary to Massachusetts public policy, Defendants direct the Court's attention to Kaur v. World Business Lenders, which applied Massachusetts law despite the conflicting choice of law provision in the contract at issue because "the usury cap represents a 'fundamental policy' of Massachusetts."  440 F. Supp. 3d 111, 117 (D. Mass. 2020). As the Plaintiffs note, however, Kaur is inapposite because it involved a usury claim brought by consumers who were residents of Massachusetts.  Id.  Here, the Defendants are residents of Nevada.  Doc. No. 62 at 2 ¶ 6, 19 ¶ 1.  In fact, a case authored by the same Judge as Kaur acknowledged that "Massachusetts does not seem to have a strong public policy promoting or prohibiting Auctus from arranging these deals with entities outside of the Commonwealth." Sunstock, Inc., 405 F. Supp. 3d 218, 230 (D. Mass. 2019).  In the face of these holdings, the Nevada Defendants, who per their allegations took a loan to operate a business in Nevada under transaction documents selecting Nevada law as governing the agreements, have failed to plausibly allege a basis to subject the conduct of the parties to the Massachusetts Usury statute.

22

E.  Counterclaim IV: Declaratory Judgment to Void the Transaction Documents for

Violation of Nev. Rev. Stat. §§ 604A.0703, 604A.400

The Defendants allege in their fourth counterclaim that the Plaintiff violated Nevada's

high interest loan law, which requires lenders who make loans that charge an annual percentage

rate of more than 40% to be licensed with the State.  Doc. No. 62 at 40-42 ¶¶ 158-160; Nev. Rev.

Stat. §§ 604A.0703, 604A.400.  The Plaintiffs contend that the high interest loan statute is

inapplicable here in light of case law acknowledging that Nevada has no usury law. See EMA

Fin., LLC v. NFusz, Inc., 444 F. Supp. 3d 530, 539 (S.D.N.Y. 2020) (explaining that Nevada

does not have a statute that precludes high interest rates).  According to the Plaintiffs, the

legislative intent behind the statute was to regulate the payday loan industry.  State Dep't of Bus.

& Indus., Fin. Institutions Div. v. Dollar Loan Ctr., LLC, 412 P.3d 30, 32 (Nev. 2018).  The

Plaintiffs do not dispute that the loans at issue charge an interest rate of more than 40%.

Because (1) the Plaintiffs have failed to direct the Court's attention to any case law

holding that the high interest loan statute is inapplicable to situations such as this one and (2) the

loans at issue plausibly fall within the statute, the Motion to Dismiss Counterclaim IV is

DENIED.

F.  Fifth Counterclaim: Violations of Section 10(b) and Rule 10b-5 of the Exchange Act and

Massachusetts Uniform Securities Act for Securities Fraud and Stock Manipulation

Finally, the Defendants' fifth counterclaim alleges that the Plaintiff violated federal and

state securities law by manipulating Players Network stock and fraudulently misrepresenting that

it could lawfully enter into the transactions.  Doc. No. 62 at 41-43 ¶¶ 167-184.  In response, the

Plaintiff argues that Defendants lack standing to bring this claim because they have not alleged

that they purchased or sold securities in connection with the alleged misrepresentation or

manipulation.  Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C., 223 F. Supp. 2d 435, 446 (S.D.N.Y. 2001) (citing Blue Chip Stamps, 421 U.S. 723, 730-31 (1975)) ("Under Section 10(b) of the 1934 Act or Rule 10–b, a plaintiff must be a purchaser or seller of securities.").  The Defendants oppose the Plaintiff's Motion to Dismiss Counterclaim V, but do not address this standing argument.  The Court views the Defendants' silence on this point as a concession that it lacks standing and, therefore, the Motion to Dismiss Counterclaim V is ALLOWED.

IV.  CONCLUSION

Accordingly, the Defendants' Motion to Dismiss (Doc. No. 35) is DENIED as to Count I and Count III.  The Motion is ALLOWED as to Counts II, IV, V, VI, and VII WITHOUT PREJUDICE.

The Plaintiff's' Motion to Dismiss (Doc. No. 67) is DENIED as to Counterclaims I, II, and IV, and ALLOWED as to Counterclaims III and V WITHOUT PREJUDICE.

Both parties have sought leave to amend in the event that the Court dismisses one or more of their claims.  Neither party has attached their proposed amended complaint nor provided an explanation of the amendments they would make in such circumstances.  Thus, these generic requests are DENIED.  If the parties wish to amend, they may file an appropriate motion explaining the reasons why leave should be granted and attaching their proposed amended complaints.  The Clerk shall schedule a Rule 16 conference.

SO ORDERED.

 /s/ Leo T. Sorokin                             
Leo T. Sorokin
United States District Judge